## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **KNOWLEDGEPLEX, INC.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** 1:07-CV-02315-RMU |
| | ) | |
| | ) | |
| | ) | |
| **METONYMY, INC.** | ) | |
| **D/B/A PLACEBASE** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
METONYMY, INC. D/B/A PLACEBASE'S MOTION TO DISMISS**

Dated: February 25, 2008

Kenneth W. Brothers (D.C. Bar No. 441113)
Rebecca L. Barbisch  (D.C. Bar No. 500641)
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C.  20006
(202) 420-2200

*Attorneys for Metonymy, Inc. d/b/a Placebase*

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION ............................................................................. 1

II.   KPI'S INCOMPLETE ALLEGATIONS ........................................... 2

III.  GOVERNING LEGAL PRINCIPLES ............................................... 4

      A.  California Substantive Law Applies .......................................... 4

      B.  This Court May Investigate The Jurisdictional Basis Of The Complaint .................... 6

      C.  This Court May Investigate The Assertion Of Venue In The Complaint .................... 6

      D.  This Court May Consider Documents Incorporated Or Referenced In
          The Complaint, Matters Of Which The Court May Take Judicial Notice, And
          Matters Of Public Record In Deciding A Motion To Dismiss .................... 6

      E.  KPI's Complaint Must Provide More Than Labels And Conclusions ........................ 7

IV.   ARGUMENT ..................................................................................... 8

      A.  This Court Does Not Have Personal Jurisdiction Over Placebase ............................. 8

          1.  This Court lacks general jurisdiction over Placebase ............................................. 8

          2.  This Court does not have specific jurisdiction over Placebase under D.C.'s
              long-arm statute ................................................................................................... 9

      B.  KPI's Complaint Should Be Dismissed For Improper Venue Pursuant To
          Fed. R. Civ. P. 12(b)(3) .......................................................................................... 9

          1.  Venue for copyright actions is governed by 28 U.S.C. § 1400(a) ........................ 9

          2.  The only contract to which Placebase is a party also requires venue in
              California ............................................................................................................ 10

      C.  The Complaint Should Be Dismissed Under Rule 12(b)(7) For Failure To
          Join A Party Under Rule 19 ................................................................................... 11

          1.  The obligations and rights of Vinq will necessarily be litigated in the case
              at bar .................................................................................................................. 12

          2.  KPI and Placebase have a substantial risk of incurring double, multiple, or
              otherwise inconsistent obligations ...................................................................... 13

DSMDB-2399457

D.  KPI's Copyright Claim Should Be Dismissed Pursuant To
Fed. R. Civ. P 12(b)(1) For Lack Of Subject Matter Jurisdiction ............................. 14

1.  The scope of KPI's registered copyright is limited to the code it
deposited ............................................................................................... 15

2.  KPI's copyright infringement claim is limited to alleged infringement of the
source code it deposited ...................................................................... 17

3.  KPI cannot expand the scope of its registration to salvage its copyright
claim...................................................................................................... 18

E.  KPI's Trade Secret Misappropriation Claims Should Be Dismissed For
Failure To State A Claim Upon Which Relief Can Be Granted ................................ 20

1.  The Complaint fails to state a claim for statutory trade secret
misappropriation for which relief may be granted................................ 20

2.  The Complaint fails to state a claim for common law trade secret
misappropriation for which relief may be granted................................ 22

V.    CONCLUSION ............................................................................................. 23

DSMDB-2399457

# TABLE OF AUTHORITIES

Page(s)

Cases

* *Accuimage Diagnostics Corp. v. Terarecon, Inc.*,
  260 F. Supp. 2d 941 (N.D. Cal. 2003) .............................................................20, 22

*ADT Security Services, Inc. v. Apex Alarm, LLC*,
  430 F. Supp. 2d 1199 (D. Colo. 2006).................................................................11

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007)..................................................................................7, 20

* *Capital Bank Int'l Ltd. v. Citigroup, Inc.*,
  276 F. Supp. 2d 72 (D.D.C. 2003) (Urbina, J.)....................................................8, 9

*Catalyst & Chem. Servs., Inc. v. Global Ground Support*,
  350 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................21

*Commerce Consultants Int'l, Inc. v. Vetrerie Riunite, S.p.A.*,
  867 F.2d 697 (D.C. Cir. 1989) ..........................................................................10

*Corsi v. Eagle Publishing, Inc.*,
  No. 1:07-CV-02004-ESH, 2008 WL 239581 (D.D.C. Jan. 30, 2008)....................12

* *Creations Unlimited, Inc. v. McCain*,
  112 F.3d 814 (5th Cir. 1997) ......................................................................17, 20

*D'Onofrio v. SFX Sports Group, Inc.*,
  No. 06-0687 (JDB), __ F. Supp. 2d __, 2008 WL 423035 (D.D.C. Feb. 18, 2008)..............2, 6

* *Data Gen. Corp. v. Grumman Sys. Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994)......................................................................16, 19

*Egilman v. Keller & Heckman, LLP.*,
  401 F. Supp. 2d 105 (D.D.C. 2005) .....................................................................7

* *Geoscan, Inc. of Texas v. Geotrace Techs., Inc.*,
  226 F.3d 387 (5th Cir. 2000) ............................................................................19

* *Global Discount Travel Servs, LLC v. Trans World Airlines, Inc.*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ...............................................................13, 14

*Himmelman v. MCI Communications Corp.*,
  104 F. Supp. 2d 1 (D.D.C. 2000) (Urbina, J.)....................................................7, 16

iv

*Hunter v. Johanns*,
    517 F. Supp. 2d 340 (D.D.C. 2007) ....................................................................6

\* *Johnson v. Gordon*,
    409 F.3d 12 (1st Cir. 2005) ............................................................................17

\* *Kroger v. Legalbill.com*,
    436 F. Supp. 2d 97 (D.D.C. 2006) ............................................................4, 5, 6

*Marra v. Papandreou*,
    216 F.3d 1119 (D.C. Cir. 2000) .....................................................................11

*Miller v. The Andrew Jergens Co.*,
    No. CV-98-1945, 1998 WL 1473633 (C.D. Cal. May, 20 1998) ....................20, 21

*Nix v. Hoke*,
    139 F. Supp. 2d 125 (D.D.C. 2001) ..................................................................4

*Papasan v. Allain*,
    478 U.S. 265 (1986).................................................................................7, 21

\* *Trans-Bay Engineers & Builders, Inc. v. Hills*,
    551 F.2d 370 (D.C. Cir. 1976) .......................................................................11

\* *Vincit Enterprises, Inc. v. Zimmerman*,
    No. 1:06-CV-57, Slip Copy, 2006 WL 1319515 (E.D. Tenn. May 12, 2006) ........21

\* *Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp.*,
    210 F. Supp. 2d 147 (E.D.N.Y. 2002) .............................................................17

*Zella v. E.W. Scripps Co.*,
    No. CV 06-7055 ABC, __ F. Supp. 2d __,
    2007 WL 4643888 (C.D. Cal. Dec. 18, 2007) .....................................................7

<u>Statutes</u>

17 U.S.C. § 408.............................................................................................19

17 U.S.C. § 411.................................................................................14, 17, 20

28 U.S.C. § 1391...........................................................................................9, 10

28 U.S.C. § 1400.......................................................................................1, 9, 10

Cal. Civ. Code § 3426.1......................................................................................21

DSMDB-2399457

D.C. Code § 13-423 ..........................................................................................................9

D.C. Code § 36-401 ........................................................................................................21


## Other Authorities

5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 .............................7, 21

37 C.F.R. § 202.20 ...............................................................................................15, 16, 17

Fed. R. Civ. P. 11 ..............................................................................................................2

Fed. R. Civ. P 12 ..............................................................................1, 6, 7, 9, 11, 14, 20, 21

Fed. R. Civ. P. 19 ...............................................................................................12, 13, 14

Fed. R. Evid. 201 ........................................................................................................7, 16

Restatement (Second) of Conflict of Laws § 145 ............................................................6

Restatement (Second) of Conflict of Laws § 188 ............................................................5

DSMDB-2399457

## I.    INTRODUCTION

The Complaint of KnowledgePlex, Inc. ("KPI") should be dismissed for five reasons.

First, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(2) because this Court does not have personal jurisdiction over defendant Metonymy, Inc. d/b/a/ Placebase ("Placebase"). In the Complaint, KPI (which is based in California) acknowledges that Placebase is a California corporation and has its principal place of business in Los Angeles. KPI has alleged no facts to show that Placebase had sufficient minimum contacts with the District of Columbia ("D.C.") to be subject to this Court's jurisdiction.

Second, for similar reasons, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(3) because venue is improper. KPI should have brought this action in California, where all of the parties are located and do business. The sole basis for federal subject matter jurisdiction is KPI's copyright claim. 28 U.S.C. § 1400(a) governs venue for copyright claims and provides for venue "in the district in which the defendant or his agent resides or may be found" – the Central District of California. Further, the only relevant contract at issue to which Placebase is a party requires that all actions be brought in California pursuant to a forum selection clause.

Third, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(7) because KPI refuses to join an indispensable party in this action under Rule 19. The Complaint does not allege that KPI and Placebase entered into a contract with each other – instead, KPI's alleged predecessor-in-interest contracted with a California company named Vinq, LLC ("Vinq"). Vinq, in turn, subcontracted with Placebase. Because Vinq's rights and obligations are at issue, and the rights and obligations of KPI and Placebase cannot be adjudicated without Vinq, Vinq is an indispensable party.

1

Fourth, the copyright registration that forms the basis of KPI's copyright claim is fatally defective and cannot, as a matter of law, serve as the basis for KPI's broad cause of action. KPI's publicly-available copyright registration deposit, which KPI incorporated by reference in its Complaint, is limited to twenty-six pages of computer source code. As a matter of law, KPI's copyright claim must be limited to the actual code deposited. KPI cannot assert consistent with Fed. R. Civ. P. 11(b) that the deposited code is the source code required to operate DataPlace.

Fifth, KPI's trade secret claim fails as a matter of law. KPI has failed to identify *any* trade secrets, either by category or subject matter. Before a party can make out a trade secret claim, it must show that it had trade secrets. KPI also has failed to allege that Placebase obtained KPI's (unidentified) trade secrets by improper means. Finally, KPI's theory of "common law" trade secret misappropriation simply is not a cognizable cause of action.

## II.     KPI'S INCOMPLETE ALLEGATIONS

KPI's Complaint is deliberately ambiguous and incomplete. While Placebase acknowledges that generally, when challenged under Rule 12(b)(6), the factual allegations in the Complaint are deemed to be true, this is not the case when faced with a jurisdictional challenge. "Instead, the court may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts." *D'Onofrio v. SFX Sports Group, Inc.*, No. 06-0687 (JDB), __ F. Supp. 2d __, 2008 WL 423035 at *2 (D.D.C. Feb. 18, 2008) (internal quotations omitted). (Ex. A.) Because KPI's Complaint makes no factual allegations to support this Court's personal jurisdiction over Placebase, there is no need for a lack-of-jurisdiction declaration from Placebase.

KPI concedes that Placebase is organized under the laws of and maintains a principal place of business in California. (Compl. ¶ 2.) KPI's Complaint does not allege that Placebase

2

carried on any business activity in the District of Columbia.  Likewise, KPI fails to allege that a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.  With the exception of a single reference to a D.C. law (Compl. ¶ 54), *there is not a single mention* of the District of Columbia in the entire Complaint.

KPI alleges that it is the owner of United States Copyright Registration No. TXu 1-570-162 and attached its Certificate of Registration to the Complaint.  (Compl. ¶ 26.)  KPI broadly characterizes this Registration as evidence of its alleged registered copyright "for the code required to operate DataPlace."  (Compl. ¶ 26.)  KPI's deposit of source code, which is part of the Registration, consists of forty-two pages of source code with diagonal redactions.  (Ex. B[1] (certified copy of KPI's deposit for Copyright Registration No. TXu 1-570-162 ).)  A comparison of the first sixteen pages and the last sixteen pages of the source code in Exhibit A shows that they are identical.  Thus, KPI's deposit consists of only twenty-six pages of source code.

Although KPI has included a breach of contract claim against Placebase, KPI does not allege that there was a contract between KPI and Placebase.  Instead, KPI alleges that it contracted with Vinq, the prime contractor.  (Compl. ¶¶ 13-14.)  Vinq, in turn, subcontracted with Placebase.  (Compl. ¶ 15-16.)  KPI claims that it is a third-party beneficiary to that contract.  (Compl. ¶ 17.)  The Vinq-Placebase contract that forms the basis of KPI's contract claim is attached hereto as Exhibit C.  The contract contains a choice-of-law provision requiring the application of California law and a forum selection clause requiring all related actions to be brought in a court in Santa Clara County, California.  (Ex. C at 11.)

---

[1]    Page numbers have been added to Exhibit B by Placebase for ease of reference.

DSMDB-2399457

KPI alleges that Vinq (but not Placebase) is party to an agreement that "required Vinq to treat the project as confidential." (Compl. ¶ 14.)  KPI does not allege that this confidentiality provision in the prime contract with Vinq flowed down to the subcontract between Vinq and Placebase.  KPI further alleges that the Vinq agreement assured "the proprietary nature of the system to KnowledgePlex," even though Placebase was not a party to that agreement. (Compl. ¶ 14.)

The general allegations of the Complaint use the phrase "trade secret" only once, and that use is only as a legal conclusion. (Compl. ¶ 36.)  KPI does not identify, either generally or by category, its alleged "trade secrets."  KPI also never alleged that it took any steps to protect any alleged trade secrets from Placebase.  KPI does not allege that Placebase acquired any "trade secrets" through improper methods, such as espionage, hiring of KPI's employees, or any other illegal or improper means.  Rather, KPI admits that "Vinq, Placebase, and KnowledgePlex worked together and *freely shared ideas and information* to further the development process." (Compl. ¶ 19.)

## III.      GOVERNING LEGAL PRINCIPLES

### A.      California Substantive Law Applies

"When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." *Nix v. Hoke*, 139 F. Supp. 2d 125, 131 (D.D.C. 2001).  Generally, under D.C. choice-of-law principals, "a court must apply the law of the state that has the most significant relationship to the parties and the transaction." *Kroger v. Legalbill.com*, 436 F. Supp. 2d 97, 103 (D.D.C. 2006) (internal quotation omitted).  However, "parties to a contract may specify the law they wish to govern, as part of their freedom to contract, as long as there is some reasonable relationship with the state

4

specified." *Kroger*, 436 F. Supp. 2d at 103. Under D.C. choice-of-law principals, this Court should apply California substantive law for three reasons.

First, as explained above, the only contract to which Placebase is a party requires the application of California law. This contract between Vinq and Placebase, to which KPI claims it is a third-party beneficiary (Compl. ¶ 17), states, "[t]his Agreement shall be governed by the internal laws of the State of California exclusive of its conflicts-of-law principles." (Ex. C at 11.) KPI, Placebase, and Vinq are all located in California, the alleged causes of action accrued in California, and any alleged damages occurred in California. Because there is a reasonable relationship to California, this Court should enforce the contracts choice-of-law clause.

Second, California is the state with the "most significant relationship" to the dispute. *Kroger*, 436 F. Supp. 2d at 104. "Five factors influence the determination [of the state with the "most significant relationship"]: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance of the contract, (4) the location of the subject matter of the contract and (5) the place of incorporation and the place of business of the parties." *Id.*; Restatement (Second) of Conflict of Laws § 188(2). The Complaint along with the Vinq-Placebase contract make clear that the events giving rise to the litigation substantially occurred in California. The contract was between California companies. Placebase's performance (and alleged wrongful acts) took place in California. Vinq and Placebase are organized under the laws of California where Vinq, Placebase, and KPI have their principal places of business.[2] As such, California law should govern any disputes arising from the Vinq-Placebase contract.

Third, with respect to claims of injury, consideration is given to: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the

---

[2]     KPI is organized under the laws of Delaware. (Compl. ¶ 1)

5

domicile, residence, nationality, place of incorporation, and place of business of the parties; and
(4) the place where the relationship is centered." *Kroger*, 436 F. Supp. 2d at 104; Restatement
(Second) of Conflict of Laws § 145(2). Any alleged injury and any conduct causing any alleged
injury occurred in California where KPI and Placebase are located. KPI has not made any
allegations to the contrary. California substantive law should govern KPI's claims.

### B.    This Court May Investigate The Jurisdictional Basis Of The Complaint

When a Court's jurisdiction is challenged in a Rule 12(b) motion, the Court may go
beyond allegations contained in the complaint and examine the allegations upon which
jurisdiction depends. "When considering personal jurisdiction, the Court need not treat all of the
plaintiff's allegations as true. Instead, the court may receive and weigh affidavits and other
relevant matter to assist in determining the jurisdictional facts." *D'Onofrio*, 2008 WL 423035 at
*2 (internal quotation omitted). (Ex. A.)

### C.    This Court May Investigate The Assertion Of Venue In The Complaint

Like jurisdiction, when a Court's venue is challenged in a Rule 12(b) motion, the
Court may go beyond the allegations contained in the complaint and challenge the facts upon
which venue depends. The burden of establishing venue is proper lays with the plaintiff. *Hunter
v. Johanns*, 517 F. Supp. 2d 340, 343 (D.D.C. 2007). While "the court accepts the plaintiff's
well-pled factual allegations regarding venue as true, draws all reasonable inferences from those
allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor," a
defendant may present facts to defeat a plaintiff's assertion of venue. *Id.*

### D.    This Court May Consider Documents Incorporated Or Referenced In
The Complaint, Matters Of Which The Court May Take Judicial Notice,
And Matters Of Public Record In Deciding A Motion To Dismiss

In evaluating a Fed. R. Civ. P. 12(b)(6) motion to dismiss, "[t]he court may consider
the allegations of the complaint, documents attached to or specifically referred to in the

6

complaint, and matters of public record." *Himmelman v. MCI Communications Corp.*, 104 F. Supp. 2d 1, 3 (D.D.C. 2000) (Urbina, J.); *Egilman v. Keller & Heckman, LLP.*, 401 F. Supp. 2d 105, 109 (D.D.C. 2005). Additionally, "it is proper for the court to consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201." *Zella v. E.W. Scripps Co.*, No. CV 06-7055 ABC, __ F. Supp. 2d __, 2007 WL 4643888, *3 (C.D. Cal. 2007). (Ex. D.)

KPI's copyright deposit is part and parcel of Registration No. TXu 1-570-162. KPI's copyright claim incorporated the contents of its registration. In addition, the Court can take judicial notice of the certified copy of the deposit under Fed. R. Evid. 201. Further, the copyright deposit is a public record available from the Copyright Office.

### E.    KPI's Complaint Must Provide More Than Labels And Conclusions

While a complaint attacked by a Fed. R. Civ. P. 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1965-66 (2007). Factual allegations in a Complaint must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true, even if doubtful in fact. *Id.* at 1966. On a Rule 12(b)(6) motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 (1986). "[T]he pleading must contain something more [than] a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004).

DSMDB-2399457

IV.    **ARGUMENT**

   A.    **This Court Does Not Have Personal Jurisdiction Over Placebase**

   KPI bears the burden of establishing that personal jurisdiction exists over Placebase.

*Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003) (Urbina, J.).

KPI must show that there is either general or specific personal jurisdiction over Placebase under

D.C. law and that the exercise of jurisdiction satisfies constitutional due process requirements.

*Id.* at 75. Although facts in the Complaint are viewed in the light most favorable to KPI,

conclusory statements are not sufficient to establish personal jurisdiction. *Id.* at 74. As shown

below, KPI fails to allege specific facts connecting Placebase with the forum. This failure is

fatal to KPI's attempts to hale Placebase into this Court.

   1.    **This Court lacks general jurisdiction over Placebase**

   General jurisdiction requires that a defendant "carries on a consistent pattern of

regular business activity within the jurisdiction" or is "domiciled in, organized under the laws of,

or maintain[s] … its principal place of business, in the District." *Capital Bank*, 276 F. Supp. 2d

at 75 (citing cases). KPI's Complaint, however, does not allege that Placebase carried on any

business activity in the District, let alone a consistent pattern of regular business activity.

Furthermore, KPI's Complaint concedes that Placebase is organized under the laws of and

maintains a principal place of business in California. (Compl. ¶ 2.) With the exception of KPI's

legal conclusion that Placebase violated the District of Columbia Uniform Trade Secret Act,

*there is not a single mention* of the District of Columbia in the entire Complaint.

   KPI's allegations "fall well short of establishing general jurisdiction" over Placebase.

*Id.* at 77-78 (finding no general jurisdiction where plaintiff failed to show nonresident corporate

defendants' contacts to the district). Because KPI has not established that Placebase has any

DSMDB-2399457

contacts to the District, let alone that Placebase carries on "a consistent pattern of regular business activity" in the District, this Court lacks general jurisdiction over Placebase.

> **2.    This Court does not have specific jurisdiction over Placebase under D.C.'s long-arm statute**

Specific jurisdiction in the District of Columbia only exists for claims for relief arising from acts enumerated in the District's long-arm statute. D.C. Code § 13-423(b). KPI has not alleged a basis for jurisdiction over Placebase under the long-arm statute, D.C. Code § 13-423(a). Because KPI has not established that its claims arise from acts enumerated in the long-arm statute, this Court lacks specific jurisdiction over Placebase. *See Capital Bank*, 276 F. Supp. 2d at 77 (holding that "plaintiff's conclusory statements and bare allegations are not sufficient to establish specific jurisdiction over [the defendants] under the District's long-arm statute").

> **B.    KPI's Complaint Should Be Dismissed For Improper Venue Pursuant To Fed. R. Civ. P. 12(b)(3)**

KPI alleges venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as well as pursuant to agreement by the parties. (Compl. ¶ 4.) KPI is incorrect on both counts. Venue for copyright infringement claims is determined by 28 U.S.C. § 1400(a). This statute does not support venue for this action in the District of Columbia. And, as explained below, there is no agreement by the parties providing for venue in this Court. Therefore, the Court should dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(3) for improper venue.

> **1.    Venue for copyright actions is governed by 28 U.S.C. § 1400(a)**

The sole basis for federal jurisdiction is KPI's copyright claim. Venue for copyright infringement actions is governed by 28 U.S.C. § 1400(a), which provides for venue "in the district in which the defendant or his agent resides or may be found." 28 U.S.C. § 1400(a). Inexplicably, KPI omits the copyright venue statute from its analysis and has failed to allege that Placebase or any agent thereof "resides or may be found" in the District of Columbia.

9

A corporate defendant's residence is determined pursuant to 28 U.S.C. § 1391(c). For purposes of venue, a corporation "shall be deemed to reside in any judicial district in which it is subject to *personal jurisdiction* at the time the action is commenced." 28 U.S.C. § 1391(c) (emphasis added). KPI makes no factual allegations to show that Placebase is subject to personal jurisdiction in the District of Columbia. Because there is no allegation sufficient to support venue under § 1400(a), KPI's Complaint should be dismissed for improper venue.[3]

## 2.    The only contract to which Placebase is a party also requires venue in California

Despite KPI's unsupported allegations that venue is by agreement of the parties, no such agreement exists.[4] The Complaint does not, and cannot, allege that there was any contract between KPI and Placebase relating to the DataPlace project. Placebase and non-party Vinq entered into an agreement including a forum selection clause requiring all actions relating to the agreement to be brought in California.[5] (Compl. ¶ 15; Ex. C at 11.) This agreement requires "[a]ll disputes relating to or arising out of this Agreement shall be resolved in a state or federal court located in Santa Clara County, California, and the parties consent to the jurisdiction of such

---

[3]    Assuming *arguendo* that 28 U.S.C. § 1400(a) does not apply and 28 U.S.C. § 1391(b) governs venue, KPI still has failed to allege facts sufficient to show that venue is properly laid in this Court. KPI does not allege that Placebase resides in D.C. KPI also fails to allege that "a substantial part of the events or omissions giving rise to the claims occurred" in the District of Columbia.

[4]    To the extent KPI is attempting to rely on a separate agreement between KPI and Vinq to establish venue for its Complaint against Placebase, its reliance fails for three reasons:  (1) Placebase is not a party to any such agreement; (2) KPI did not plead any such reliance; and (3) Vinq is not a party to this action.

[5]    This Court properly may consider such contractual evidence when ruling upon a motion to dismiss for lack of venue. *See Commerce Consultants Int'l, Inc. v. Vetrerie Riunite, S.p.A.*, 867 F.2d 697, 698-699 (D.C. Cir. 1989) (affirming district court's dismissal for improper venue upon reviewing contract language and affidavits).

DSMDB-2399457

courts." (Ex. C at 11.)  As KPI's alleged copyright and trade secret claims relate to and arise out

of the Vinq-Placebase contract, the forum selection clause governs all such claims.

KPI alleges it is a third-party beneficiary to the VinqPlacebase.  (Compl. ¶ 16.)  A

third-party beneficiary "cannot accept the benefits and avoid the burdens or limitations of a

contract."  *Trans-Bay Engineers & Builders, Inc. v. Hills*, 551 F.2d 370, 378 (D.C. Cir. 1976).

"A forum selection clause encumbers a third-party beneficiary who could reasonably have

foreseen its designation as beneficiary."  *ADT Security Services, Inc. v. Apex Alarm, LLC*, 430 F.

Supp. 2d 1199, 1201 (D. Colo. 2006).  Forum selection clauses are "prima facie valid and [will]

be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the

circumstances."  *Marra v. Papandreou*, 216 F.3d 1119, 1124 (D.C. Cir. 2000).  KPI has not, and

can not, provide any evidence that the forum selection clause is unreasonable, therefore, the

forum selection clause must be enforced.  As every claim in the Complaint arises out of or relates

to work performed under the contract, KPI is precluded from bringing this action in this Court

and the Complaint should be dismissed under Rule 12(b)(3).

> ### C.    The Complaint Should Be Dismissed Under Rule 12(b)(7) For Failure To Join A Party Under Rule 19

KPI does not, and can not, allege that Placebase and KPI ever entered into a

contractual agreement with each other, because they never did.  KPI and Placebase never were

parties to any agreement relating to the subject matter of the lawsuit – the development of

DataPlace.  Instead, as KPI acknowledges (Compl. ¶¶ 13-14), KPI contracted with Vinq, the

prime contractor.  Vinq, in turn, subcontracted with Placebase. (Compl. ¶ 15.)  KPI has elected

not to sue Vinq.  As discussed below, however, Vinq is a necessary party, because in Vinq's

absence, the Court cannot accord complete relief among the existing parties – KPI and

Placebase.

DSMDB-2399457

In order to dismiss a claim or action for failure to join an indispensable party, the Court must undertake a two-step inquiry. *See Corsi v. Eagle Publishing, Inc.*, No. 1:07-CV-02004-ESH, Slip Copy, 2008 WL 239581 at *3 (D.D.C. Jan. 30, 2008). (Ex. E.) First, the Court must determine under Fed. R. Civ. P. 19(a) whether the absent party is "necessary." *Id.* Then, if the party is necessary, but cannot be joined, the Court must determine if "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* (quoting Fed. R. Civ. P. 19(b)).

1.    **The obligations and rights of Vinq will necessarily be litigated in the case at bar**

Vinq has "an interest relating to the subject of the action and is so situated that disposing of the action [in Vinq's] absence may [] as a practical matter impair or impede [Vinq's] ability to protect the interest" Fed. R. Civ. P. 19(a)(1)(B)(i). As a direct party to a contract that is under dispute, Vinq is a necessary party. *Corsi*, 2008 WL 239581 at *3-4 (holding that "each claim in this case implicates [the non-party's] conduct under the contracts, and any findings involving these contracts will necessarily affect [the non-party's] rights"). KPI alleges that Vinq (but not Placebase) is party to an agreement that "required Vinq to treat the project as confidential." (Compl. ¶ 14.) KPI further alleges that the Vinq agreement assured "the proprietary nature of the system to KnowledgePlex," even though Placebase was not a party to that agreement. (Compl. ¶ 14.) KPI does not allege that these provisions in the prime contract with Vinq flowed down to the subcontract between Vinq and Placebase. Because KPI apparently is relying upon its agreement with Vinq and may argue that Vinq was supposed to include these provisions in agreements with subcontractors, including Placebase, the obligations and rights of Vinq under any such contract will necessarily be litigated in the case at bar.

12

KPI's allegations are based *not* upon any agreement directly between KPI and Placebase (since none exist) but upon the separate agreement between Vinq and Placebase. (Compl. ¶ 15.)  The interpretation of any agreement between Vinq and Placebase will implicate of the prime agreement between KPI and Vinq.  The Court cannot interpret the agreement without having Vinq as a party.  In *Global Discount Travel Servs, LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 703 (S.D.N.Y. 1997), as here, the plaintiff brought suit against the defendant over an agreement entered into by the defendant and an absent party.  There, as here, the rights and obligations of all of the parties were at issue.  *Id.*  There, the court held that the absent party was a necessary party.  *Id.*  The same should occur here.  Similar to the absent party in *Global Discount*, Vinq's ability "to protect its interest[] may be *practically* impaired or impeded by proceeding with this action in its absence" and Vinq's interests "could be impaired or impeded by this Court's resolution of a contract to which it is the primary signatory."  *Id.*

### 2.    KPI and Placebase have a substantial risk of incurring double, multiple, or otherwise inconsistent obligations

The factual and legal determinations made in the absence of Vinq could prejudice KPI and Placebase and subject the parties "to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."  Fed. R. Civ. P. 19(a)(2)(ii).  For example, in assessing KPI's claims against Placebase, should this Court find that Vinq breached its duties under its prime contract with KPI that allegedly required "Vinq to treat the project as confidential" and required Vinq to ensure that all of its subcontractors "were undertaking this project as a work-made-for-hire and assigned all rights in anything developed under the project to KnowledgePlex" (Compl. ¶ 14), there is nothing to prevent KPI from later bringing suit against Vinq for that breach.  This Court's finding of breach would not bind a court hearing KPI's suit against Vinq.  Vinq, in turn, could bring a claim against Placebase, alleging

13

DSMDB-2399457

that Placebase, not Vinq, failed in its duties under the contract.  At the end of the day, Placebase

would have another court re-decide its rights and obligations under the agreement(s) at issue in

the case at bar.

The risk to the parties is not the only consideration under Rule 19.  "The interests that

are being furthered here are not only those of the parties, but also that of the public in avoiding

repeated lawsuits on the same essential subject matter."  Fed. R. Civ. P. 19 advisory committee's

note.  "Because res judicata will not bind any subsequent court to this Court's interpretation of

the contract, [defendant] is at risk of having another court re-decide its rights and obligations

under the Agreement."  *Global Discount*, 960 F. Supp. at 708-09.  Like the defendant in *Global*

*Discount*, without joinder of non-party Vinq, Placebase is at risk of having a second court re-

decide its rights and obligations under its agreement with Vinq.

Vinq is a necessary party to this litigation.  KPI has refused to join Vinq as a party,

and failed to plead why it has failed to join Vinq to this action as required by Rule 19(c)(2).

Placebase suspects that business considerations have kept KPI from suing Vinq; however, KPI's

allegations necessarily require a resolution of the rights and responsibilities of KPI, Placebase –

and Vinq.  Because KPI is unwilling to sue Vinq, in violation of Rule 19, this Court should

dismiss the Complaint under Rule 12(b)(7).

### D.    KPI's Copyright Claim Should Be Dismissed Pursuant To Fed. R. Civ. P 12(b)(1) For Lack Of Subject Matter Jurisdiction

Copyright registration is a prerequisite to filing suit for copyright infringement.  17

U.S.C. § 411(a).  KPI alleges that it owns United States Copyright Registration No. TXu 1-570-

162. (Compl. ¶ 26.)  KPI broadly characterizes this registration as evidence of its alleged

registered copyright "for the code required to operate DataPlace." (Compl. ¶ 26.)  The deposit

submitted with KPI's copyright registration is insufficient to grant subject matter jurisdiction for

14

KPI's broad allegations of copyright infringement, and KPI's copyright claim must be dismissed as a matter of law.

1.    **The scope of KPI's registered copyright is limited to the code it deposited**

For computer programs, the copyright deposit requirement comprises "one copy of identifying portions of the program, reproduced in a form visually perceptible without the aid of a machine or device" and varies on many factors, including whether the program contains trade secret material, whether the source code for the program is more than fifty pages in length, and whether the program is a revision or an original work.[6]  37 C.F.R. § 202.20(c)(vii).  If the

---

[6]    "Identifying portions" is defined as one of the following:

(1) The first and last 25 pages or equivalent units of the source code … together with the page or equivalent unit containing the copyright notice, if any.  ***If the program is 50 pages or less, the required deposit will be the entire source code.***  In the case of revised versions of computer programs, if the revisions occur throughout the entire program, the deposit of the page containing the copyright notice and the first and last 25 pages of source code will suffice; if the revisions do not occur in the first and last 25 pages, the deposit should consist of the page containing the copyright notice and any 50 pages of source code representative of the revised material; or

(2) Where the program contains trade secret material, the page or equivalent unit containing the copyright notice, if any, plus one of the following:  the first and last 25 pages or equivalent units of source code with portions of the source code containing trade secrets blocked-out, provided that the blocked-out portions are proportionately less than the material remaining, and the deposit reveals an appreciable amount of original computer code; or the first and last 10 pages or equivalent units of source code alone with no blocked-out portions; *… or **for programs consisting of, or less than, 50 pages or equivalent units, entire source code with the trade secret portions blocked-out**, provided that the blocked-out portions are proportionately less than the material remaining, and the remaining portion reveals an appreciable amount of original computer code.*  If the copyright claim is in a revision not contained in the first and last 25 pages, the deposit shall consist of either 20 pages of source code representative of the revised material with no blocked-out portions, or any 50 pages of source code representative of the revised material with portions of the source code containing trade secrets blocked-out, provided that the blocked-out portions are proportionately less than the material remaining and the deposit reveals an appreciable amount of original computer code.  *Whatever method is used to block out trade secret material, at least an appreciable amount of original computer code must remain visible.*

DSMDB-2399457

computer program KPI sought to register was more than fifty pages in length, then KPI would be required to deposit the first and last 25 pages of human readable source code. 37 C.F.R. § 202.20(c)(vii)(A). Where, as here, if the registered computer program was fifty pages or less, the *entire* source code must be deposited. *Id.*

Additionally, if a program contains trade secrets, the trade secret portions may be blocked-out "provided that the blocked-out portions are proportionately less than the material remaining, and the remaining portion reveals an appreciable amount of original computer code. *Id.* KPI's deposit consists of forty-two pages of source code with diagonal redactions.[7] (Ex. A.) The first sixteen pages are identical to the last sixteen pages. Thus, KPI's deposit consists of only twenty-six pages of source code. Because KPI deposited only forty-two pages, pursuant to 37 C.F.R. § 202.20(c)(vii)(A) that deposit consists of the entire program KPI copyrighted under registration number TXu 1-570-162.

"The deposit required by Section 408(b) serves the … purpose of providing the Library's Copyright Office with sufficient material to identify the work in which the registrant claims a copyright. *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161 (1st Cir. 1994) (citing H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 5 (1976)). The Copyright Office relied on KPI's deposit to identify the work in which KPI claims a copyright. Indeed, "a key purpose of the Section 408(b) deposit requirement is to prevent confusion about which work the author is attempting to register." *Data Gen. Corp.*, 36 F.3d at 1162. KPI only deposited forty-

---

37 C.F.R. § 202.20(c)(vii)(A) (emphasis added).

[7]    "The court may consider the allegations of the complaint, documents attached to or specifically referred to in the complaint, and matters of public record." *Himmelman*, 104 F. Supp. 2d at 3. While KPI did not attach its deposit to the complaint, its contents are alleged therein by the allegation of copyright infringement for TXu 1-570-162. Additionally, the Court can take judicial notice of the certified copy of the deposit under Fed. R. Evid. 201. Further, the copyright deposit is a public record available from the Copyright Office.

DSMDB-2399457

two pages of source code (of which only twenty-six were "unique") with the Copyright Office,

demonstrating that KPI was registering an entire computer program and, necessarily, bounding

the scope of its registered copyright.  37 C.F.R. § 202.20(c)(vii)(A).

**2.    KPI's copyright infringement claim is limited to alleged infringement of the source code it deposited**

Copyright registration is a prerequisite to filing suit for copyright infringement.

17 U.S.C. § 411(a).  As discussed above, KPI's registration is limited to the source code it

deposited with the Copyright Office.  "Elements distinct to an unregistered work cannot draw

protection from a registered work even though the latter may contain the seminal idea that

inspired both works."  *Johnson v. Gordon*, 409 F.3d 12, 20 (1st Cir. 2005) (holding that only

those elements of an unregistered long version of a song that are derived directly from the

registered short version of the song form the basis for a charge of infringement).

KPI's Complaint broadly alleges that it registered "the code required to operate

DataPlace."  (Compl. ¶ 26.)  The registered code comprised a total of forty-two pages, of which

sixteen pages are wholly duplicative.  Because KPI's deposit was less than fifty pages, as a

matter of law, KPI's deposit represents *the entire computer program* that defines the scope of

KPI's copyright claim.  37 C.F.R. § 202.20(c)(vii)(A).  In other words, KPI's copyright

infringement claim must be limited to the registered copyright.  To the extent that the code that

actually operates DataPlace is more than forty-two pages, it is outside of the scope of the

Complaint as a matter of law.  This Court lacks subject matter jurisdiction to entertain KPI's

copyright infringement claims that are not based upon the deposited code.  *Well-Made Toy Mfg.*

*Corp. v. Goffa Intern. Corp.*, 210 F. Supp. 2d 147, 164-65 (E.D.N.Y. 2002).

In *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 815-16 (5th Cir. 1997), the

plaintiff, who was "in the business of designing art-work and then printing that artwork on tee-

17

shirts," registered black and white line drawings – not on any apparel – with the copyright office. The plaintiff accused the defendant of selling tee-shirts that copied the plaintiff's designs. *Id.* at 815. The district court granted summary judgment in favor of the defendants based on the court's comparison of "the [defendant's] tee-shirts to [plaintiff's] registered black and white line drawings, rather than to the ultimate rendition of those line drawings on [plaintiff's] tee-shirts." *Id.* On appeal, the Fifth Circuit upheld the district court's finding of non-infringement. *Id.* However, as "registration with the copyright office is a *jurisdictional* prerequisite to filing a copyright infringement suit," the Fifth Circuit ordered the district court to modify its judgment of dismissal on the merits such that the copyright infringement claim be dismissed for want of subject matter jurisdiction "insofar as that judgment pertains to claims for infringement of the tee-shirts themselves." *Id.* at 816.

Similarly, KPI's broad claim of copyright infringement of DataPlace, a system that required "a total of well over 50,000 billable hours … to develop the system that KnowledgePlex envisioned" (Compl. ¶ 19) must be dismissed for want of subject matter jurisdiction insofar as KPI's claim of copyright infringement extends beyond the scope of its copyright registration. KPI registered a computer program comprised of forty-two pages of source code. This Court does not have subject matter jurisdiction over any claims of copyright infringement beyond the scope of the forty-two pages deposited by KPI.

### 3.    KPI cannot expand the scope of its registration to salvage its copyright claim

KPI doubtlessly will be greatly embarrassed to learn that its copyright claim – the sole basis for federal jurisdiction – is based upon such a slipshod and incomplete registration, but KPI cannot correct the deposit and salvage its lawsuit. To the extent KPI alleges it inadvertently omitted pages from the deposit, it has "not fulfilled all the statutory formalities necessary to

18

register its copyright and have 'ownership' in its software for the purposes of a copyright infringement claim." *Geoscan, Inc. of Texas v. Geotrace Techs., Inc.*, 226 F.3d 387, 393 (5th Cir. 2000) (upholding summary dismissal of a copyright infringement claim where plaintiff submitted an incomplete and inadequate deposit). Although "immaterial, inadvertent errors in an application for copyright registration do not jeopardize the validity of the registration," *Data Gen. Corp.*, 36 F.3d at 1161, KPI's defective deposit is not immaterial. Indeed, unlike the plaintiff in *Data General Corp.*, KPI cannot allege that any such missing pages from its deposit would have no bearing on the operation of the program. *Id.*

A goal of the deposit requirement "is to furnish the Copyright Office with an opportunity to assess the copyrightability of the applicant's work." *Id.* at 1162. The Copyright Office assessed the copyrightability of the limited deposit KPI provided; KPI deprived the Copyright Office of the opportunity to identify or assess KPI's computer program beyond that limited deposit. KPI's deposit simply was inadequate to indicate to the Copyright Office that it intended to register more than a complete computer program of forty-two pages, sixteen pages of which were exact duplicates.

While Section 408(d) of the copyright law provides for "the filing of an application for supplementary registration, to correct an error in a copyright registration or to amplify the information given in a registration." 17 U.S.C. § 408(d). The form for making such corrections and amplifications provided by the Copyright Office does not provide for a method to supplement or amplify a deposit once registration has issued.[8] KPI is unable to remedy its defective registration through supplementary registration. KPI's defective deposit is material and fatal to its registration.

---

[8]     U.S. Copyright Office Form CA for Supplementary Registration, available at http://www.copyright.gov/forms/formcawi.pdf.

DSMDB-2399457

A copyright registration is a jurisdictional prerequisite to an infringement action. 17 U.S.C. § 411. KPI's error-riddled registration defines the limits of its claim, and the Court is obligated under *Creations Unlimited* and the other cases cited herein to dismiss for lack of jurisdiction any claim that goes beyond the twenty-six non-duplicative pages. Under either Rule 12(b)(1) or Rule 12(b)(6), KPI's broad copyright claim must be dismissed.[9]

### E. KPI's Trade Secret Misappropriation Claims Should Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted

KPI alleges both common law and statutory trade secret misappropriation. As explained below, both of these claims fail to state a claim upon which relief can be granted.

### 1. The Complaint fails to state a claim for statutory trade secret misappropriation for which relief may be granted

Rule 12(b)(6) requires that a plaintiff allege facts sufficient to state a viable claim entitling the plaintiff to relief. Fed. R. Civ. Proc. 12(b)(6). As the Supreme Court has recently made clear:

> [A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atlantic*, 127 S.Ct. at 1964-65. To establish a claim for misappropriation of trade secrets, KPI must show "(1) the existence of a trade secret and (2) misappropriation of the trade secret." *Accuimage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003); *Miller v. The Andrew Jergens Co.*, No. CV-98-1945, 1998 WL 1473633, *2 (C.D. Cal. May, 20

---

[9]    The defects in KPI's copyright claim jeopardize the entire basis for federal jurisdiction. KPI's trade secret and contract claims are not based upon federal law, but are purely supplemental to the copyright claim. Both KPI and Placebase are corporations with their principal place of business in California, so there can be no diversity jurisdiction.

DSMDB-2399457

1998) (Ex. F); Cal. Civ. Code § 3426.1.[10] KPI fails to allege the existence of a trade secret, and

even if KPI has sufficiently alleged the existence of a trade secret, it has not alleged

misappropriation of any trade secret.

On a Rule 12(b)(6) motion to dismiss, courts "are not bound to accept as true a legal

conclusion couched as a factual allegation." *Papasan,* 478 U.S. at 286. "[T]he pleading must

contain something more ... than ... a statement of facts that merely creates a suspicion [of] a

legally cognizable right of action." 5 C. Wright & A. Miller, Federal Practice and Procedure

§ 1216, pp. 235-36. KPI's bald allegation that Placebase misappropriated "confidential,

propriety, and trade secret information owned by KnowledgePlex" (Compl. ¶ 36) is nothing

more than "a legal conclusion couched as a factual allegation," and this Court should not accept

KPI's allegations as sufficient to state a claim for which relief can be granted.

A trade secret, by definition, must derive "actual or potential independent economic

value[] from not being generally known." D.C. Code § 36-401(4)(A); *see also* Cal. Civ. Code

§ 3426.1(d). KPI's allegations that Placebase was "privy to valuable, confidential information

about Dataplace, its functionality, and innovative solutions to problems" is simply insufficient to

allege the existence of a trade secret. *See Vincit Enterprises, Inc. v. Zimmerman*, No. 1:06-CV-

57, Slip Copy, 2006 WL 1319515 at *6-7 (E.D. Tenn. May 12, 2006) (holding that complaint

failed to allege sufficiently the elements of misappropriation of a trade secret where Plaintiff's

---

[10]   California substantive law should govern this action. With respect to substantive trade
secret law, however, there is virtually no difference between California and DC law. Both are
based upon the Uniform Trade Secrets Act. *See* D.C. Code § 36-401 et seq.; Cal. Civ. Code §
3426.1 et seq. Additionally, "[i]n light of the paucity of precedent from this jurisdiction for
interpreting [D.C. Code § 36-401] and because the D.C. Trade Secrets Act is based on the
Uniform Trade Secrets Act …, it is appropriate
to consider how the courts in those states have interpreted their states' trade secret acts when
interpreting the D.C. trade secrets statute." *Catalyst & Chem. Servs., Inc. v. Global Ground
Support*, 350 F. Supp. 2d 1, n.3 (D.D.C. 2004).

DSMDB-2399457

failed to allege its trade secrets had "independent economic value" despite allegations that "its

trade in its products 'are of great value' and that its trade secrets are 'valuable'"). (Ex. G.)

Simply put, KPI's failure to allege that its trade secrets had independent economic value warrant

dismissal of its claim for misappropriation of a trade secret.

Further, the Complaint does not allege that the "trade secrets" were acquired through

improper means or otherwise misappropriated. Rather KPI admits that "Vinq, Placebase, and

KnowledgePlex worked together and *freely shared ideas and information* to further the

development process." (Compl. ¶ 19 (emphasis added).) While the Complaint alleges that Vinq

was under a confidentiality obligation (Compl. ¶ 14), KPI fails to allege that *Placebase* was

bound by any duty of confidentiality with regard to the DataPlace project.

Thus, KPI has failed to allege "the existence of a trade secret" and "misappropriation

of the trade secret." As such, KPI has failed to state a claim for which relief can be granted

under either California (or D.C.) law.

> **2.      The Complaint fails to state a claim for common law trade secret misappropriation for which relief may be granted**

KPI alleges a claim for common law misappropriation of trade secrets. Under both

District of Columbia and California law, common law misappropriation of trade secrets has been

preempted by statutory trade secret misappropriation law and is not available as a remedy to

alleged trade secret misappropriation. *Accuimage*, 260 F. Supp. 2d at 954. As such, KPI has

failed to state a claim for which relief can be granted. KPI's common law trade secret

misappropriation claim must be dismissed.

DSMDB-2399457

## V.        CONCLUSION

KPI's Complaint should be dismissed.  A proposed order is attached.

Dated:  February 25, 2008                      Respectfully submitted,


                                               /s/ Kenneth W. Brothers
                                               Kenneth W. Brothers (D.C. Bar No. 441113)
                                               Rebecca L. Barbisch  (D.C. Bar No. 500641)
                                               Dickstein Shapiro LLP
                                               1825 Eye Street, N.W.
                                               Washington, D.C.  20006
                                               (202) 420-2200

                                               *Attorneys for Metonymy, Inc. d/b/a Placebase*

DSMDB-2399457

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2008 a copy of Metonymy, Inc. d/b/a Placebase's Motion to Dismiss; Memorandum of Points and Authorities in Support of Metonymy, Inc. d/b/a Placebase's Motion to Dismiss, including all exhibits thereto; Metonymy, Inc. d/b/a Placebase's Proposed Order; and Metonymy, Inc. d/b/a Placebase's Certificate Rule LCvR 7.1 were served via electronic transmission on the following:

> Brian A. Coleman
> DRINKER BIDDLE & REATH LLP
> 1500 K Street, NW
> Suite 1100
> Washington, DC 20005-1209

Dated:  February 25, 2008                         /s/ Kenneth W. Brothers
                                                  Kenneth W. Brothers

**KnowledgePlex, Inc. v. Metonymy, Inc. d/b/a Placebase**
**1:07-cv-02315**

## EXHIBITS ATTACHED TO THE MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF METONYMY, INC. D/B/A PLACEBASE'S MOTION TO DISMISS

Exhibit A:    *D'Onofrio v. SFX Sports Group, Inc.*,
              No. 06-0687 (JDB), __ F. Supp. 2d __, 2008 WL 423035 (Feb. 18, 2008 D.D.C.).

Exhibit B:    Certified copy of KPI's deposit for Copyright Registration No. TXu 1-570-162.

Exhibit C:    Vinq-Placebase contract.

Exhibit D:    *Zella v. E.W. Scripps Co.*,
              No. CV 06-7055 ABC, __ F. Supp. 2d __,
              2007 WL 4643888 (C.D. Cal. Dec. 18, 2007).

Exhibit E:    *Corsi v. Eagle Publishing, Inc.*,
              No. 1:07-CV-02004-ESH, Slip Copy, 2008 WL 239581 (D.D.C. Jan. 30, 2008).

Exhibit F:    *Miller v. The Andrew Jergens Co.*,
              No. CV-98-1945, 1998 WL 1473633 (C.D. Cal. May, 20 1998).

Exhibit G:    *Vincit Enterprises, Inc. v. Zimmerman*,
              No. 1:06-CV-57, Slip Copy, 2006 WL 1319515 (E.D. Tenn. May 12, 2006).

# Exhibit A

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 423035 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

**H**
D'Onofrio v. SFX Sports Group, Inc.
D.D.C.,2008.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Audrey (Shebby) D'ONOFRIO, Plaintiff,
v.
SFX SPORTS GROUP, INC., et al., Defendants.
**Civil Action No. 06-0687(JDB).**

Feb. 18, 2008.

**Background:** Female former employee brought discrimination action in District of Columbia court against employer and company executives in their individual capacities alleging violations of the District of Columbia Human Rights Act, District of Columbia Family Medical Leave Act and Equal Pay Act. Defendants removed action to federal court. Executives moved to dismiss.

**Holdings:** The District Court, John D. Bates, J., held that:

(1) court did not have general jurisdiction over executives, and

(2) District of Columbia long-arm statute did not authorize personal jurisdiction over executives.

Motions granted.

**[1] Federal Courts 170B ⊙⊃96**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk96 k. Affidavits and Other Evidence. Most Cited Cases
In order to meet the burden of establishing personal jurisdiction over each defendant, the plaintiff must allege specific facts on which personal jurisdiction can be based; she cannot rely on conclusory allegations.

**[2] Federal Courts 170B ⊙⊃96**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk96 k. Affidavits and Other Evidence. Most Cited Cases
A plaintiff cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant.

**[3] Federal Courts 170B ⊙⊃96**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk96 k. Affidavits and Other Evidence. Most Cited Cases
When considering personal jurisdiction, the Court need not treat all of the plaintiff's allegations as true; instead, the court may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts.

**[4] Federal Courts 170B ⊙⊃76.5**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
                170Bk76.5 k. Contacts with Forum State. Most Cited Cases

**Federal Courts 170B ⊙⊃76.10**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
                170Bk76.10 k. Defendant's Activities in Forum State; Cause of Action Arising Therefrom. Most Cited Cases
There are two distinct variants of personal jurisdic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 423035 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

tion: (1) general, "all purpose" adjudicatory authority to entertain a suit against a defendant without regard to the claim's relationship vel non to the defendant's forum-linked activity, and (2) specific jurisdiction to entertain controversies based on acts of a defendant that touch and concern the forum.

**[5] Federal Courts 170B ⟨⟩76.5**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
            170Bk76.5 k. Contacts with Forum State. Most Cited Cases
General jurisdiction sets a high bar, requiring a defendant's contacts with a forum to be "continuous and systematic" before forcing a defendant to defend a suit arising out of any subject matter whether or not related to the forum.

**[6] Federal Courts 170B ⟨⟩76.10**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
            170Bk76.10 k. Defendant's Activities in Forum State; Cause of Action Arising Therefrom. Most Cited Cases
Specific jurisdiction requires a lesser showing than general jurisdiction that nevertheless must satisfy a two-step inquiry: (1) jurisdiction over the defendant must be authorized by the forum's long-arm statute, and (2) the exercise of that jurisdiction must satisfy the federal requirement of constitutional due process. U.S.C.A. Const.Amend. 5;D.C. Official Code, 2001 Ed. § 13-423.

**[7] Federal Courts 170B ⟨⟩1037**

170B Federal Courts
   170BXI Courts of District of Columbia
      170BXI(A) In General; District Court

         170Bk1035 Jurisdiction of District Court
            170Bk1037 k. Persons Subject. Most Cited Cases
Non-resident company executives did not have continuous and systematic contacts with District of Columbia, as required for federal district court to have general jurisdiction over two executives in their personal capacities in female former employee's discrimination action against employer and executives alleging violation of District of Columbia Human Rights Act, District of Columbia Family Medical Leave Act and Equal Pay Act; during relevant time period, both executives lived and worked in Texas, neither regularly did business with District of Columbia, and they did not solicit business within the District. Fair Labor Standards Act of 1938, § 6(d)(1), 29 U.S.C.A. § 206(d)(1)D.C. Official Code, 2001 Ed. § 2-1401.01 et seq.; D.C. Official Code, 2001 Ed. §§ 32-501 to 32-517.

**[8] Federal Courts 170B ⟨⟩1037**

170B Federal Courts
   170BXI Courts of District of Columbia
      170BXI(A) In General; District Court
         170Bk1035 Jurisdiction of District Court
            170Bk1037 k. Persons Subject. Most Cited Cases
Contacts of non-resident company executives with District of Columbia were in the course of employment, rather than based on personal contacts, and thus subsection of District of Columbia long-arm statute allowing personal jurisdiction over person transacting business in District did not authorize personal jurisdiction over executives in female former employee's discrimination action against employer and executives alleging violation of District of Columbia Human Rights Act, District of Columbia Family Medical Leave Act and Equal Pay Act. Fair Labor Standards Act of 1938, § 6(d)(1), 29 U.S.C.A. § 206(d)(1); D.C. Official Code, 2001 Ed. § 2-1401.01 et seq.; D.C. Official Code, 2001 Ed. §§ 32-501 to 32-517; D.C. Official Code, 2001 Ed. § 13-423.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[9] Federal Courts 170B ⬤⟳76.20**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk76 Actions Against Non-Residents;
"Long-Arm" Jurisdiction in General
            170Bk76.20 k. Persons Acting in Representative Capacity, Venue For; Fiduciary Shield.
Most Cited Cases
As a general rule, courts cannot exert jurisdiction over individual corporate officers or employees just because the court has jurisdiction over the corporation.

**[10] Federal Courts 170B ⬤⟳96**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk96 k. Affidavits and Other Evidence. Most Cited Cases
Plaintiff bringing action against individual officers of corporate entity bears the burden of demonstrating that the individual defendants are subject to personal jurisdiction in their own right apart from any jurisdiction that might exist over their corporate-entity employers.

**[11] Federal Courts 170B ⬤⟳1037**

170B Federal Courts
   170BXI Courts of District of Columbia
      170BXI(A) In General; District Court
         170Bk1035 Jurisdiction of District Court
            170Bk1037 k. Persons Subject. Most Cited Cases
Limited contacts that non-resident company executives had with District of Columbia were not "separate from and in addition to" employee's allegedly unlawful termination, and thus tortious injury subsection of District of Columbia long-arm statute did not authorize personal jurisdiction over executives in former employee's discrimination action against employer and executives alleging violation of District of Columbia Human Rights Act,

District of Columbia Family Medical Leave Act and Equal Pay Act. Fair Labor Standards Act of 1938, § 6(d)(1), 29 U.S.C.A. § 206(d)(1); D.C. Official Code, 2001 Ed. § 2-1401.01 et seq.; D.C. Official Code, 2001 Ed. §§ 32-501 to 32-517; D.C. Official Code, 2001 Ed. § 13-423(a)(4).

**[12] Federal Courts 170B ⬤⟳1037**

170B Federal Courts
   170BXI Courts of District of Columbia
      170BXI(A) In General; District Court
         170Bk1035 Jurisdiction of District Court
            170Bk1037 k. Persons Subject. Most Cited Cases
In order to exercise jurisdiction over a non-resident defendant pursuant to tortious injury subsection of District of Columbia long-arm statute, the defendant must have caused tortious injury within the District and one of the "plus factors" in that subsection must also be present. D.C. Official Code, 2001 Ed. § 13-423(a)(4).

David E. Schreiber, Bethesda, MD, Plaintiff.
Johnine P. Barnes, Baker & Hostetler LLP, Washington, DC, for Defendants.

### MEMORANDUM OPINION

JOHN D. BATES, District Judge.
  ***1** Plaintiff Audrey ("Shebby") D'Onofrio brought this civil action alleging that she was discriminated against on the basis of her gender and pregnancy by her employer defendant SFX Sports Group, Inc. ("SFX"), a wholly owned subsidiary of defendant Live Nation, Inc., which in turn was formerly a subsidiary of defendant Clear Channel Communications, Inc.[FN1] She filed suit on March 13, 2006 in the Superior Court of the District of Columbia. In addition to naming the aforementioned corporations as defendants, plaintiff added Dan Rosier and Kimberley Wray-the former Chief Financial Officer at SFX and the head of Human Resources at Clear Channel Communications, respectively-as defendants in their personal capacities. Plaintiff seeks monetary and injunctive relief

--- F.Supp.2d ----                                                          Page 4
--- F.Supp.2d ----, 2008 WL 423035 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

under the District of Columbia Human Rights Act ("DCHRA"), the District of Columbia Family Medical Leave Act, and the Equal Pay Act, 29 U.S.C. § 206(d)(1). Defendants removed the case to this Court on April 17, 2006, citing diversity jurisdiction over the District of Columbia claims and federal question jurisdiction over the Equal Pay Act claims. Although the corporate defendants then answered the complaint, defendants Rosier and Wray have each moved to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). Those motions are now fully briefed and ripe for resolution. After careful consideration, and for the reasons set forth below, the Court will grant the motions.

### BACKGROUND

In May 2000, plaintiff was hired as the "Senior Director of Public Relations" at SFX.[FN2] Second Am. Compl. ¶ 9. At the time she was hired, plaintiff was promised a promotion if one of her immediate supervisors, Howard Schacter, departed for another branch of SFX. *Id.* Mr. Schacter did in fact transfer to a different department and plaintiff "ascended to Mr. Schacter's former role," taking on his responsibilities and duties but without "the corresponding change in title [or] ... equivalent salary."*Id* . ¶ 10.

Following an ethical disagreement with SFX's Chairman and CEO, David Falk, plaintiff was informed that her position was being eliminated during the summer of 2001. *Id.* ¶ 12.She believes that she was terminated "in retaliation for her 'disagreement' with Mr. Falk."*Id.* ¶ 13.In any event, plaintiff was promptly rehired by SFX in 2002. *Id.* ¶ 14.According to her, she accepted the position that she was offered upon the condition that she would shortly be promoted to "Vice President, with a commensurate increase in salary."*Id.* Over the course of the next several years, plaintiff continued to agitate for her putative promotion and salary increase to no avail. *Id.* at 15-16.

Plaintiff informed SFX that she was pregnant

in August 2005. Because she was having a "difficult pregnancy and was experiencing several serious medical issues,"*id.* ¶ 18, and pursuant to medical advice, she decided to go on disability leave during the remaining term of her pregnancy. *Id.* Thus, plaintiff requested the appropriate paperwork from Alaka Williams, "the Human Resources Manager at Clear Channel who was assigned to SFX Sports Group, Inc."*Id.* Ms. Williams informed plaintiff that she would prepare the disability paperwork and inquired whether plaintiff intended to return to the company following the completion of her pregnancy; plaintiff confirmed that she did so intend. *Id.* ¶ 19.

*\*2* The operative events for our purposes took place on or around September 26, 2005. On that day, Ms. Williams contacted plaintiff by phone and allegedly informed her that "due to changes in the company, there was no longer a need for a public relations function, such that her position was to be eliminated effective that day."*Id.* ¶ 20.According to plaintiff, Wray also participated in that conversation via conference call.[FN3] Thus, plaintiff added Wray as a defendant because she believed that Wray was in part "responsible for the discriminatory and retaliatory acts" directed against plaintiff. *Id.* ¶ 30A.Additionally, Rosier was added as a defendant because "he was the individual who decided to terminate [plaintiff's] employment."*Id.* ¶ 30B.Specifically, plaintiff alleges that as of the late afternoon on September 16, 2005, plaintiff's position was not scheduled to be terminated.*Id.* ¶ 30A.In her view, however, "Rosier and Wray subsequently had a telephone conversation in which they discussed [plaintiff's] pregnancy and her termination."*Id.* Pursuant to that conversation, plaintiff alleges, she was added to the "termination list" on September 17, 2005.[FN4]

Wray's Clear Channel Communications office is located in Texas, where she also resides. Wray's Mot. to Dismiss (hereinafter "Wray's Mot.") Ex. 1 ¶¶ 1-2. For his part, Rosier's office during his tenure at SFX was located in Texas as well. Rosier's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 423035 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

Page 5

Mot. to Dismiss (hereinafter "Rosier's Mot.") Ex. 1 ¶¶ 1-2. He currently resides in Texas and works out of California. *Id.* Ex. 1 ¶ 2. At the time that the phone call concerning plaintiff's termination took place, then, both Wray and Rosier were situated in Texas.

### STANDARD OF REVIEW

[1][2][3] Plaintiff bears the burden of establishing personal jurisdiction over each defendant. In order to meet her burden, plaintiff must allege specific facts on which personal jurisdiction can be based; she cannot rely on conclusory allegations. *See GTE New Media Services, Inc. v. Ameritech Corp.,* 21 F.Supp.2d 27, 36 (D.D.C.1998), *remanded on other grounds sub nom.GTE New Media Services, Inc. v. BellSouth Corp.,* 199 F.3d 1343 (D.C.Cir.2000); *Comsat Corp. v. Finshipyards S.A.M.,* 900 F.Supp. 515, 520 (D.D.C.1985). Moreover, plaintiff cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant. *See Rush v. Savchuk,* 444 U.S. 320, 331-32, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980) (rejecting aggregation of co-defendants' forum contacts in determining personal jurisdiction because "the requirements of *International Shoe* must be met as to each defendant over whom a state court exercises jurisdiction"). When considering personal jurisdiction, the Court need not treat all of the plaintiff's allegations as true. Instead, the court "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts."*United States v. Philip Morris Inc.,* 116 F.Supp.2d 116, 120 n. 4 (D.D.C.2000); *see also Capital Bank Int'l, Ltd. v. Citigroup,* 276 F.Supp.2d 72, 74 (D.D.C.2003); *Novak-Canzeri v. Al Saud,* 864 F.Supp. 203, 206 (D.D.C.1994) ("the Court must accept Plaintiff's claims as true in ruling on a 12(b)(2) motion, unless they are directly contradicted by an affidavit").

### DISCUSSION

*3 [4][5][6] There are, of course, two distinct variants of personal jurisdiction: "(1) general, 'all purpose' adjudicatory authority to entertain a suit against a defendant without regard to the claim's relationship *vel non* to the defendant's forum-linked activity, and (2) specific jurisdiction to entertain controversies based on acts of a defendant that touch and concern the forum."*Kopff v. Battaglia,* 425 F.Supp.2d 76, 81 (D.D.C.2006) (citing *Steinberg v. Int'l Criminal Police Org.,* 672 F.2d 927, 928 (D.C.Cir.1981)). General jurisdiction sets a high bar, requiring a defendant's contacts with a forum to be "continuous and systematic" before forcing a defendant to defend a suit arising out of any subject matter whether or not related to the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction, by contrast, requires a lesser showing that nevertheless must satisfy a two-step inquiry: (1) jurisdiction over the defendant must be authorized by the forum's long-arm statute, here D.C.Code § 13-423; and (2) the exercise of that jurisdiction must satisfy the federal requirement of constitutional due process. *See United States v. Ferrara,* 54 F.2d 825, 828 (D.C.Cir.1995).

[7] Here, Wray and Rosier correctly argue that general jurisdiction is unavailable. During the relevant time period, both lived and worked in Texas. Wray Mot. Ex. 1 ¶ 2; Rosier Mot. Ex. 1 ¶ 2. Neither regularly does business with the District of Columbia, nor do they solicit business within the District. Wray Mot. Ex. 1 ¶ 3; Rosier Mot. Ex. 1 ¶ 3. Indeed, within the past decade Wray has visited the District only twice, and Rosier only twelve times. Wray Mot. Ex. 1 ¶ 4; Rosier Mot. Ex. 1 ¶ 5. In short, plaintiff has alleged no facts to satisfy the steep requirement of continuous and systematic contacts with the District of Columbia sufficient to impose general jurisdiction.

[8][9][10] Turning to specific jurisdiction, plaintiff has similarly failed to make the proper showing required by the District's long-arm statute.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                      Page 6
--- F.Supp.2d ----, 2008 WL 423035 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

At the outset, it is worth noting that "as a general rule, courts cannot exert jurisdiction over individual corporate officers or employees 'just because the court has jurisdiction over the corporation.' " *Kopff,* 425 F.Supp.2d at 84 (quoting *Flocco v. State Farm Mu. Auto. Ins. Co.,* 752 A.2d 147, 162 (D.C.2000)). Thus, plaintiff bears the burden of demonstrating that the individual defendants are subject to personal jurisdiction in their own right apart from any jurisdiction that might exist over their corporate-entity employers. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) ("But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him.... Each defendant's contacts with the forum State must be assessed individually."). In relevant part, the D.C. long-arm statute provides:

A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's-

*4 (1) transacting any business in the District of Columbia;

(2) contracting to supply services in the District of Columbia;

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C.Code § 13-423(a)(1)-(4). Plaintiff has alleged no facts in this case that would trigger the application of subsections (a)(2) or (a)(3).[FN5] Instead, she focuses primarily upon subsections (a)(1) and (a)(4).

In her opposition, plaintiff initially argued that the relevant prong of the long-arm statute is subsec-

tion (a)(1). Specifically, she contended that "Section 13-423(a)(1) is 'given an expansive interpretation' that is 'coextensive with the due process clause.'" Pl.'s Opp'n at 4 (quoting *Mouzavires v. Baxter,* 434 A.2d 988, 992 (D.C.1981), *cert denied,* 455 U.S. 1006, 102 S.Ct. 1643, 71 L.Ed.2d 875 (1982)). Thus, according to plaintiff, the sole inquiry is whether the "non-resident defendant[s] had sufficient minimum contacts with the jurisdiction in order to satisfy due process." *Id.* Relying on *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and its progeny, plaintiff argues that defendants Wray and Rosier have had sufficient minimum contacts with the District because they purposefully directed their discriminatory activity in Texas towards the District, ultimately causing tortious injury there-namely, plaintiff's termination for an allegedly discriminatory reason. *Id.* at 5-7. Put another way, plaintiff effectively argues that this case presents the so-called "direct-a-tort" scenario.

As defendants correctly point out, plaintiff's argument falters with respect to subsection (a)(1). In *Wiggins v. Equifax,* the court held that "[p]ersonal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their *personal* contacts with the forum and not their acts and contacts carried out solely in a corporate capacity." 853 F.Supp. 500, 503 (D.D.C.1994) (emphasis added). In instances where contacts with the forum were exclusively in relation to defendants' corporate responsibility, the court reasoned, "defendants are clearly not 'doing business' with the District of Columbia." *Id.* Moreover, the court added that "[t]he fact that [defendants] may have acted in a supervisory capacity over persons with contacts with the District also fails to create personal jurisdiction." *Id.* Similarly, in *Richard v. Bell Atlantic Corp.,* 976 F.Supp. 40 (D.D.C.1997), the court held that "plaintiffs have failed to plead sufficient jurisdictional facts, because acts committed within the scope of employment cannot be imputed to the individual defendants to establish personal jurisdiction over

*Id.* at 50.The D.C. Court of Appeals has expressly adopted the principles identified by *Wiggins* and *Richard* with respect to the "doing business" prong of the long-arm statute found at subsection (a)(1).*See Flocco,* 752 A.2d at 163 ("We agree with the analysis of the courts in *Wiggins* and *Richard.*"). Indeed, that court explained that a contrary conclusion would "permit the exercise of jurisdiction ... whenever a plaintiff has made conclusory allegations, on information and belief, that [defendants] have directed or supervised activities of subordinates who have taken some action in the District."*Id.* at 164.

**\*5** The present case is indistinguishable from *Wiggins, Richard,* and *Flocco.*Viewed most charitably to plaintiff, the only facts of jurisdictional import alleged in her complaint (and accompanying briefs) are that Wray and Rosier discussed-in Texas-plaintiff's employment situation (and arguably her pregnancy) prior to placing her on the termination list. As plaintiff points out, "Rosier admitted that he was the individual who decided to terminate D'Onofrio's employment in the District of Columbia."Pl.'s Opp'n at 2. Similarly, "Wray also admitted her involvement in D'Onofrio's termination."*Id.* Although it is not entirely clear, plaintiff appears to have abandoned the assertion made in her Second Amended Complaint that Wray participated in plaintiff's termination phone call on September 26, 2005 in light of sworn deposition testimony that directly contradicts that claim. *See* Wray Mot. Ex. 3 at 3 & Ex. 4 at 3. Finally, plaintiff asserts that Wray instructed Ms. Williams "not to give [plaintiff] the disability paperwork she requested prior to her termination."Pl.'s Opp'n at 3.

All of those factual assertions fall squarely within Wray and Rosier's scope of employment. Indeed, they are all actions taken pursuant to Rosier and Wray's official corporate duties and responsibilities. None of the allegations involve either Wray or Rosier doing business with the District in their personal capacities. Similarly, plaintiff has not suggested that any of the past instances when either defendant visited the District were in any way connected to her allegedly discriminatory termination. Simply put, just as in *Wiggins,*"[t]hese acts, carried out within the scope of [defendants'] employment, do not create sufficient contacts to establish personal jurisdiction." 853 F.Supp. 503.

It is true, as plaintiff points out, that there is an exception to the general rule that jurisdiction over the corporate entity does not alone establish jurisdiction over employees of that entity. Indeed, this Court has previously recognized that exception "in cases where the individuals are 'more than employees of the corporation.'" *Kopff,* 425 F.Supp.2d at 84. Plaintiff's argument that the exception applies in this case, however, is not persuasive. She asserts that Wray and Rosier "cannot be treated as mere employees acting solely in their corporate capacities."Pl.'s Sur-reply at 3. To support that position, plaintiff cites to *Purcell v. Thomas,* 928 A.2d 699 (D.C.2007). But her reliance on *Purcell* is misplaced. There, the D.C. Court of Appeals held that a high level official can qualify as an "employer" under the DCHRA and thus incur individual liability under that act. *Id.* at 714-15.Be that as it may, that conclusion has no relevance to the personal jurisdiction inquiry. The question here is not whether Wray and Rosier can be held liable as a matter of substantive law but rather whether the Court can exercise jurisdiction over them in the first instance consistent with both the long-arm statute and the Due Process Clause.[FN6]The Court concludes that it lacks personal jurisdiction over defendants Wray and Rosier on the basis of D.C.Code 13-423(a)(1).

**\*6** **[11][12]** That does not end the inquiry, however. Plaintiff also attempts to take refuge under D.C.Code § 13-423(a)(4). To begin with, Section 13-423(a)(4) is "*more* restrictive than the Due Process Clause of the Constitution-meaning the District government has made a deliberate decision not to allow access to D.C. courts to every person who is injured here and otherwise could bring a claim for civil redress." *Kopff,* 425 F.Supp.2d at 82 (citing *Crane v. Carr,* 814 F.2d 758, 762

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 423035 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

(D.C.Cir.1987) ("The drafters of this provision apparently intended that the (a)(4) subsection would not occupy all of the constitutionally available space.")). In order to exercise jurisdiction over a non-resident defendant pursuant to subsection (a)(4), the defendant must have caused tortious injury within the District and one of the "plus factors" in that subsection must also be present. *Id.* Those "plus factors" are: (1) regularly doing or soliciting business in the District; (2) engaging in any other persistent course of conduct in the District; or (3) deriving substantial revenue from goods used or consumed, or services rendered, in the District of Columbia. *See*D.C.Code § 13-423(a)(4). Moreover, the requisite plus factor must be "separate from and in addition to the in-state injury."*Crane,* 814 F.2d at 762.

Against that backdrop, it is apparent that plaintiff cannot establish personal jurisdiction over the individual defendants pursuant to subsection (a)(4). As explained above, Wray and Rosier are not "doing business" in the District in their personal capacities, let alone "regularly" doing so. Nor is there any evidence that either defendant is engaged in any other persistent conduct within the District. Plaintiff has also not asserted that either defendant is deriving substantial revenue from services rendered in the District, especially not outside of their corporate capacities. Furthermore, even the limited contacts with the District that plaintiff has identified do not appear to be "separate from and in addition to" her supposedly unlawful termination; indeed, those contacts relate *only* to that injury. In short, none of the plus factors identified in subsection (a)(4) are present here.

Plaintiff's "direct-a-tort" argument ultimately misses the mark. While it is true that *Calder* and its progeny are not limited to defamation cases, as defendants would have it, they are nevertheless inapposite here. *Calder* only discussed the minimum contacts required to establish personal jurisdiction consistent with the Due Process Clause; the long-arm statute at issue in that case was co-extensive

with the reach of the Federal Constitution. 465 U.S. at 787-88. Similarly, *Keeton,* another case relied upon by plaintiff, only concerned that issue. 465 U.S. at 774-75 ("New Hampshire has adopted a 'long-arm' statute authorizing service of process on nonresident corporations whenever permitted by the Due Process Clause."). But as discussed above, subsection (a)(4) of the District of Columbia's long-arm statute does not reach all of the defendants that the Due Process Clause would permit being hailed into District courts. Thus, even assuming that the exercise of personal jurisdiction here would not offend the Due Process Clause under the rubric of *Calder,*[FN7] plaintiff still could not establish personal jurisdiction over defendants due to the lack of the requisite plus factors identified in subsection (a)(4).

*7 In sum, plaintiff cannot provide an adequate basis for personal jurisdiction over defendants Rosier and Wray under either subsection (a)(1) or (a)(4) of Section 13-423, which are the only conceivably applicable portions of the District's long-arm statute. Hence, the Court need not decide whether defendants have sufficient minimum contacts with the District to satisfy the requirements of the Due Process Clause. As explained above, it is plaintiff's burden to prove that there is an adequate basis to assert personal jurisdiction over defendants Wray and Rosier and she has failed to carry that burden here. The Court will therefore grant the motions to dismiss.

### CONCLUSION

For the foregoing reasons, the Court will grant the motions to dismiss of defendants Wray and Rosier. A separate Order accompanies this Memorandum Opinion.

FN1. Live Nation previously "functioned under the name of Clear Channel Entertainment."Live Nation Answer ¶ 2. And Clear Channel Communications "was the parent company of Clear Channel Enter-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tainment."Clear Channel Communications Answer ¶ 2. According to defendant Clear Channel Communications, it is not a proper party to this lawsuit because the organizations in question are distinct legal entities. *See id.* at 2. It has not, however, moved to dismiss the complaint on that basis and thus that question is not presently before the Court.

FN2. The factual discussion here is limited to that necessary to determine the applicable jurisdictional facts for purposes of the motions. Because many of the facts alleged in plaintiff's complaint are not relevant to personal jurisdiction over these two individual defendants, they need not be explored here.

FN3. As discussed below, both Ms. Williams and Wray directly contradicted this account in their respective depositions. Each asserted that Wray was not on the phone during this conversation.

FN4. The "termination list" was evidently a component of SFX's reorganization plan to scuttle "various underperforming units," including plaintiff's Public Relations department. Second Am. Compl. ¶ 29.

FN5. Just as in *Kopff,* here "[t]he other provisions of the long-arm statute deal[ing] with ownership of real property and the existence of certain contractual or familial relationships ... are not relevant for present purposes."425 F.Supp.2d at 82.

FN6. Similarly, *Covington & Burling v. Int'l Marketing & Research, Inc.,* 2003 WL 21384825 (D.C.Super. Ct. April 17, 2003), a case not cited by plaintiff but nevertheless discussed in *Kopff,* is also distinguishable from the present action. In that case, the court found personal jurisdiction over two corporate officers in their individual

capacity because they were "the *only* corporate officers of [the corporation] and set company policies and procedures."*Id.* at *6 (emphasis added). Indeed, the defendants in *Covington & Burling* had direct "involvement and supervision of *all* aspects of the company."*Id.* (emphasis added). That is not the case here. Plaintiff's former employer is a member of a far larger corporate structure. Rosier and Wray are most certainly not the only corporate officers of their respective companies and plaintiff does not suggest that those two individuals control all aspects of the relevant corporations.

FN7. The Court expresses no opinion on this question.

D.D.C.,2008.
D'Onofrio v. SFX Sports Group, Inc.
--- F.Supp.2d ----, 2008 WL 423035 (D.D.C.)

END OF DOCUMENT

# Exhibit B



LIBRARY OF CONGRESS

*Copyright Office*
*of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that the attached photocopy is a true representation of the work entitled **DATAPLACE** deposited in the Copyright Office with claim of copyright registered under number **TXu 1-570-162.**

**THIS IS TO CERTIFY FURTHER**, that beginning October 1, 2006 the Office discontinued the practice of stamping incoming deposits with accession stamp dates. Incoming deposits are now identified with barcode labels.

**IN WITNESS WHEREOF**, the seal of this Office is affixed hereto on February 14, 2008.

Marybeth Peters
Register of Copyrights

Rosemary Kelly
Head
Records Research and
    Certification Section
Information and Records
    Division

Use of this material is governed by U.S. Copyright Law 17 U.S.C. 101 seq.

LC COPYRIGHT

0 024 590 387 A

```
       ">Show           </a></      >
                            ;
 %          }
 %      c) = s      \t/);
 <TR>
 %  my        ;
 %  fore      c) {
   n style   ing-ri    x; bor    ttom: 1       id #f0        ertica     n:top;
     -famil)    ; fon     :10px"      =~ m/^\        ? 'ali    ht'  :       n:top;
     if ($f     egion    nd $co    {
 %     First     s dp_b     id: disp    t as a
 %     my $p =      Place-     romDpBi         $_);
 %             = "$_     TD sty    font-si    \">($p    e})</TD.
         }
         %>
 %      l++;
 %  }
 </TR>
         }
   ABLE>
       close

 %
 </d
 # aja    .html

   args>

 <      results     
 </     >
 <%o,
 use A    ::Const    w(OK);
 use JS
 my $what    ength
   %once>
     it>
   at = $s,
 d      UT TOO         "       ( $what     > '      max_len    f lengt.
 $wh      $what_     ngth;
 $m->c    uffer;
 $r->con    ype('te    in');
   ->send_    header;
   output
     son = n    N(prett    , auto    -> 0);
 my    t = su    $what,    ($what,    + 1);        up str    ter la
 sem.
 $inpu    @^\s*(    *$@$1@;
 if( $i     {

    my @     tokens    t ' ,    ;

    v $quer    t_cou      :
      %uniqu    = ();
      ord_pa
      in    o.    ap {          *       input_t
 display_    ish_cma    o->{sc    sePath},    e -f    geoSwis    Path} 
    open      TS,    exec(s,    ,  $s    md )) u    ERROR    TSHING
    for my     <RESUL    {
      chomp
      next u     $line =    d+)\si      \s"id=    \s(\d+    *)"$/;
        v ( $id     d, $id     , $desc    on ) =    $2, $>     $5 );
```

Copyright © 2007 KnowledgePlex, Inc.

```
           'ip = 0;
     fo    token(      t_token
           $token,
     u     $descr        =~ /$      i ) {
                 = 1;
           }

     ne    $skip;

{    if( o    $uniq    t{$desc      n} && .    e_what     iption,    )
           next,
        lse {
           unique_    $descr    = 1;
           }
     las    +$quer    lt_cou    $max_re
     push       out, [    iption    i
     RESUL
#         STDERR       ->objTo     @outpu
  init>
    son->o    on(\@ou       %>
       t/aut   esugges

/**
 * An a    gest t    contro
 * @class
    scope

fu    n AutoS    Contro

/*:H     tEleme                   oPr      /*:Sug    nProvi
                                               )

    /**
     * The cu    y selec    uggesti
       scope p
    t     r /*:in    -1;
    /**
     * The    own lis    r.
     * @scop    ate

          layer

    /*
     * S    ion pr      for th    sugges    ure.
     * @sc    ivate.
     */
     is.prov    /*:Sugge    rovide    oProvi

    .    textbox    nture.
     *    privat
     */
this.te    /*:HTM    Element    nTextbo

   nitiali    contro
     init();
```

3

```
    ar oNo      his.tex
        iLeft

    w   oNode.     e != "B       {
           t += o     ffsetLe
            = oNo     setParei.
    }

    turn iL
};

/**
 * Gets    op cool    e of ti   tbox.
 * @scope      te
 * @return     op coor     of th   box in    s.
 A    gestCon     rototy     Top =     on ()        */ {
    ode = t    xtbox;
    va     = 0;

    while      tagNam      BODY")
        iTop     Node.ot    p;
        oNode    de.offs    ant;

    re    Top;


    dles t     eydown
 *    e priv
 *        oEvent     vent o    for the     wn eve
 */
AutoSug    ntrol.   ype.han    Down =    ion (o     /*:Even.
    switch    t.keyC
        case    /up ar
           th    viousS    ion();
            brea
        se 40:     arrow
        this.ne    estion
            reak;
        c    : //ent
            hideSug    ns();


};

**
    andles      events
    cope pr
 *    am oEve     event    t for t    up eve
 */
Autos    tContro   otype.    KeyUp =    ion (o     /*:Even.
    var    de = o    keyCode.

    //for b    ce (8)    lete (   hows su    ons w    typeahe.
        (ikeyC   8 ||    de == 4.
        this.p    .reque   estions    false,

    //    sure no.    nterfer    h non-c    er keys
```

```
        } els.      iKeyCo       ? || (iK    e >= 33        eyCode        || (iK      >=
        & iKey    = 123),
            //igr
        se {
            /reques     estions     the su     n prov.    ith typ
        s.prov    equestSu    ions(th.    ue);
    }


    s the s    ion dr
 * L    privat
 */
AutoSug    ontrol.    ype.hi    estions    ction
    this.    .style.    lity =    en";


    ights t    en node    he sugg    s dropL
 * @    privati
 * @pa.    Suggesti    e The n    oresen    sugge       n the o    n.
 */
    oSugge    rol.pro    highl    gestic    nction     estion.    {
        for (va.    i < th    er.chi    s.leng    +) {    estion.
            var o    this.    childNo    ode) {
            if (oN    oSugge
                oNod    sName =    ent"
            se if    .class    = "curr    {
            Node.c    e = "",
        }


/**
 * In.    zes the    box wit.    t hand    or
 * auto    st fun    lity.
 * @scop    ate
 */
    Suggest    .proto    init = 1    on () {

        ve a re    e to t.    iect
        his = t.

    //a.    the onk.    vent ha
    this..    x.onkey    functio    ent) {

        //ch    the p    locatio    the eve.    ect
        if (!o    {    window.e
            oEve.    indow.e

        /.    the ha    yUp() m       with t.    nt obje.
        oT.    ndleKey    ent);

    ign on    n event    ler
    extbox.    own = 1    on (oEv

        k for    per lo    of the    objec
        i    vent) {
            t = win    ent;
        }

        /call t.    dleKeyD    method    the eve.    ect
        is.hanc    own(oEv
```

5

```
        };

        //assign     r event    ler (hi    gestio.
        .textb.     lur = 1.    n () {
            this.h,    estions
        };

        //cre.    he sugg.    ns dropc
        this.c.    ropDown.

/**
 * Hi.    ts the    sugges.    n the o.    n and
 * plac    e sugge.    into t.    rtbox.
 * @scop.    ate
 */
    uggestc    l.proto.    extSug.    n = fun.    () {
        " cSugg.    Nodes =    layer.    Nodes;

        uggest.    es.leng.    n && th.    < cSug.    nnNodes.    h-1) {
            oNode =    question    r++this
            highlig    estion.    );
    .    t.    xtbox.v.    = oNode.    Child.    lue;

/**
 * Hi.    ts the    us sug.    n in th    ndown a.
 * plac.    sugge.    into th.    box.
 * @scope    ate
 */
    uggestc    l.proto.    revious.    tion =    ion ()
        cSugg.    Nodes =    layer.c    des;
        Sugges.    des.len    0 && t.    r > 0)
            oNode    uggestic    s[--thi    ;
            highl.    estio.    e);
    }    extbox.    = oNo.    tChild.    alue;

/*
 * S    s a ran.    ext i.    textbox.
 * @s.    ublic
 * @par.    art The    index    0) of    lectio.
 * @param    th The    r of c.    rs to .
 */
    uggestc    l.proto.    lectRa.    functio.    tart /*.    . iLen.
        ") {
    //    ext ra.    or Inte.    xplore.
        if    textbo.    teTextb    {
            ange =    textbox.    eTextR.    ;
            o.    oveSta.    aracter    art);
            oRan.    veEnd('    ter", i    h - th.    tbox.va.    ngth);
            oRange    ct();

        }    setSele    Range()    ozilla
            if (thi.    box.se.    tionRan.
            textbox.    lectio.    (iStart.    ngth);
        }

        //set fo.    ck to t.    tbox
        s.textb.    us();
};
```

```
*
* uilds t  ngestio    r conte   oves i    positi
* l displ   e layer.
* (  rive
* (     aSugge   s An ar   suggess   for the   rol.
*/
 AutoSug   ntrol.   ype.sho   stions   ction (  stions    ray*/)
    var ob    ll;
    his.laye   erHTML   //cle   ntents o   layer

    var i=   aSugge   s.lengt    ) {
       iv = do   .create   nt("div
       append   docume   ateText   aSugges    i]));
    }

    is.laye   e.left   s.getLe    px";
    .layer.   top =   etTop   s.textb   setHeig   px";
    layer.s   isibili   visibl

*:

   erts a   stion   e textu  ighligl   the
* sted p  the te
* (  privat
* @p   Suggest   he sugg   for th  tbox.
*/
 toSugge   trol.pr  e.type   = funct   Sugges   *:Strin   r
    //chec   support  peahea  tionali
    f (this  box.cre  tRange   s.textu  tSelect  nge){
       var iL  this.te   value
       this.te   value =   estion,
       is.sele   e(iLen,  gestion   h);
    }
;

*********   *******   ********   ********   *******   *******  ******
/*
* t  utoremo  est ho,  mmon co
*/
functio   AutoSug   ntrol   tbox, o  er, sel  Callbac
 ableTy    d ) {

    var    new Au  estCon   oTextb  rovider
    elf.pr  Text =

    e defau  llback   l if n   is sup
    electi  hack = _  ionCal

    //Ov  den to   selecti  hack
    self.  ggesti  unction
       Sugges   des = t.   ayer.ch  des;
       uggesti  des.le    && th.   <
       1) {
          r oNod   uggesti  s[++th   r];
          s.high   ggesti  de);
          textbox   = oNo   stchil   Value;
          is.sele  allbac
          this.se  nCallb   Node.da
```

7

```
//...idden to    selecti...back
self.    ...ousSugg...  = func...  ) {
    cSugges...  ndes = ...  ...ayer.ch...  ...des;
    ...Suggest...  ...es.leng...  ... && th...  > 0) {
        var on...  cSugges...  ndes[--...  ...ur];
        ...his.hig...  ...Suggest...  ...Node);
        ...is.text...  ...lue = o...  ...irstch...  ...evalue,
            this.se...  ...nCallba...
                this.  ...ionCal...  ...oNode....  ...;
    ...;

...enable...  ...head = ...  ...TypeAh...
...ajax s...  ...roblem  ...  ...id rep...  ...xt.
se...  ...ndleKey...  ...unctio...  ...ent) {
    ...ar curs...  ...his.te...  ...value;
        ...curst...  ...his.pre...  )
            ret...
    ...  ...his.pre...  ...curst...

    var ...  ...de = o...  ...keyCode...
    if( i...  ...e == 32
        else i...  ...ore spa...
            th...  ...Code ==  ...  iKeyC...  ...46) {
                th...  ...vider.r...  ...Sugges...  ...this, ...
        ...  ? if (i...  ...e < 32 ...  ...eyCode  ...  ? && iK...  ... < 46) ...
(iKeyc...  = 112 ...  ...vCode <...  ...) {
                } els...  ...//ignor...

    ...enable...  ...ad);  ...provid...  ...uestSug...  ...ns(th...
...;

...erridd...  ...support  ...data n...  ...n this  ...we can  ...reuse
se...  ...ent_ty...  ...d = se...  ...eAhead;
sel...  ...Ahead ...  ...tion (s...  ...tion)
th...  ...txtbox.va...  ...Suggs...  ...toLowe...  ...).index
            ...Lower...  ...) < 0 ...
                retu...
    ...  th...  ...ent_ty...  ...d( sSug...  ...n );

//...idden to  ...e json  ...result  ...he firs  ...uestion
...t is a ...  ...selecte...
self.a...  ...ngest =  ...ion( a...  ...tions, ...  ...head )
    ...thi...  = -1;
    if (a...  ...tions &...  ...ngestio...  ...ngth > ...
        if  ...eAhead ...
            ...is.type...  ...aSugge...  ...[0][0]),
    }
        ...all se...  ...nCallba...  ...the fi...  ...uggestio...
            ...this.se...  ...nCallba...
                this...  ...ionCal...  ...aSugge...  ...s[0] );
    ...  th...  ...wSugges...  ...aSugge...  ...);
    ...e {
        this.h...  ...ngestio...
}
};

//Overr...  ...to hand...  ...n array  ...lts - e...  ...ggesti...  ...l carry
addi...  ...data
```

```
s    owSugge      = func    (aSugge   ) {
         var oDiv    ];
      is.laye       rHTML =    //clea      nts o       layer
          (var i=     aSugge  .lengt    ) {
             oDiv     ment.c     lement(  );
  oDiv.app    ild(doc    .create   de(aSug   ns[i][
            ke eac    estion    data
          ata = a    tions[
           .appen       (oDiv);
      }
      thi     r.sty      = this   ft() +
      this.    style.   (this.g   ()+this.   ox.offs   ht) +
";
  };
      his.laye   le.vis.   v = "vi   ;
  };

  Overri      call     ionCal.    - there   ething    with t
  his func   must be    d aga    .
  createD     n = fun    () {
      var ol    this;
      //create    layer a    ign st,
      is.laye    cument.    Elemen   ");
      layer.    ame =    tions
      layer.st   isibili   hidden
  th   ver.sty   th = th    tbox.o   width;
  //whe    user c    n the     estion,   the tex   erHTML,
  //and p    t into   tbox
  is.laye   ousedow
  s.layer.    seup =
      layer.o    over =    ion (oE     {
          oEvent    vent ||   w.event
          Target   ent.tar    oEven    lement,
          (oEven.    == "mo   wn") {
             oTh   tbox.v    oTarge   tChild   alue;
             oThis    suggest
             if( o     lection   ck ) {
                  select    lback(o    .data
             } else       vent.t    "mouse     {
                  highlig   estion   t);
          se {
             oTh   tbox.fo
      }
          ent.body   ndChil    layer),
      create   wn();
      self;
  ********   ******    *******    ******    *******   *******   ****
  */
  /*.
  * T    ersion    oremot   st
  */
  functio.    AutoSug    ntrol(   box, oP,   r, sel   Callbac
      ctionCa      f = new    AutoSug   ntrol(   box, oP   er,
      retu    f;
  }
  }/**
  *****   ********    *******.   *******   *******.   *******   *******
```

9

```
this.      style.v.    ity = '.       ";
this.lay   vle.wia.    his.tex    ffsetw.

      en the    clicks        a sugg      , get       xt (inn     )
t.        ver.onm        wn =
thi.       r.onmou.
this.      onmouse        = funct.    Event)
             nt = oE.      window    t;
           t = oEv.      target ||     nt.srcE.      :
        o.        = oTarg    rentNode.
           f (oEve.      e == "m    own") {
oTarget   ntNode.      ]
             o.        xtbox.v
                    //oTh.    eSugges.    )
             if.    s.selec.    lback
     t.paren.    data );            his.se.    nCallba.
        } e.      (oEve.    e == "m    er") {
      } else        is.hig.    Suggest.     Node);
             vent.t.        mouse    arget.    Node);
           se {        re this
        }        oTh.    box.fo.

        nt.body    ndchil.      layer).

     create   wn();

se.    hlights    tion =      ion (oSu    ionNode
        r (var        i < thi.    r.chil        lengt.      ) {
             va.    de = th    r.chil      [i];
           if (      == oSu    ionNode)
               de.clas.      = "cur.
           } else       ode.cla.      == "c.      ") {
               o.    lassNa.    ";
};

        //Overri.      call      tionCal.
        f.nextS.    ion =      ion () {
           var        stionN.       = this.        hildNo.
           if (cs      tionNo.      ngth >      his.cur
               v.    de = c.    tionNo.      this.cu.
           th    hlights    tion(ON.      this.cu.
           this.      ox.val      ionNode.da.
           if( th      lection.    ck )
                   select.    lback(      data );
        }
};

        //Ove.      n to ca      lection.    ck
self.pr.    Sugges.      funct.      {
        if      uggest.      s = th    r.chi.      ;
           r oNode    uggest.      s[--th    ];
             s.high.    uggestic        this.          s[--th      ];
             textbox      ggesti.      a = ON.      de);
        .    s.selec.    llback      Node.da
                this.se.    nCallba    Node.da
```

11

```
        ret.    ⌐lf;
 ⌐

/***    ******.    *******.    *******.    *******`    *******    *******.
******⌐
/**
  Policy.   ⌐ such ⌐   ⌐toRemo⌐   ⌐est der⌐   ⌐es must   ⌐he sam⌐
   ⌐ocol be   ⌐  ⌐'s one u   ⌐s from   ⌐riginal   ⌐  the ad⌐   of a c⌐   ⌐k to a⌐
ac   ⌐  when re⌐  ⌐turned .   ⌐fore a   ⌐gest i⌐   ⌐ed.
 * @c⌐
 * @sc⌐   ⌐blic
 */
   ⌐tion R⌐  ⌐uggest⌐   ⌐emoteu⌐  ⌐lection⌐   ⌐ck ) {
      if (type   ⌐HttpRe⌐   != "un⌐   ⌐d") {
         this.⌐   new XM⌐   ⌐equest
         ⌐se if (  ⌐  ⌐ Active   ⌐t != ⌐   ⌐ined")
         ⌐is.http   ⌐v Active   ⌐ct("MS⌐   ⌐mlHttp⌐
      }   ⌐ ("No XM⌐   ⌐equest   ⌐ avai⌐   This f⌐   ⌐nality ⌐   ⌐ot
   ⌐k.");
      ⌐is.rem⌐   = remo⌐
         ⌐.reque⌐   = 0;
         ⌐selecti⌐   ⌐back =   ⌐tionCa⌐.
}
   ⌐*
   ⌐equest   ⌐stions   ⌐he giv⌐.   ⌐suggest   ⌐ol.
   ⌐ope pr⌐   ⌐d
 * ⌐   ⌐m OAu⌐.   ⌐estCont⌐   ⌐e autos⌐   ⌐ contr⌐   ⌐rovid⌐   ⌐estions
Remot⌐   ⌐stions.   ⌐type.r⌐   ⌐ Suggest.   ⌐ funct⌐
   ⌐Sugges   ⌐ol /*⌐   ⌐ggestC⌐   */,
   ⌐   ⌐head /⌐   ⌐ean*/

   ⌐r oHttp   ⌐Reques   ⌐: // th   ⌐   ⌐p;
      request.   ++this.   ⌐stNum;   ⌐p
   // ⌐ the UR⌐
      ⌐var   ⌐hString   ⌐toSugg⌐   ⌐ntrol.te   value.⌐   ⌐e(/^\s⌐   \s*$/,
   ⌐l");
      var su⌐   ⌐his.rem⌐   + enc⌐   ⌐Compone.   ⌐rchStr⌐
   ⌐en con⌐   ⌐n to s⌐   ⌐xt fi⌐
      ⌐.open(   ⌐   sURL ,   ⌐:
      v⌐   = this.
      oH⌐   ⌐readyst⌐   ⌐nge = 1   ⌐on () {
   ⌐ing thi⌐   ⌐back o⌐   ⌐e   ⌐) { //   ⌐e recen⌐   ⌐est has   made,
   ⌐   ⌐ttp.abo.
         ⌐r⌐
      ⌐ (oHtt⌐   ⌐yState .   {
         //eval⌐   ⌐he ret⌐   ⌐ext Ja⌐   ⌐ot (an   ⌐)
         ⌐ar aSug⌐   ⌐ns = e⌐   ⌐ttp.res,   ⌐ext);
         ⌐e.se⌐   ⌐nCallba⌐
         ⌐e.sele⌐   ⌐allback   ⌐estion.
      ⌐   ⌐ide sug⌐   ⌐ns to t⌐   ⌐ntrol
      ⌐   OA⌐   ⌐gestCo⌐   ⌐autosug⌐   ⌐Sugges⌐   bType⌐   :
   ⌐.
```

12

```
        oHttp      (null);

/       `*******       `*******,      `*******,     *******     `*******,     `*******     `****
**  b)        /
# b)       aimport     table_    tor_hma

#! /usr,     /bin/p

    strict
       PI qw(:        oes);
u:       dBin qw
use      "$Bin/...      ib";
use      Bin/../.     kp2/li
use Tex       V_XS;

    Vinq::.
       Data::D
u       nq::C2;
us      ot::Lon

our (      ame, $a       e, $tab       e, $sta       e, $end

    IN {
      $confNa       dpigho_
        ataFil
        hleName
}

use con.        SCRIPT_     NS => t      Name=s'       confNa
                          ie=s' =     taFile,
                         ta     e=s' =>      hleName
                         star        s' =>       Date,
                         endDat       => \$en         ;

use         nt USAG       <<EOF;
$0 - U       system      in DP

    TIONS:
      confName=      > REQU      Use th      figura     deter     he dat
        aFile=<      REQUI      se this     file to     into da
        eName=<r       REQUIR       ad the      into th      hleName
    EOF

use lit      /../..      /bin";
    commi        n;


#       he con       tion re       o use.
###
my $c      inq::C2       $confNa

f (! $c
    my $e       = "Unab      create      uratic      ect for      ame: '$       me'";
    die($er

my $       h = Vin      new(co       ct=>$c       abase=      atabase
my $csv      t::CSV_      w;
    ($curi      $gscin      $sth,      gsc, %_      fields,     ds, $po
    r_idfie      firstli      ieldty
    ind_dat      d, $dp       id, $b       v_type_      houndai     t_id, %      ds,
$      scid, $      blumn_i      splay_n       $value,      mat_id       name);
# ge      all fie       s from      irst li       the dp       da_summ      4.dat
```

```perl
    ...sition
        (IN1,        aFile"),
    ...     (<IN1>
            ...p $_;
            ...ds = sp    /, $_),
        f...    my $f,    @fields
            ...field... (field);    ...sition
        }
        last;
    ...
c...    N1;

#get... he posi...    of the    ...lds in    ...ata fil...
$first,...    1;
    ...en(IN2,    ...da_kpi_...   txt"),
        ...le (<IN...
        if ($fi...  ...e) {
            $firs... ... = 0;
            ...se {
            ...omp $_,
                ...rr_gsc
                ...csv->pa... ...curr_g...
                ...ields = ...->fields
                ...inforef... ...elds[1]    ...igsci... fields[...
                    ...foref->... ...ds[1]}  ...nositic    $data_t...    ...$fields
                $i... ...s{$fie... ... = 1;
        }
    ...
    ...ose IN...
        ...fields{...    ...leid} =
        ...elds{ye...    ... 1;
$,    ...ds{stus    ...    1;

#prep... the ha...    contai...    ...cator n...    ...nd the...    ...els wh... ...11 be u...
to popu...    display    ...in ino...    ...n table
$firstli...   1;
    ...en(IN2,    ...ax_meta...  ...hmda.da...
    ...e (<IN2>
        ...($firs...   ... {
            $firsti...    ...  0;
            ...e {
            ...mp $_;
            ...csv->pa...  ...t_)) {
                ...ields = ...->fields
                ...olay_na... ...($fiel...   ...} = $f...   ...9];
                ...ay_name,    ...$fields    ...  =~ s/,, ...
                $i...    ...ids{lc...   ...ds[3]),
                if ...    ...fields... ... m/^pc...  ...1 (lc(...   ...:[7]) =...
                    $fu...   ...ids{lc(...    ...s[3])}
                elsif ...   ...fields... ... m/^do...   ...) || (l...   ...lds[7],    ...  / dolla
                ...format_...  ...($fiel...   ...} = 2;
                }    ...c (lc($...   ...7]) =~    ...tio /)
                ...mat_ids...   ...fields[...   ... 3;
            }
        }
    }
    ...e IN2;
    ...aring a    ...to cont...    ...ndicato...    ...s and ...    ...rypes w...    ...vill be    ...  to
c...    the di...
$fi...    ...e = 1;
open...    "<hmda_...    ...oes.dat
```

```
        file (<1          r
          if ($f     ne) {
              $fir       = 0;
              lse {
                homp $_
                  ($csv-     ($_))
                     3fields     v->fie
                     ieldtyp   fields[0,     fieldsl
              }
        }
        clo      ;
        # Rea     he dat      and g    ing the      script     at file.      data t
        and in    mn tabl
         firstl
          n(IN1,    taFile"
           OUT1,      leName
         L    JT2, ">      ighosh,      /hmda/    Name.da
        op    3, ">/h    nhosh/l    mda/in    leName
        whi     N1>) {
          # Gene    n the c   TABLE s    nt fo     table
            if     tline)
                p.    OUT1 "D     3LE $ta      e;\n";
                pri     T1 "CRE     BLE $ta     e (\n
                prin             ndary_    d    cha    r varyi     \n";
                print  "          dary_ty     inte     \n";
                  rint Ou          t    nd_id    ner"
                  mp $_;
                   = $geo    repare    T NEXT    ind_da    seq')").
                   execute
                $i     aset_i    th->fet    arrayre    r0];
                if    parse     {
                  @     = $csv    ds ();
                  for    v $fie    ields)
                    n    ($field     geoscal    {
                    t OUT1
                  } el    lc($fie    n coun     ($field    inte    ')) {
                    pr    T1 ",\    "    || (lc     eq    ')) {
                                     eld) .    haracte
         ing(100,
        (     eld) eq     cd')    field) e    fid') ||    $field)    nsapmas
        || (i    ld) eq    05') |    field) e    unty')   -($field    uplace
        rying(           OUT1     $field)    netrod0
                                  $field)    charac
                  } else
                    print       ",\n    " . lc    d) . "
        $       vpes{l    d)};
        # Gen    ng the    file for     column
                    $su    neodbh->    re("SEL    EXTVAL     column_    ");
                    $sth    ute();
                    $ind_c    id = $s    tchrow    ref()->
               f (not     ($idfie    r($fie    {
                    $db_na    lc($fie    {
                      rint O    lc($fie
        "$in    mn_id,    ataset_    _name,    ay_name    $field),    1,$form
        s{lc(     ")}\n    ;
                  }
                  t OUT1       ";
          $first     0;
          e {
              ($csv-     ($_))
```

```
                  elds =         fields
   ping           oscale       and 12       ro05 a      ro05d        t there
e      g data     if      fields[      11) ||     ds[0] =    (      } {
$fiel       infore.        fields[        ldposi
                  $bou       type_i       scinfor        fields      kpigsc
                  $sth =     dbh->pr     SELECT       und_id       boundar      ntifier
   bound      it_id       d bound      e_id =
                  h->exe      boundar    t_id, $     ry_type
                  e = $      tchrow     ef();
                  und_i     lue->[o    d_id};
         it      lds[0]    \ {
                  nd_i
         }
         nless      ound_
         print     n't f     n_bound     r geosc      $fields
b     v type      ary_typ    boundar    t id $b    y_unit
         ext;
         }
         pri     2 $bou      nit_i      ";
         print     $bound     e_id     ;
         print     dp_boun
         reach     eld (@        ) {
           if ($1     eq ".")
              $fi     "0";
           t OUT2     eld";
         }
         print     "\n";
}
}
print       "COPY        Name FR    ome/ig     cal/hm     bleNam      DELIM1
   int OU     SERT IN     d_datas    d_datas      series    table_r
   play_na    eation     publis    data_fi    path,
      OUT1
m      a_file     th, st     options    te )     perio      date, o    tor,
pr     T1 "     UES (     ataset        Stab       Ho    tgage
Disc.     Act (F     Finan    nstitut    xamina    uncil)    (), t
'/usr/    shared/    ing/da    $datar
   int OU     to_date    artDate     \n";
   vy-mm-     Federa    ncial     utions     vy-mm-     o_date    Date',
  /local   d/dpsta    dataset      x_meta    nda.dat    ta imp
   .delim     Impo    ;\n";
pr    T1 "CO     COLUMN    column    nd_data    , db_na    isplay
for    y, for    for_cha    rmat_    ,
'/home    sh/loca    /ind_S    ame.da    MITER       ";
close I
  ose OU
   e OUT2,
   OUT3;

# c     /js/co     ism

<%flag

  %flags>    t => '.     nexpir    ler'
    r>
n      enab     Cache

</

/* ---         -------    --------      -------     -------     ----hi
```

```
...art----      -------    --------    -------     -------        '
...ese tw...  ...are re...   ...d to sy...  ...tory/c...
   ...istoryL... ...andPres... ...Trigger... false;
Va... ...toryCa... ...Trigger... false;
win... ...load = ...ryInit;
funct... ...istory... {
          ...lHistor... ...tialize...
          ...istory... ...istener... ...oryCall... ...);

...ion his... ...xtract... ...omLocat...
     var m... .../h_(... ...ePage|... ...e|chart... '.exec( ...ion );
     return ...ch && ... ...length ... ...ch[0]... ...>= 2 )
matc... ...substri... : '';
}
function... ...oryExt... ...aFromL... ...on( loc... ) {
     v... ...a = Ob...
     var ...string ...tion.s... ...ing( lo... .index... ) + 1 ),
     var ... = key_s... split... ...
     for( ... i < pa... ...ngth; ... {
          ...air = p... ...].spl... ...);
          d... ...ir[0]] ...r[1];

     ... data;

...ion his... ...et( pag... ...a ) {
     if( p... ...) false;
     var anc... '#' + ...
     ...r pairs ...ray();
     ...( var ... ...ta ) {
          if( ...i] != ...
               ...s.push( '=' + a... );
     }
     var ...tra = p... ...ion('&
     if( ur... ...a != ...
          ...r += '... ...l_extr...

     ...lHistor... ...ancho... ...e );
     ...ar i i... ...
          if( da... == '' ...a[i] == ...fined'
               ...ryStora... ...ove( i...
     ...e ...
     his... ...orage... ...data...
     ...storyS... ...put( ... ...page ...
     ...rn tru...
}

...nction ...ryCallba... ...ocation... ...ation_... {
     his... ...allback... ...red = ...
     if( ...DPCob... ...sent = ... se ) //... reset ...k here
dp... ...nd wil... ...ll this ...ion wh... ...obrand ...itialize
     ...n;
     ...' locat... : '' ) {
          DP... ...d.showP... ...rofil... );
          hist... ...lbackTr... ...d = fa...
     }
     return...
     var p... ...histor... ...ctPage... ...ation... ...tion );
     if( pag... ...') {
          ...nd.sh... ...( DPCob... ...efault... );
          hi... ...allbac... ...ered =
     }
     ret...
     va... = hist... ...ractDa... ...Locati... ...cation
     swit... ...ge ) {
          ...'prof... ...e':
               hist... ...playPr... ...age( l... n_data, ...);
```

```
                    k;
        case 'ma   ':
            h.        Display.    ne( loc     data, 
            bre.
            'chartP
            histor)      ayChart.    locatio    a, data
            break;
        defau
            brand.s    e( DPCo.    default   );

    }
    istoryc    kTrigg   = false,
}
functio    toryDis,   ofilet    location,   data 
       Cobranc    ntPage     ' && DP        d.curre.    != 'pi    age' )
       Cobranc    Page( b.   nd.curi    ne ).hi

}
DPCobra.    wPage(    lePage
   p = t  and.get,   orofil   ');
   typeof    'places    unde    ) {
       var    Cobranc    ge('p    age');
       var c     = p.    dget.g      s();
       var h_p.   = new s.    data[    s[] ] );
       laces .    aces.sp    ');

       ve
       va   places    ay();
       for    i = 0;    places.    h; ++i
            h_plac    exOf(    es[i]        )
            exp_    s.push(    ces[i

       exp_p1    ength 
       var     = p._pr   able.ge    ns();
       for(     = 0; i    .lengt    ) {
            xp_plac    exOf(    ].name    0 } {
                p._pr   able.re    lumn(    :].name
                areaWh    oldRem    a( col    ame
       }
       o._pro   ble.ret.   );
   }
   //Add
   r_new_p    = Arra
   ( var i    i < h_    .length,    )
       if(    $/.tes.    laces[1      c_plac    exOf(
h_pla.   ) < 0
            laces.p    h_place-
       if( .    aces.le     {
            var i     < new.    s.lengt    i )
                p._ai    net._o,   rea( new     es[i] ),
            p..    Widget.    Area(),

}

nction .    yDispla    ge( lo    data,    ) {
    if(    brand.c    Page !=    & DPCob.    urrent.    != 'mapP    ) {
       Cobrano.    ge( DP    d.curre    ).hi
    }
    //Place    ndicato    ired
    ( type    a['ind    '] ==    ined')
```

```
        || (ty,    data['p,    '] == 'u,    ed')
        (!/^      test( o     indicato      )
        (!/^x\    est( da    laces']
    ) {
            and.sho    ( DPCob,    efault,    .
      re {
            DPCob,    howPage   age');
    }
    var p    Cobran    age('ma,    ');
    var ma,    getMap
    ar lege    n.lege     et._dpL

      dicator
      dicator    v DPIn       r( data,    cators
    DP.    addLis    indica    dataloa    nction,
    u    periods    { 
            ind,    setAc    ar( dat    iods']
        if,    of data    r'] !=    fined'
            dicator    ctiveC    data['c    );
    }

        ( typeo    ['nbran    != 'un    d' ) {
            in    .setAc    Ranges    ['nbran    );
        i    eof data    ndary'    ndefin    {
            indicato    ctiveT    Bound    ata['bo    '] );
        }
        map.se    ator(in    r)
        egend.s    cator(1    or);
    });
    //Map t    ings o

        (ty,    data['z    'unde     
        && (    data['    != 'un    d')
        && (ty,    data['l    = 'unde.    )
    ) 
da    '] );    .cente    om( new    Lng( da    t'], o    ng'] ),
      else {
            va    e = ne    ace( da    laces'],    tion(p)
        } );    p.cent    ace(p);

        ( typeo    ['z']'    ndefine
            map    ro( da    '] );
}
functi    toryDis,    hartPage    ation_    data )
    Cobran    ntPage    && DP    d.curre    != 'ch    e' ) {
        DPCobr    tPage(    and.cu    Page ).h
    }
    DPCob,    howPage    artPage
    if( typ,    ta['pl    ==  'un    d'
        || eof data    icators    unde
        || f data    ds'] =    efined
        ale    ramete    be mis.    places.    icators,    ds)' ,
        return
    }
    var p    Cobran    age ( c    qe' );
    var pl    new S    data['    '] );
    laces =    s.spli    :
        u_plac    new Obj,
```

19

```
for(    i = 0;        laces.l      ++i )
          ( /^x\d        st( pla     i ) )
              u_p       r places        = 1;

          r_plac      rray(),
          var i      laces )
          r_pla      sh( i )

   if( i.    es.leng      {
              c_plac       ._area     getArea
              ve pla
          va     places    ray();
          for    i = 0;      places     +h; ++i
              r_pla   ndexOf(      ces[i]       )
                 ol    es.push      laces[i]
          f( old_      .lengt
              va      = p._        getColu
              for    i = 0;      ls.len        +i ) {
                  old_p.      indexOf      [i].nam     ) >= 0
                  p.r    rea( co      name[0
                  p._ar     net._re      ea( co     name[0]
                      _table.     eColumn       s[i].nam
              }
          }
              p._ta    efresh(
      }
      //Au    ces
      var n      ces = A     ;
      for( va      0; i <      ces.len      ++i ) {
          i    laces.     f( r_p      i] ) <
              new_pla     sh( r_+      [i] );
      }
      if(    places..      ) {
          clearAr          )
              var i      i < new_      s.lengt      i )
              p.ad     new_pl      ] );
          p.    sh();

/*
      indicato.    ew Str    data['in      rs'] ),
   .    tors = .    tors.s      );
   va    dicators    w Obje
   for(    = 0; i    icator.     th; ++i
          /^\d+$    ( indic      i] ) )
              u_in    rs[ in     rs[i] ]
      r_ind.    s = Arr
      var i      indicato
          r_in    rs.push
   it     dicato    gth ) {

          c_ind       s = Arr
          var i      indicat
          if( p.    cators      true
                  icators     ( i );

      //rem

      r( var          i <       cators.      ; ++i
          if(     icator.    xOf( c      ators[
              remove.    or( c_      ators[i     0 ) {
              able.re     w(1);
```

```
        'd
        var i =        < r_ind,     s.lengt,      )
            if( c_     tors.in,       r_ind,      s[i] )
                    ndicato     indicato      );
    }

    var peri,    new St    data['      's'] );
      iods =      ds.spl,     );
        l_perio,   new Obj,
        var i =      perio,    ngth; +
            if( /^\     /.test,   ods[i]
                    ods[ p,      [i] ]  =
    }
    var r_p,       = Arra,
        r( var    _perio,
            r_,    s.push(
        perio,     th ) {

        var c_p,       = Arra,
            r( var    _perio,
                c_p,    s.push(

        //    Perio,
        var    eriods    y();
        for(    = 0; i    eriods,      ; ++i
            _perio,   exOf( c    ds[i]         )
                old_p,   s.push(     iods[i
            old_pe,   length
                var    p._ta,    tColumn,
                for(    = 0; i    eriods    th; ++
                    var j =      < cols,    h; ++j
                        if( c    name[1      ld_per,    '] ) {
                            oyePer,   ld_per,     );
                            p    e.remo,   mn( co,    name

                }
        _table,    sh();
    }

        'Add Per,
        new_pe,      = Array
        var i =      < r_pe,    length;
            if( c    s.inde,      perio,      < 0 )
        if( n    iods.l,      eriods,    r_peri,      );
                var i      < new_    ds.leng      i )
                    p.ad,    ( new_    ds[i] ),
                p.    sh();

*/

        //b      image
        if(    f data[    By'] !=     efined,    typeo     'colorb,    =
    ,    ned') &    eof dat,    itBy']    ndefine
data[      By'] )      /^x\d+$/     ( data[    By'] )     \d+/.t,
```

```
                    )
            $('char      ').src      $co->{b     } %>a],      rtImage
                                  ?column.           + data.      ators
                                     laceKey=         data['      ']
                                  +  iods=            a[ per
                                  +   nBy=' +         groupL
                                  +  '&      v=' + a.      olorBy
            }                     +  '&li     '  + dat      itBy'],

        }
        /* --       --------    ------      -------      --------     ----hi
        end---       -------     -------     -------      --------         */
          DPCobr       {
            s : {},
             ntPage
         a      Page :        lePage

        load      ction()
            DPCob    ddPage(        ge', ne        pPage         age', ne    );
            DPCobra   dPage('       ePage',        PPProfi   ('profi       , 'Ne     hoods
           iles'])
             brand.   e('char       ', new L     tPage(     age',      nd Char
             rand.ad     ranks     new DP
         //  rand.p    w Peri      Execute     age('r     ge', 'r     s'));
        DPCob    andlePe     nk(); },    :0);       ction(

           t-----      -------    -------      -------            ory
             hist     obran       t = tru
             var cu     locati      new Str     htmlHis     etCurr     ation()
             f( his     llback      ed ==    on);
                h         Callba     rrent_l     n);
             se if(        nt_loca     length >        //boo     access
             }       hist     lback(
           }
             PCobra     wPage(      and.de     ge );
           /* ----      -------     -------            ----his
        end          -------     -------      ----- */

         $('me     ').appe    d(DPCob     etMenu

        ;    permal     functio
        //   v     ath = w     locati     hname     /(');
        //    v     e = pa     h.lengt     oLower      ;
         swit    e) {
         case
         case 'p     :
             PCobra     wPage(      lePage')
             eak;
                  map':
                rand.sh      ('mapPa
         b
         case       ts':
             PCob     howPage     tPage',
         break;
         se 'ran       :
             obrand     ge('ran     );
         de
```

```
        DPCob.        showPage        filePage
        break;

    },

    addP         functi      eName,           {
        DPCob.      ages[p     e] = pa

        ap : fu      () {
            n DPCob      ages[     e].ge       :
    },

    showP      functio      Name)
        if (DP        .curre       e == p       e) retu
        or(var        PCobra      es) it           pageNa
            PCobra      s[p].h
        {
            rand.cu      Page = t      me;
        b.     nd.page      Name].        );
        } ca     ) {
        thro
    }

    g      : fun      PageNa
    re      DPCobra     es[pag      :
    },

    etMenu      tion()
        r ul =      ent.cr     ement('
        ClassNa      DPMenu
        ar p in      brand.p      {
            l       = doc      create      ('li'),
            li       HTML =      brand.p      .getCa      );
            li       ame =      uItem';
            li.on      = DPCo      makeM      n(p);
            ul.appe      d(li);

        rn ul;
    }

    mak     tem : t      n(page
        retu      tion()
            DPCob      howPage      :

},

var b      age = c      reate()
Object.      d(DPMa      rototy      Page.p      e);
bject.e      DPMapP      otype,
    Widget      ,
    ndWidge      ll,

    i      ize :      n(id)
        DP      rototy      tialize      (this,      ents);
        var      new DP      cument.      ementBy      p'));
        map.a      ure(DP      RE_LAYE      DARY_D      );
        map.ad      e(DP_F      LAYER       DYNAMI
        p.addc      new DP      oomCon      );
        addCon      ew DPCo      entCon      );

    /    ide map      er for       v
    var      rySeto      = funct      roomdir
```

```
va    ation =       History     urrentL     n();
if(    ion ) {
      data      oryExtr    aFromL    ( loca.    );
      (typeof    places    undef.
      && (     /.test    'place.
      && (ty    ata['in  rs'] !=    fined',
      (/\d    st( dat   icators
      (typeof   periou    = 'unde.    )
      /\d{4}/    ( data   ds'] )
      va     ms = Ob     );
      para.   laces']
      params  icators    data['in   rs'];
      arams[  ds'] =    periods
      typeo    [color    undef.
      pa   color']    a['colo.
      neof d    branges    undef.
      params   nges']    ['nbra     :
      if(    data    ary'] =   defined
      ams['bu   v'] = a   oundary
      params[    = map.   mLevel
      cente.    p.getc   atLng(
      ms['la   center.
      s['lng   nter.l
      h    set( h   ge', p      );

};

var kaN    ap.kaN
   zc = .    tZoomc    ();
   sc = zc   erConta

ka   ldonMou    = kaNav.   seup;
kaN   ouseup   ction(e
     rySeto    );
     ldonM   (e);

   ldonMous    sc.onn    ;
   ouseup   tion(e
     oldonk   (e);
     toryseto   );
}

   oldzoo    zc.zoon   click;
   oomIn.   k = fun   map,    {
     zc.ola   ( map,
     istorys   oom();
}

zc.old    = zc.   t.oncl
   zoomOu   lick =    ion( ma   ) {
   c.oldzo   map,
     torySe   n();

this.    map;
var se    this;
PEvent.   tener(   ap, 'i    orchang   nction    {
     se    ndwidge   ndicate    );
     self.   widget.   );

D    addLis    self.ma   movein    r', fu   (ind)
     f.legen    t.hide
```

```
          project,        import.
   $t        id => 0
   $ds
   $cid =
   all =>
      %args>
        it>
      h = '';
   i     d and n    ble_ia
      m      0 = $ge              LECT in     set_id      ind_col      ere
ind_c      id=?")
   $sth         cute($c
   if (my      $sth0      hrow_a   f()) {
      $dsid      ->[0];
     rint "     t ID: $     R>\n";
     se {
        t "No     lumn av    e with      id<BR>\.
   }
  f ($ds,     not $t     id) {
   y $sth       eodbh->     e("SEL      from o.      table       dataset      ");
      tb =     fetchr    href(),
           >{table
     le_id      "Table     table,      \n";
   } e.    "Table     table,      \n";
     pr      uploa    taset t.     availab,     datas     $dsid<B.

    able_
     th2 =      h->prep    ELECT      offlin     e WHER     e_id=?.
   $     execute    le_id);
   $tb     h2->fe     hashr
     prin    le: $t     me}<BR>

   $base =    /loca,    d/dp/ta    $table_.

    tes = (    s.outp    Resu    import,    ur addr    or ino,
ro.     more er.    bout      r table    existi,    NOTICE      impl
 sequ    or index
     regi    tput'     sults o     rting y    egions     Ignor
 errors,    indexes    ble d     table     t do no    t"     Ignor
  at for    t into    tabase    You    inal da    le, con    t'to a    oaratec

inc.    any \"    n.dat' =    ions u    ed from     origina    table.    s
 geogr.    s.");     up\" d    at has    aggrega,    highe     l
   v $MAXL      ($all     0 : 10,
     init>

 %     tyle="p     :10 20
 %     h my $t    ints.ou    region.    ut','p    dat','    dat')
 %     en(IN,    a/$f"))    ine=0;
<P>
     /com     r, tit     f, leve     %>
     notes{
        >
 %     hile (<.
 %     if ($l      $MAXL       {
<TR><     span=3.     vle="te.    oration.    rline"     "<% se     $r,all=
```

25

```
            project,        import.

        $t        id => 0
        $ds
        $cid =
        all =>
        %args>
        it>
            h = '';
         d and n        ble_id
          m,      0 = $g
        ind_c         id=?")
         $sth       cute($c
        if (my        $sth0        row_a      f()) {
         $dsid      ->[0];
         rint "L       t ID: S      R>\n";
         se {
           t "No        umn av       e with         id<BR>\
        }
    }
    f ($ds.      not $t       d) {
        y $sth         eodbh->       e("SEL        from o       table       datase       ");
          h1->ex      ($dsid),
         $tb =        fetch       href(),
        le_id       >{table
        } e        "Table       table      \n";
       pr       uploa      taset t      avail      dataset      $dsid<B
            able        
         th2 =         h->prep       SELECT        offlin       e WHER      e_id=?
        $tb        execute       le_id);
        $tb         h2->fe      hashr
        prin       le: $t      me}<BR>

        $base =     -/loca       d/dp/t      table

         tes = (      s.outp      Resu       import      r addr      or in
    r       nore er       bout      r tabl      existi      NOTICE      t impl
    errors        regi      tput      sults o      rting y      egions       Ignor
        indexes       ble d       table      t do n      t"       
    at for      t into      tabase      nal da      le, con      t to a       parate
    inc        any \",      dat'      ions       ed from       origina      table.      s
    geogr      .");       up\" d      at has       aggrega      higher      table.
     v $MAXL       ($all      00 : 10,
      init>

 %       tyle="p      :10 20
 %       h my $t      nts.ou
 %         pen(IN,      e/$f"))      region      ut','p      dat','      dat')
 <P>        ine=0;
      ./com       r, tit      f, leve      >
      notes{
 %       hile (<       
 %       if ($l      $MAXL      {
 <TR><      1span=3      vle="te       oratio      rline"      "<% se      (Sr,all=
```

26

```
        ">Show         </a></            
  \             }                +;;
  %         c) = s          \t/);
  <TR>
  %   my          0;
      fore       c) {
      n style       ding-r    x; bor     ttom: 1        id #f0      ertica.    n:top;
      -family      d; fon      :10px"       =~ m/\.        ? 'alig     ht' :
      if ($t      egion.      nd $co          {
  %%      First       s dp_b       d: disp      as a
  %         my $p =      Place-    romDpBi       $_);
  %         (ref
  %              = "$_         TD sty      font-si      \">($p     e})</TD.
       }
       %>
  \
  %       ol++;
  %   }
  </TR>
       }
    ABLE>
       close
  \
  %
  </d
  # aja     .html

   args>

   results       n
  </
  <%o
  use A     :Const     w(OK);
  use JS
  ny $what     ength
     %once>
       it>
  \       at = $s,
  d        UT TOO            " .       $what      > '        max_ler     f lengt.
  $wh        $what_n      ngth;
  $m->c        uffer;
  r->con       ype('te.     in');
  ->send       header;
     output
       son = n      N(prett      n, auto    > 0);
  my       it = su     $what, i     ($what,      + 1);        up str     ter la
  sem.
  $inpu       =@\\s*(.       *$@$1@;
  if( $i       {

       my @       okens       t ' ',       ;

    v $quer       lt_cou      :
       %unique       = ();
       word_pa     in' o.      ap { '       *     input_t
  display      asc -p      y_name      word_pa.      -e -f      geoSwis     Path} .
       open       TS, "-      exec(s       ', $s      nd )) t    "ERROR     TSHING
  \n";
       for my      <RESUL      {
       chomp
       next u      line =      d+)\si      \s"id=      "\s(\d+       *)"$/;
       v ( $i      d, $id       $desc      n ) =       $2, $       $5 );
```

```
            ip = 0;
      fo    token(      t_token
            $token,
      u      $descr       =~ /$      i ) {
            n = 1;
      }

    ne.    $skip;

      if( a    $uniq    t{$desc    on} &&    e_what    iption,    )
{
          next,
      lse {
          unique_    $descr    = 1;
      }
      las    +$quer    lt_cou    $max_re
      push    ut, [    iption    d, i

    RESUL
#         STDERR       ->objTo.    @outpu

  init>
    son->o.    on(\@o    %>
       t/aut    sugges

/**
 * An a    gest t    contro
   @class
    scope

fu    n Autos    Contro

/*:HT    tEleme.             oPr      /*:Sug    nProvi
                                        )

  /**
    * The cu    y sele    uggest
      scope p
    
  t      r /*:in    -1;

  /**
    * The    own lis    r.
    * @scop    ate

      layer

  /*
    * S    ion pr    for th    sugges    ure.
    */
    is.prov    /*:Sugg    Provide    oProvi

    textbox    nture.
    *     privat
    */
  this.te    /*:HTM    Element    nTextbo

    nitiali.    contro
      init();
```

```
 *      suggest.    or more    estions    hat the    has ty
 * .    suggest.    are pas.    , then ,   osugges   urs.
 * @s.   rivate
 * @par.  ggesti.   n array   ngestio.  ngs.
 * @param.  eAhead    e contr.  uld pro.   type a    suggest
     uggestc.   .proto.  utosugg    functi.  uggest.    *:Array
           cur = .                   eAhead   lean*/.
     .     sure t.   at le.   e sugge
      it . gestion.   th > 0.
           ypeAh.
               typeAh.  uggest.  n]);
           }
       this..  ggesti.  uggest.
      se {
         his.hid.    stions(.
     }
  .:


     .ates t.  odown .   o disp.  ltiple    stions.
 *   .e priv.
 */
AutoS.   Contro.  otype.c.  ropDown.  nction

     var .  = this;

      /create    layer a.  ign sty
       s.layer.  cument.  eElemen.  ");
         layer.  ame =    stions",
      .   ayer.st.  sibili.  "hidden"
      th.   er.sty.  th = th   tbox.o.  idth;

     //when.   user c.  n the.  estion,    he tex.  erHTML.
     //and p.  t into   tbox
      his.laye.  ousedow.
       s.layer.  eup =
       layer.o.  over =   ion (oE.   {
       .  ent = o.  || win.  ent;
         et = o.  target   vent.sr.  nt.

        it .  nt.type   ousedo.
            textbox   . = oTa.  firstCh.  deValue,
         o.  ideSugg.  s();
       . else .  vent.ty.  mouse.  . {
          oThis   lightSug.  n(oTa.
          se {
            his.te.  focus(),
        }
     .;


};
      .nt.body.  ndChil.  layer),

  .*
     .ets the.  coordi.  f the .  x.
     cope pr.
 */
    urn The    coordi.  f the t.   in pi.
AutoS.   Contro.  otype.g.  . = fun.  () /*:.
```

```
        'ar oNo       'his.tex
            ~ iLeft

    ,.       oNode.       e != "B          {
             't += o,       ffsetLe
                  = oNo       :etPare,.
        }

        ~turn iL

    };

    /**
     * Gets    'op coor    e of t,    tbox.
     * @scope       te
         @return    'p coor,   , of th,    box in    's.

    A     gestCon      rototy,     Top =        'on () /      */ {

        ,     'de = t,    'xtbox;
        va,        = 0;

        while,       tagNam,     "BODY")
            iTo,       Node.ot     )p;
            oNode       .de.offs      nt;

        re      Top;

    };



     *      dles t,      ,eydown    ,.
     *       e priv,
     * (      oEvent      vent o,     for the      ,wn ever.
     */
    AutoSug,      ntrol.,     'ype.hai,     ,'Down =        'ion (o,     /*:Even,     r

        switch,      ,t.keyC,
            case       'up ar,
                th      'viouss,     'ion();
                bre,
            'se 40: ,     arrow
            ,   this.ne.     ,estion
                 'reak;
            c,       : //ent,
                    hideSug,     ,ns();
                L

    };

     '*
        'andles          events
         'ope pr,
     *      am oEve,     , event      't for t,     'up eve,
     */
    Autos,      'Control,     'otype.,     ,KeyUp =        'ion (o,     /*:Even,     r

        var       'de = o,     keyCode,

        '/for b,       'ce (8) ,     ,lete (,     'hows su,     ,ions w,       typeah,
         ' (iKeyC,       , 8 | |     ,de == 4,
            this.p,     ,.reque,     'estions          false,

        /,      'sure no,     'interf,     ,h non-c,     'er keys
```

30

```
      } els    iKeyCou    ? || (i       e >= 33       eyCode        || (iK        >=
      & iKey     = 123),
          //ign
       se {
          /reque    estions    the su      on prov    ith typ    d
          s.prov    equestS    ions(th    ue);
      }


    *    s the s    ion dr
    *         privat
    */
  AutoSug    ontrol.   vpe.hi    estions    ction
      this.    style.    lity =    den";


    *    ights t    en node    he sugg    s dropa
    * @     orivate
    * @pa    Suggesti    e The nu    oresen    sugges    n the o    n.
    */
      oSugge    rol.pro    highl    ngestia    unction    estion    {
      for (va    i < th    ver.chi    s.leng    +) {
          var o    this    childNo    ;
          if (on     oSugge    ode) {
              oNo    SName =    ent"
          lse if    .classh    "curr    {
              Node.c    me = "",
          }
      }


  /**
  * In    zes the    box wit    t hand    or
  * auto    st fun    lity.
  * @scop    te

    Suggest    .proto    init =     n () {

      ve a re    e to t    iect
          This = t

      //a    the onk    vent h
      this    x.onke    unctio    ent) {

          //ch     the p    locatio    the eve    ct
          if (!o    {
              oEve    indow.e

          /    the ha    yUp() m    with t    nt obje
          oT    ndleKey    ent);


      ign on     event    er
      extbox    own = 1    n (oEv
          k for     per lo    of the    obje
      i    vent) {
          t = wir    ent;
      }

          call t    dleKey    method    the eve    ect
          is.han    own(oEv
```

31

```
    };

     //assign      r event    ler (hi     ngestio
       .textb      lur = i.    n () {
          this.h.   estions
     };

     //cre   he sugg      s dropu
     this.c    ropDowi.

/**
 * Hi    ts the       sugges    n the o.     n and
 * plac    e sugge    into t.   tbox.
 * @scop   ate
 */
     uggestu   l.proto   extSug   n = fun      () {
       cSugg   Nodes =      layer.    Nodes;

        uggesti   es.leng    && th.    < cSug    nnNodes.    h-1) {
           oNode    question.    ++this
             highlig    estion    );
          t.    xtbox.v   oNode.    Child.    lue;
       }

/**
 * Hi    ts the     ous sug    n in th     ndown a.
 * plac   sugge   into th.   box.
 * @scope   ate
 */
      ggestu   l.proto    revious.   ction =    ion () {
         cSugge   Nodes =    layer.   des;
          Sugges   des.len    0 && t.   r > 0)
            oNode   ggestic   s[--th.    ;
           highl   ngestio    e);
       }    extbox.   = oNo   stChild.   alue;
       }

/*
 * S    s a rang   text i.   textbox.
 * @s    ublic
 * @par.   art The    index   0) of     election.
 * @param.   nth The    r of ch   ers to s   .
 */
      ggestu   l.protot   lectRa   functic   art /*.   ., iLeng
/.    7) {

     //   text ra   or Inte.   xplore.
     if    textbu   teTexti   {
        ange =       textbox.   eTextR    ;
        oR.   oveSta.   aracter   art);
        oRan.   veEnd(.   ter", i   h - th.   tbox.va.   ngth);
        oRange   ct();

        setSele   Range()   ozilla
     }    if (thi.   box.se   tionRan
          textbox.   lectio.   (iStart   ngth);
     }

     //set fo.   ck to t.   tbox
       s.textb.   us();
};
```

32

```
 *
 * ...ilds ... ...ngestio...    ... conte...  ...oves it      positi...
 *    display    ...e layer.
 *    ...e priv...
 * @...  ...aSugge...  s An ar...  ...sugges...  for the   ...rol.
 */
...AutoSugg... ...ntrol... ...ype.sho... ...stions ...ction (...stions   ...ray*/)
    var oD...    ...ll;
    this.lay... ...erHTML    //cle... ...tents ...  layer
       var i=...  aSugge... s.lengt...   } {
         ...iv = do... ...create ...nt("div
           ...append... ...docume... ...ateText ...aSugges... ...i]));
    }        ...ayer.ap... ...ild(o...
    ...s.laye... ...e.left ...s.getL... ... "px";
    ...layer... ... top = ... ...qetTop... ...s.textb... ...setHei... "px";
       ...ayer.s... ...isibili... ...visibl...
  ...:

 *  ...erts a ...stion ... ...e textu ...ighli... ...the
 *  ...sted p... ...f the te...
 * @...    privat...
 * @p... ...Sugges... ...he sugg... ...t for t... ...tbox.
 */
 ...toSugg... ...trol.pr... ...e.type... = funct... ...Sugges... ...*:Strin... ...r
    //chec... ...support ...ypeahea... ...tionall...
    ...f (this... ...box.cre... ...tRange ...is.textu ...tSelec... ...nge){
       var i... ...this.te... value...
       ...his.te... value = ...estion,
       ...s.sele... ...e(iLen, ...estion. ...h);
    }
  ...;

 ...******* ...****** ...****** ...****** ...****** ...****** ...*****
   **/
/*
 * ...     ...utoremo... ...st ho... ...mmon co...
 */
functio... ...AutoSug... ...ntrol... ...tbox, o... ...er, sel... ...Callba...
 ...ableTy... ...) {

    var ... ... new A... ...estCon... ...oTextb... ...rovider

    ...elf.pr... ...Text =

       ...e defau... ...llback ... ...l if n... ...is sup...
       ...electi... ...back = ... ...ionCa...

    //O... ...den to ...selecti... ...hack
    self.... ...ggesti... ...unction
       ...Sugges... ...des = t... ...ayer.ch... ...des;
       ...uggesti... ...s.leng... ...&& th... ...<
          ...r oNo... ...uggesti... ...s[++t... ...r];
          ...s.high... ...uggesti... ...de);
          ...textbo... ...e = oNo... ...stChil... ...value;
          ...s.sele... ...allback
             this.se... ...nCallba... ...Node.d...
```

33

```
//  dden to      selecti    back
self.   ousSugg    = func   () {
         cSugges    des = t   ayer.ch    des;
       Suggest.  es.leng    && th    > 0) {
         var oh   cSugges    des[--    ur];
         this.hig   Sugges   Node);
         is.text   lue = o   firstCh   devalue,
         this.se   nCallba
         this.   ionCal   oNode.    ;
   ;

   .enable    head =   TypeAh
   ajax s   roblem   id rep   xt.
se   ndleKey   unctio   ent) {
      ar curs.  his.te    value;
      curst    his.pre
         retu
   e  his.pre.   curst.

      var    ode = o   keyCod
      if( i    == 32
            ore spa.
      else i    Code ==   iKeyC    46) {
         th    vider.r    Sugges   this, 1.
      if (i    < 32    eyCode    && ik    < 46)
(iKey    = 112 a    vCode <   ) {
         //ignor
   } els.
   enable   ad);       provia   uestSug   ns(th
   ;

   erridd   support   data n    n this    we can    reuse
arent's   on.
   se   nt_ty   d = se   eAhead;
sel   Ahead =   tion (s   tion) {
         sSugg   .toLow   ).index
th   xtbox.va   nLower.   ) < 0
         retu
   th.   ent_ty   d( sSug   n );

   //   dden to   e json   resu.   he firs   nestion
st is a   selecte.
self.a   ngest =   ion( a    tions, l   head )
   thi   = -1;
   if (a.   tions &   ngestio.   gth > l
      if   Ahead
         is.type   aSugge   [0][0]).
   }

      all se   nCallba   the fi.   ggestio.
         his.se   nCallba
         this..   ionCal   aSugge   s[0] );
   th.   wSugges   aSugge   );
}
};
   //Overr   to hand   n array   lts - e   ggesti    l carry
addi    data
```

```
s...    .owSugge...    ..  = func...    (aSugge...   ) {
            var oDiv...    ll;
        ...is.laye...    ...rHTML =    //clea...    ...nts o...    ...ayer
            (var i=...    ...aSugge...    ...s.lengt...    ) {
                oDiv...    ...ment.c...    ...lement( ...;
    ...Div.app...    ...ild(doc...    ...create...    ...de(aSug...    ...ns[i][...
                    ...ke eac...    ...estion  ...    data
                ...    ...ata = a...    ...tions[...
            }
            ...    this    ...append...    ...(oDiv);
            thi...    ...r.styl...    = this    ...ft() +
            this...    ...style.    (this...    ()+this...    ...ox.offs    ...ht) +
    ";
            ...is.laye...    ...le.vis...    ...y = "v...    ...";
    };

        ...Overri...    ...call ...    ...ionCal...    ...there    ...ething    with t...
        ...his func...    ...must be    ...d agai...    ...
        ...reateD...    ...n = fun...    () {
            var o...    this;
            //create    ...layer a...    ...ign st,
            ...is.laye...    ...cument...    ...Elemen...    ...");
            ...layer...    ...ame =    ...tions
            ...layer.s...    ...sibili...    ...hidden
            th...    ...ver.sty...    ...th = th...    ...tbox.o...    ...width;
            //whe...    user c...    ...n the ...    ...estion,    the tex...    ...erHTML...
            //and p...    ...it into    ...tbox
            ...his.laye...    ...ousedow...
            ...layer...    ...seup =
            ...layer.o...    ...over =    ...ion (oE...    {
                ...oEven...    ...vent ||    ...w.even...
                ...nTarget    ...ent.tar...    ...oEve...    ...lement;
                ...(oEven...    == "m...    ...wn") {
                    ...oTh...    ...xtbox.v...    ...oTarge...    ...tChild...    ...alue;
                    ...oThi...    ...Suggest...    ...);
                    if( o...    ...lection...    ...ck ) {
                        ...select...    ...lback(o...    ...data ...
                ...} else    ...Event.t...    ..."mouse    ...) {
                    ...highli...    ...estion(    ...t);
                ...lse {
                    ...oTh...    ...tbox.fo...
            }
        ...ent.body...    ...ndChil...    ...layer),
        ...create...    ...wn();
        ...    ...self;

    ****** ...    ******    *******    ******    *******    *******    ****
    /*.    */
    * ...    ...ersion    ...oremot...    ...st
    */
    functio...    ...utoSug...    ...ntrol(    ...box, oP...    ...r, sel...    ...Callbac...
    ...    v...    ...f = new    ...utoSug...    ...ntrol(    ...box, o...    ...er,
    ...ctionCa...    ...);
        retu...    ...f;
    }
    /**    ******    *******.    ...*******    ...*******    ...******    ...*******    ...
    *****...
```

35

```
/*
Place v    of au     resugge
genera    differs    Topics        e of th      lation      lay
func    hereAu    estCont    Textbox      vider,    tionCa      ) {
self =    aseAuto    stContr    extbox,    vider,
electi    back, t

//O     dden to     popula
self.    uggesti    functi    uggesti
oDiv =
ayer.     ML = "        clear c    s of th     r
r i=0;    Suggest.    ength;
Div = c    nt.crea    ent("d
v.data    uggestio
Span =    ment.cr    ement(        );
eft = c    nt.crea    ent("sp
va    ht = c    nt.crea    ent("spa
oSpa    sName    an";
sLeft.    Name =    t";
Right.    ame =    t";
eft.inn    = aSu    ions[i]
ht.inne    = aSu    ns[i]L
append    sLeft)
o    ppendC    ight);
oDi    ndchild    );
this.    append    oDiv);
}
this    r.style.    = this.    t() +
this.    style.t    this.g    )+this.    ox.offs    ht) +
is.laye    le.visi    = "vis
};

verrid    call s    ionCall
nextSu    ion = fu    () {
var    stionNo    this.la    hildNod
if(cs    ionNode    th > 0    is.cur
estionN    length–
va    de = cs    ionNode    this.cur
thi    lightSu    (oNo
this.    x.value    ode.fir    d.node
if( th    ectionC    k )
}    electio    back( o    ata );
};

//Over.    to ca    ctionc    k
elf.pre    Suggesti    functi    {
v    uggestio    = thi    r.chilo
if    estionN    length    this.c    ) {
oNode    ggestio    s[--thi    :
.highli    ggestio    e);
i    s.select    stChild.    alue;
i    s.selec    llback
his.sel    Callba    ode.dat

/    idden t    sele    llback    re's s    ng wrong    this
se    teDropu    functi    {
oThis
eate th    s;
ayer =    nt.cre    ment("
th    ver.cla    = "Sug    ns";
```

36

```
        this.      style.v.     ity = '.      ";
        this.lay    vle.wia.    this.tex    offsetw.

        .en the       clicks c    a sugg     , get     xt (inn    )
            place    o a tex
        t.    ver.onm    wn =
        thi.    r.onmou
        this.     onmouse     = funct.    Event)
                nt = oEv.    | windo    t;
                t = oEv.    target |    nt.srcE.    ;
            o1.     = oTar.     rentNod.
                f (oEve.     e == "m    wn") {
    oTarget    ntNode.     ];     o1.     xtbox.v
                            //oTh.    eSugges.    );
                        if.    s.selec    llback
    .    t.paren.    data );
                    } e.    ? (oEve.    e == "m    er") {
                        is.hig.    Suggest    arget.    Node);
            } else     .vent.    mous    {
                    lse {'.    re this
                    oThi.    box.fo.
                }

            .nt.bod.    ndchil.    layer),

        create    wn();

    se.    hlights    tion = .    ion (oSu    ionNode)
            r (var    i < th.    r.chil    length.    ) {
                va.    le = th    r.chil    [i];
                if (    == oSu    onNode)
            } else .    ode.cla.    = "cur
                        o.    ode.cla    == "c    ") {
                        o.    lassNa.    ";

    };

    //Overri.    call    tionCal.
    f.nextS.    ion = .    ion () {
        var .    stionN    this.    childNo.
        if (cs    stionNo.    ngth > u    his.cur
    gestio.    .length.
            v.    de = c.    tionNo.    this.cu
            th.    hlights    tion(oNu
            this.    ox.val.    Node.da.
            if( th    ection    ck )
                    select.    lback( u    data );
    }
    };

    //Ove.    n to c.    lection    ck
    self.pr.    Sugges.    functi    {
        if     ggesti    s = th.    r.chi    s;
            estio.    length    & this.    0) {
            r oNod    uggesti    s[--th    ];
            s.high.    ggestic    de);
            textbox    = oN.    a[0];
        1.    s.sele    allback
                this.se.    nCallba    Node.da
```

```
        ret     lf;
 }

/***      *******     *******.    *******    *******     *******     *******.
 *****
/**
    Policy.      such      toRemo     est der     es must    he sam
       ocol be
       s one     s from      riginal     the add    of a c    k to a
  a     when re
    *         turned     fore a     ngest i     ed.
    * @c
    * @sc    blic
    */
    ction R    uggest      emoteu     lection     ck ) {
       f (type     HttpRe     != "un      d") {
         this.     new XM    equest
       se if (    Active    t != ined")
         is.http    Active   ct("MS    mlHttp
       }
    ("No XM    equest    avai    This f    nality    ot
    k.");
       is.rem    = remo
       reque    = 0;
       selecti    back =    tionCal

}

    request     stions    he give     suggest    ol.
       ope pr    d
    */    m OAut    estCont    e autos    t contr    provid     estions
Remot    stions.    type.re     Suggest.    funct
       Sugges    ol /*:     gestCo    */,
       head /    ean*/


    r oHttp    Reques    : // th    p;
       request    ++this.    stNum;

    //    the URL
    var    hString    toSugg    ntrol.te    value.    e(/^\s    \s*$/,
    1");
    var su    his.rem    + enc    Compone    rchStr

       en con    n to s    xt fi
       .open(    sURL
    v    = this,
    oH    readyst    nge =    n ()
    questN    me.requ    ) { //    e recen    est has    made,
 ing thi    back o    e
       tp.abo.
    r
    }
       (oHtt    State .    {
       //eval    he ret    text Ja    ot (an    )
       r aSug    ns = e    ttp.res,    ext);
       me.se    nCallba
       me.sele    allback    estion
       ide sug    ns to    ntrol
       OA    gestCo    autosug    Sugges    bType    :
    }.
```

```
oHttp       (null);

/      '******    '*******    *******,   *******   '*******,   '*******    ****
**    /
# b.     aimport.      table_.      tor_hma.

#! /usr,    '/bin/p.

    strict,
    9I qw(:       oes);
us.      dBin qw.       .
use    "$Bin/...    ib";
use .    9in/../.    kp2/li.
use Tex.    V_XS;

.Vinq::.
.hata::D.
L     nq::C2;
us.    ot::Lon.

our (.     ame, $c.     e, $tal.     9, $sta.     9, $end.

.IN {
    $confNa.     'dpigho.
    .ataFil.     ':
        .leName
}

.ise con.      SCRIP1    NS => .     Name=s'        confNa.
                            .      le=s' =.    .taFile.
                            'ta.    e=s' =>    .leName
                            'star    s' =>    .tDate,
                            'endDa.    => \$en.    .;
use c.    nt USAG.    <<EOF.
$0 - U.     system    in DP

.TIONS:
    .onfName.    =>    REQU.    Use th.    .figura.    n deter.    .he dat.
    .taFile=<.    REQUI.    .se this    file to    into da.    e
    .eName=<.    REQUIR.    .ad the    into th.    .leName
EOF

.ise lil    ./../../    ?/bin";
.e comm.    n;

#       .he con.    tion re.    o use.
###
my $c.    .inq::C.    .$confNa.

.f (! $c.
    my $er    = "Unab.    create    .nuratic    .ect for    .ame: '$.    .me'";
    .ie($er.
.

my $.    h = Vinq.    >new(c.    .ct=>$c.    .abase=.    .atabase

my $csv    t::CSV_    .w;
    ($cur.    $gscin.    $sth,    gsc, %.    fields,    .ds, $po.    .,
    .r_idf.    .firstli.    .ieldty.
    .ind_dat.    .id, $dp.    .id, $b.    .v_type_    .houndai    .t_id, %.    .ds,
$.    .scid, .    .lumn_i.    .splay_n.    $value,    .mat_i.    .name);
# get    all fie.    .s from    .irst li.    the dp.    .da_summ.    .4.dat
```

```
    osition
       (IN1,        aFile"),
    y.      (<IN1>,
         p $_;
            ds = sp    /, $_),
       fu    my $f.    @fields
           -field.   (field),    osition
       }
       last;
   c.    N1;

   #get    he posi.    of the    lds in    ata file
   $first.    1;
    en(IN2,    da_kpi_.    txt"),
     ile (<IN.
       if ($fi    e) {
           $firs.    = 0;
         se {
            homp $_,
             rr_gsc
             csv->pa.    curr_g.
             elds =    >fields
             inforet    elds[1.    igscia    fields[.
             foref->    ds[1]]    position    $data_t.    $fields
           $i    ds{$fie    } = 1;
       }

    ose IN.
      fields{s    leid} =
         lds{ye    1;
   $.    ds{stus    1;

   #prep    the ha    contai    cator n    and the.    els wh.    ll be u.
   to popu    display    in ino.    n table
   $firstli.
       en(IN2,    x_meta.    hmda.da.
     e (<IN2.
       c ($firs.    {
           $firsti    0;
         e {
        mp $_;
             csv->pa.    _)) {
             fields =    >field.
             olay_na.    ($fiel.    } = $f.    9];
           olay_name.    $fields    =~ s/,.
           $.    ds{lc.    ds[3]),
             if    fields.    m/^pc.    | (lc().    7]) =~    ercent
             $f.    ds{lc(.    s[3])}
           elsif    fields.    m/^do    ) || (i.    lds[7],    / dolla
       || (lc.    ds[7]) =.    income
           format_    ($fiel.    } = 2;
           }    c (lc($.    7]) =~    tio /)
             mat_ids.    fields[.    3;
         }

     }

    e IN2;
       aring a    to cont.    ndicato.    s and .    types w    will be    to
   c.    the di
   $f.    e = 1;
   open.    <hmda_.    oes.dat
```

40

```perl
        ile (<1         r
        if ($f       ne) {
            $fir       = 0;
            lse {
            homp $_
            ($csv-       (S_))
            afields       v->fie
            ieldtyp    ields[0,      fieldsl.
        }
    }
    clo        ;
    # Rea      the dat      and g      ing the       script        at file     data t
    and in      mn tabl
    firstl
        n(IN1,      aFile"
            OUT1,       leName.
            UT2, ">/     ighosh/      /hmda/     Name.da
    op        3, ">/h       nhosh/l      mda/in       leName.
    whi       1>) {
    # Gene      n the c       TABLE s      nt for      table
        if      tline)
        p.       OUT1 "D    BLE Sta      e;\n";
            pr      1 "CRE      BLE Sta      e (\n
        print             ndary      cha       r varyi       .\n";
        print ou       "       dary_ty       inte      ;";
        rint ou              nd_id      er";
        mp $_;
            = $geo      prepare      T NEXT      ind_da      seq')").
            i      aset_i      th->fet      arrayre      r0];
        if      parse      {
            @       = $csv      ds ();
            for      y $fie       fields)
                       $field,       geosca       {
                    t OUT1
                } el      lc($fie      n coun       || (lc      d) inte       ")) {
            pr      T1 ",\n      ".       eld)      haracte
            lsif (      field) e      fid') |      $field)      sapma
    (      eld) eq       cd')   |     $field)     unty')   -($fiel      uplac
    || (i     old) eq       05 |      $field,     metrod      $fiel
    rying(             OUT1       $field)      charac
        rying(
            } else
            prin       ",\n       ". lc      d) . "
    S,      vpes[l      ld)};
    # Gen      ng the       file for      column
            $st      eodbh->      re("SE      EXTVAL      column_      ");
            $sth      ute();
            $ind_c      id = $s      tchrow      ref()->
            f (not      s($idfie      c($fie       {
            $db_na      lc($fie.
            print O
    "$in      mn_id      ataset_      h_name,      ay_name      $field),      l,$form
    s{lc(      ")}\n";
            }
            t OUT1       ";
        }
        $first       0;
        e {
            ($csv-       (S_))
```

```
                 elds = ,      fields
   oping        oscalen        and 12      ro05 a    ro05d a      t there
e,   g data         if    fields[       11) ||      ds[0] =    )  {
$fiela    infore.              fields[   ldposin
            $bou    type_i      scinfor      fields    kpigsc
            $sth = dbh->pr  "SELECT      und_id       boundar    ntifier
   c bound    it_id    d bound    pe_id =       _t_id, $       ry_type
              h->exe       boundar       _t_id, $      ry_type
             e = $s    tchrow      ef();
             und_id     lue->{o,    nd_id};
      it    lds[0]    )  {
             ound_ic
         }
      unless    bound_r
         print     an't f   n_bound    r geosc      $fields
      ary_typ    bound    t id $b     y_unit_
         ext;
      }
      pri   2 $boun    nit_i      ";
      print    $bounda    oe_id .      ;
      print    dp_boun
         oreach    eld (@    )  {
         if ($   q ".")
            $fi    "0";
         t OUT2      ld";
      }
      print    "\n";
   }
}
print      "COPY     Name FR   ome/ig   cal/hm    bleNam   DELIM1
  ,;\n";
   int OU    SERT IN    _datas   _datas    series   table_
   play_na   eation_    publi   data_fi   path,
     OUT1 "
m    a_file   th, st   options   te )\n",    perioo    date, o    tor,
pr   T1 "     UES (    ataset_   , $tab    ', 'Ho   tgage
Disc.   Act (Fe   Finan   nstitut   Examina   uncil)   (), 't
'/usr/  shared/   ing/da  /$datar   \n";
   int OU    to_date    artDate    vy-mm-a    o_date   Date',
   vy-mm-   Federa   ncial   utions   ation_   1',
   /local   d/dpsta   dataset    x_meta   nda.dat    ta impo
   delim   Impo   ;\n";
pr.   T1 "CO   COLUMN    column    nd_data   , db_na   isplay_
for_   y, for   for_cha   rmat_    M
'/home   sh/loca   /ind_$t   name.da   TMITER      ";
lose I.
  ose OU.
   e OUT2
   OUT3;

# c   /js/col   ism

<%flag.

   t => '.   nexpir   ler'
   %flags>
   r>
   enab   Cache =
</.

/* ---    -------   --------    -------    -------    ----hi.
```

# Exhibit C

## PROFESSIONAL SERVICES SUBCONTRACT AGREEMENT

THIS PROFESSIONAL SERVICES SUBCONTRACT AGREEMENT ("Agreement") is entered into as of the effective date marked below (the "Effective Date"), by and between Vinq, LLC, 2025 Park Royal Drive, San Jose, California 95125-4649 ("Vinq") and Metonymy, Inc. d/b/a place base, 8559 Higuera St. Suite B, Culver City, CA 90232 ("Subcontractor").

## BACKGROUND

Vinq provides software development and integration professional services, focusing in particular on the design and implementation of highly interactive public web sites to support communities of experts and professionals. Vinq has entered into a prime contract (the "Prime Contract") with the Fannie Mae Foundation ("End Client") for the design and implementation of the Community Data System and its several web sites.

Subcontractor provides professional services, and has the capability of assisting Vinq in the performance of the Prime Contract by delivering to Vinq certain deliverables for ultimate delivery to the End Client. Vinq desires to enter into a subcontract under the Prime Contract with Subcontractor, and Subcontractor desires to enter into such subcontract, all under the terms and conditions of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises in this Agreement, Vinq and Subcontractor agree as follows:

1.  Relationship of Vinq and Subcontractor. Subcontractor and its employees and/or contractors shall perform the provisions of this Agreement as independent contractors and shall not be considered agents of Vinq, nor shall Subcontractor's personnel be considered employees of Vinq. Nothing contained in this Agreement shall be construed to (i) constitute the parties as partners, joint venturers, co-owners, or otherwise as participants in a joint or common undertaking, or (ii) allow either party to create or assume any obligation on behalf of the other party for any purpose whatsoever. No law, agreement, or other arrangement that has the effect of conferring benefits upon officers or employees of End Client shall be applicable to Subcontractor or any Subcontractor employee in connection with the Services rendered pursuant to this Agreement. Subcontractor's personnel are, and will remain at all times, employees of Subcontractor and shall not be deemed to be employees of Vinq or the End Client for any purpose whatsoever. Subcontractor shall be solely responsible (i) for the safety and supervision of its employees, (ii) for the payment of wages, salaries and other amounts due its employees in connection with this Agreement, (iii) for all reports and obligations respecting Subcontractor employees relating to social security, Federal, State and local personal income tax and withholding, payroll taxes, unemployment and disability insurance, worker's compensation, and similar matters.

2.  The Prime Contract. This Agreement is subject to those terms of the Prime Contract, attached hereto as Exhibit A, applicable to Subcontractor or the Services (as defined below), which terms are incorporated by reference as if fully set forth herein. All applicable

-1-

provisions contained in the Prime Contract shall be binding upon the Subcontractor, and Subcontractor hereby agrees to comply with such provisions the Prime Contract.

3.  <u>Subcontractor's Professional Services</u>.  Subcontractor shall perform professional and/or technical services, including all labor, materials, expertise, and supplies necessary for such services, under this Agreement (collectively, "Services") on a project-by-project basis. Subcontractor shall perform the Services in accordance with the highest professional standards and in conformance with all written instructions provided by Vinq (including written instructions provided by Vinq on behalf of the End Client).  The scope of work for each project of work (a "Project") shall be set forth in an addendum to this Agreement (a "Statement of Work") that describes the Project and is executed by each party. Subcontractor's Services shall consist of the development of various items of software code and/or documentation (collectively, "Deliverables") as described more particularly in a Statement of Work.  Services shall also include advice, counseling, training, and support relating to the Deliverables for a Project to the extent specified in the Project's Statement of Work.  Subcontractor shall all perform all of its obligations under this Agreement in a timely fashion in accordance will any and all deadlines that may be specified in a Statement of Work.

4.  <u>Subcontractor Personnel</u>.

    a.  <u>Management</u>.  Subcontractor shall be responsible for the management of its personnel in the performance of Services, the integrity and quality of all Services, and periodic reporting to Vinq and/or the End Client, as required, on the status of Services. Subcontractor shall require its employees, servants, and agents to abide by all reasonable written directives issued by Vinq or the End Client, including, without limitation, all on-site rules of behavior, work schedules, security procedures, and other standards and procedures established by Vinq or the End Client from time to time and provided to Subcontractor in writing.

    b.  <u>Qualifications</u>.  Vinq and the End Client reserve the right to review the qualifications of personnel selected by Subcontractor to perform Services pursuant to this Agreement. Subcontractor agrees to remove, at Vinq's or the End Client's request at any time, any person who, in Vinq's or the End Client's reasonable opinion, is unacceptable, uncooperative, not qualified to perform Services, or has performed Services in an unsatisfactory manner.  If Vinq or the End Client so requests, Subcontractor will promptly provide a qualified replacement who is reasonably satisfactory to Vinq and the End Client for any person so removed.

5.  <u>Interim Review</u>.  At each milestone ("Milestone") in the Statement of Work, Vinq is entitled to review the progress of the Project, provide written direction for any revisions that may be desired by Vinq to the Statement of Work, any such revisions being subject to Subcontractor's reasonable approval, and, if appropriate, authorize Subcontractor, in writing, to proceed to the next stage of the Project.  If Vinq notifies Subcontractor that the Services, as of the date of a Milestone, do not conform to the Statement of Work,

Subcontractor shall, at its expense, make any revisions requested by Vinq that are necessary to make the Services conform to the Statement of Work.

6.  Acceptance Testing. Within fifteen (15) days following receipt of the Deliverables for a Project, Vinq and/or the End Client shall conduct acceptance tests in accordance with the specifications set forth in the Statement of Work corresponding to such Deliverables (the "Specifications") and, to the extent applicable, a test plan set forth in the Statement of Work or otherwise mutually agreed to in writing by the parties. The acceptance test period shall be fifteen (15) calendar days. If the Deliverables perform in accordance with the Specifications and the test plan, Vinq shall accept the Deliverables in writing. If the Deliverables fail to so perform, Vinq shall deliver to Subcontractor a notice stating in reasonable detail the respects in which the Deliverables failed to conform and Subcontractor shall exercise its best efforts to correct any errors or omissions and resubmit the Deliverables for acceptance testing. If Vinq fails to provide Subcontractor with such notice within fifteen (15) calendar days after receipt of any Deliverables, Vinq shall be deemed to have accepted such Deliverables. Subcontractor agrees to correct errors or omissions identified by Vinq within thirty (30) calendar days following such notice; provided, however, that if Subcontractor is unable to correct such errors and omissions to the reasonable satisfaction of Vinq, Vinq shall be entitled, at its sole option, to terminate the applicable Statement of Work immediately upon written notice to Subcontractor.

7.  Change Orders. Vinq may, from time to time, request in writing changes in the Services under a Statement of Work. Upon receipt of any such request, Subcontractor shall, as soon as practical but in any event no less than seven (7) calendar days prior to the intended commencement of a proposed change, submit a proposal of changes in cost and schedule of Milestones. Such changes may be authorized by a change order ("Change Order") signed by the parties, and upon execution, Subcontractor shall effect the changes provided in the Change Order. Subcontractor will not begin performance of any additional or modified Services until Vinq has executed and delivered the Change Order. All proposals hereunder shall be provided on a time and materials basis at Subcontractor's then-current hourly rates, unless Vinq should request (and Subcontractor should agree to) an alternative fee structure.

8.  Insurance Coverage. Prior to commencement of any Services under this Agreement, Subcontractor shall provide to Vinq, who shall be entitled to provide a copy to the End Client, certificates of insurance from companies reasonably acceptable to Vinq, evidencing:

    a.  Workers' Compensation — in accordance with the laws of all jurisdictions (state, local, provincial, or federal) which may apply to the Services provided hereunder and/or any applicable premises, including coverage for employers' liability, with limits of not less than:

        | $1,000,000 | Each Accident |
        |------------|---------------|
        | $1,000,000 | Disease Each Employee |
        | $1,000,000 | Disease Policy Limit |

    b.  Commercial General Liability — with bodily injury, including personal injury, and property damage limits of not less than:

$1,000,000    Per occurrence
$1,000,000    Personal Injury/Advertising Injury
$2,000,000    General Aggregate
$2,000,000    Products/Completed Operations Aggregate

c. Automobile Liability (applicable only if Subcontractor owns, rents, or leases automobiles) — with a limit of not less than $500,000.00 per accident

Such insurance will include the following hazards and the certificates will so indicate:

(i) Independent Contractors — covering Subcontractor for any Services performed by its subcontractors

(ii) Contractual — covering any indemnity obligations specified in this Agreement

(iii) Products — covering any Deliverables provided under this Agreement

(iv) Completed Operations — covering any Services rendered under this Agreement.

Each such certificate will state that (1) this insurance is primary to other insurance in the event of a covered loss; (2) Vinq will be advised not less than 30 calendar days prior to any change or cancellation; and (3) insurer's rights of subrogation against the End Client and Vinq are waived. Such insurance will be maintained for the duration of this Agreement. "Completed Operations" coverage, when applicable, will be maintained for not less than one year after the end of operations under this Agreement.

The above limits may be shown as a combination of primary and excess umbrella limits.

9. Support. Subcontractor shall exercise commercially reasonable efforts to cooperate with Vinq and/or End Client to facilitate the transfer of ownership registration and the transfer of warranty protection to the End Client for any hardware or software purchased or licensed on behalf of the End Client for purposes of a Project. Subcontractor shall make arrangements with Vinq and/or End Client for the shipment of such hardware and software to such facility or address as the End Client may specify, and for the installation of such hardware and software at such facility and/or on the End Client's systems; provided, however, that unless expressly set forth in a Statement of Work, Subcontractor shall have no obligation to perform such installation on behalf of the End Client.

10. Fee. In consideration of the Services, Vinq shall pay Subcontractor fees ("Fees") for each Project as set forth in the Statement of Work for such Project. Unless otherwise stated in the Statement of Work, Fees shall be paid to Subcontractor on a time and materials basis in accordance with Subcontractor's then-current hourly rates.

11. Payment Terms.

    a.  Turn-Around of Invoices and Payments. "Business Day" means any day except for any Saturday, Sunday, or any U.S. federal holiday. Within five (5) Business Days of receiving an invoice for Subcontractor's Services, Vinq shall send an invoice to the End Client for such Services. Within five (5) Business Days of receiving a payment from the End Client on account of an invoice for Subcontractor's Services, Vinq shall send payment to End Client for such Services. Subcontractor acknowledges and agrees that payment of its invoices depends on the when the End Client pays Vinq, and that Vinq cannot guarantee that the End Client will make payment within any certain time period. Accordingly, if an invoice remains unpaid, Subcontractor shall not assess any interest, carrying charge, or any other penalty on the unpaid balance. Notwithstanding the foregoing, Vinq agrees to exercise commercially reasonable efforts to obtain payment for Subcontractor within thirty (30) calendar days after receipt of each Subcontractor invoice hereunder, and Vinq further agrees that, in the event that any Subcontractor invoice has not been paid within forty five (45) calendar days after receipt by Vinq, and Vinq does not make payment within ten (10) calendar days after receipt of a written notice of delinquency from Subcontractor, Subcontractor shall be entitled to terminate all Statements of Work applicable to such invoice upon written notice to Vinq.

    b.  Final Payments. Any balance due from Vinq to Subcontractor at the termination or expiration of this Agreement shall be paid only upon (a) Subcontractor's returning all Vinq or End Client property as provided for herein, and (b) Subcontractor submitting to Vinq such final job status report as Vinq or the End Client may reasonably request. Payment of any outstanding balance shall be made within five (5) Business Days following Subcontractor's compliance with this paragraph.

    c.  Tax Exemption. Subcontractor acknowledges that the End Client is a tax-exempt organization described in Section 501(c)(3) of the Internal Revenue Code ("Code") and a private foundation described in Section 509(a) of the Code. Consequently, the End Client is not responsible for any federal, state, and local taxes paid on its behalf, and Subcontractor will not bill or charge Vinq or the End Client for said taxes. Subcontractor is responsible for requesting and obtaining all tax exemption numbers as required; provided, however, that Vinq and the End Client shall promptly provide Subcontractor with all such tax exemption and related documentation as Subcontractor may reasonably request.

12. Expenses. In addition to the Fees, Vinq shall reimburse Subcontractor for the reasonable out-of-pocket expenses actually incurred by Subcontractor ("Expenses"), subject to Vinq's then-current expense reimbursement policy. Except as otherwise provided in the Statement of Work, Vinq will not be responsible for postage, telephone, telegram, fax, computer support, photocopying, shipping, courier service, travel, legal, accounting, outside research, or any other costs incurred by Subcontractor. Subcontractor shall not incur travel expenses under this Agreement without Vinq's prior written approval, and Vinq will in no event reimburse Subcontractor for mark-up on any hardware, other goods, or software purchased or licensed by Subcontractor from third parties, or for costs or expenses allocated on a group-basis method of accounting.

13. <u>Confidentiality.</u>

    a.  <u>Confidential Information.</u> "Confidential Information" shall mean confidential or other proprietary information that is disclosed by one party (the "Disclosing Party" with respect to such information) to the other party (the "Receiving Party" with respect to such information) under this Agreement, including without limitation, hardware and software designs and code, schematics, drawings, product specification and documentation, business and product plans, forecasts, information about potential customers, customer lists, and other confidential business information. "Confidential Information" also includes any information disclosed by a Disclosing Party to a Receiving Party that is considered to be Confidential Information in a nondisclosure agreement with a third party, including without limitation the End Client, after the Receiving Party is notified of such nondisclosure agreement. Confidential Information shall not include information that: (i) is in the Receiving Party's possession without restrictions of confidentiality prior to receipt from the Disclosing Party, (ii) is or becomes public knowledge other than due to disclosure by the Receiving Party, (iii) became known to the Receiving Party from a source other than the Disclosing Party other than by the breach of an obligation of confidentiality owed to the Disclosing Party; or (iv) is independently developed by the Receiving Party, if such development was accomplished without the use of the Disclosing Party's Confidential Information.

    b.  <u>Disclosure and Use of Confidential Information.</u> The Receiving Party shall (i) not disclose, directly or indirectly, to any third party any portion of the Confidential Information it receives from the Disclosing Party without the prior written consent of the Disclosing Party; (ii) not use or exploit the Confidential Information in any way except for the purpose of evaluating and providing Services hereunder and drafting Statements of Work and Change Orders; (iii) promptly return or destroy, at the Disclosing Party's option, all materials and documentation comprising or containing the Confidential Information received from the Disclosing Party within ten (10) days after termination of this Agreement or upon request of the Disclosing Party; (iv) take all reasonably necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as the Receiving Party would with its own confidential information, but in no event less than a reasonable degree of care; (v) disclose Confidential Information to employees only if they have a need to know the Confidential Information; (vi) cause its employees who receive access to Confidential Information to abide by the restrictions and terms of this Agreement; and (vii) promptly advise the Disclosing Party in writing upon learning of any unauthorized use or disclosure of the Confidential Information. All Confidential Information is and shall remain the property of the Disclosing Party or the third party that disclosed the Confidential Information to the Disclosing Party. The Receiving Party shall not reverse engineer, decompile, or disassemble any software disclosed to the Receiving Party.

    c.  <u>Injunctive Relief.</u> The Receiving Party acknowledges that breach of this Section 13 shall cause irreparable harm to the Disclosing Party that is inadequately compensable in damages, and acknowledges that the Disclosing Party is entitled to injunctive relief for such breach.

14. Intellectual Property Ownership.

  a. Preexisting Technology. "Preexisting Technology" means the technology owned by a party and/or whose intellectual property rights are held by such party, prior to the Effective Date, together with any and all enhancements, alterations and modifications thereto, and derivative works thereof. Each party acknowledges and agrees that, as between the parties, each party is and shall remain the sole and exclusive owner of all right, title, and interest in and to its own Preexisting Technology and associated intellectual property rights. This Agreement does not affect such ownership. Each party acknowledges that it acquires no rights under this Agreement to the other party's Preexisting Technology, except as may be necessary to such party's performance of this Agreement or Services hereunder, or to the use by such party of any Deliverables.

  b. Exclusive Property Rights of the End Client. All Deliverables produced or created pursuant to this Agreement, whether individually by Subcontractor (or its employees, agents, or its permitted subcontractors), or jointly with one or both of the End Client or Vinq ("Work"), shall belong solely and exclusively to the End Client, which will possess all ownership rights in and to such Work and any intellectual property rights associated therewith, including without limitation, patent, trademark, copyright and trade secret rights. Subcontractor agrees that it shall include and enforce such provisions in all permitted subcontracts to ensure the exclusivity of the End Client's ownership as set forth herein. The End Client, its successors and assigns, shall have the right to obtain and to hold in its own name all patents, copyrights, registrations, and such other intellectual property rights and protection as may be appropriate.

  c. Assignment. To effectuate the foregoing, it is expressly understood and acknowledged that, to the extent applicable, all Work produced hereunder shall be works made for hire under the U.S. copyright laws. In addition, Subcontractor hereby irrevocably transfers, conveys, and assigns in perpetuity to the End Client, its successors, and assigns, any and all rights, title, and interest which Subcontractor may have in or to Work, including, without limitation, rights under copyright, patent and trademark law.

  d. Assistance. Subcontractor agrees to execute applications, assignments, and other documents and to render all other reasonable assistance requested by the End Client, at End Client's expense, to enable it to obtain and enforce domestic and foreign patents, copyrights and other intellectual property rights for the Work.

  e. No License. Except as may be necessary for Subcontractor's performance of this Agreement, no license to Subcontractor under any trademark, patent or copyright, or other intellectual property right which is now or may hereafter be owned by Vinq or the End Client is either granted or implied by this Agreement.

15. Warranty, Disclaimer of Warranties and Limitations of Liability.

  a. Subcontractor's General Warranties. Subcontractor is duly organized and authorized to enter into this Agreement and perform all obligations set forth herein and is not a party to any agreement which would restrict its ability to perform its obligations hereunder.

-7-

Subcontractor warrants that it will perform the Services promptly, diligently, in a workmanlike and professional fashion by qualified Subcontractor personnel with suitable training, education, experience and skills to perform the Services. During the term of this Agreement, Subcontractor warrants that the Deliverables, following Acceptance, meet the Specifications. If the Deliverables, following Acceptance but during the term of this Agreement, fail to meet the requirements in the Specifications, Subcontractor shall use commercially reasonable efforts to repair, correct, or replace the Deliverables so that they perform in accordance with the Specifications.

b. <u>Subcontractor's Intellectual Property Warranties</u>. Except to the extent of any Preexisting Technology of Vinq or the End Client that may be incorporated into a Deliverable, Subcontractor warrants that each Deliverable has been originally developed for Vinq and the End Client and was not derived from any copyrighted or property material of any third party. Subcontractor warrants that it has all intellectual property rights necessary to perform the Services and develop and license the Deliverables as provided in this Agreement. Subcontractor warrants that, to Subcontractor's knowledge, the Deliverables will not violate the intellectual property rights of any third party, including trademark, patent, copyright, and trade secrets, or proprietary and non-disclosure rights.

c. <u>Liens</u>. Subject to all applicable provisions of Section 14 above, the End Client shall receive all right, title, and interest in and to the Services furnished hereunder, including the Deliverables, free from all liens, security interests, or other encumbrances.

d. <u>Compliance</u>. No Services performed or goods delivered under this Agreement shall infringe upon or violate any applicable laws, rules, or regulations, and Subcontractor will obtain all permits, licenses, or other certifications required to comply with such laws, rules, or regulations prior to performing such Services or delivering the Deliverables.

e. <u>Limitation of Liability</u>. NEITHER PARTY IS LIABLE TO THE OTHER FOR LOST PROFITS, LOST DATA, OR SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

f. <u>Infringement</u>. Should any Deliverable or the results of any Services become, or in the opinion of Subcontractor be likely to become, the subject of an infringement or misappropriation claim or proceeding, Subcontractor shall, at its option: (i) procure, at no cost to Vinq, the right to continue to use the Deliverable or other item which is the subject of the claim (ii) replace or modify the Deliverable or other item, or part thereof, subject to such claim with a substitute product of at least comparable functionality, at no cost to Vinq, or (iii) if neither of the forgoing alternatives are feasible, as determined by Subcontractor in its sole discretion, remove the Deliverable or component thereof that is the subject of the claim, and refund to Vinq those fees applicable to the removed Deliverable or component thereof. This paragraph states Subcontractor's sole obligation (and the sole remedy of Vinq and the End Client) for any claim of infringement asserted against Vinq or the End Client that related to any Deliverable or other product developed and delivered by Subcontractor hereunder. In addition, the terms of this paragraph shall not apply, and Subcontractor shall not have any liability for, any claim that is based on

-8-

(1) use or combination of any Deliverable with a product not provided or authorized by Subcontractor, if infringement would not have occurred without the combination; (2) use of any Deliverable more than ten (10) days after Vinq or the End Client receives notice from a third party alleging infringement, unless prompt written notice is given to Subcontractor, in which case Subcontractor shall perform any obligations it may have under Section 5; (3) Vinq, End Client or third-party modifications made to Deliverables without Subcontractor's prior written approval; or, (4) any Deliverable, or any portion thereof which has been misused, improperly installed, improperly repaired, altered, or damaged by Vinq or the End Client or by any third party.

5.   Indemnity.  Each party (an "Indemnifying Party") shall indemnify, hold harmless, and defend the other party, its affiliates, and any of their respective officers, directors, members, employees, and agents (each of whom is referred to as an "Indemnified Party") against all third-party claims, demands, suits, losses, damages, liability costs, actions, judgments, and expenses (including reasonable attorney's fees) arising from or in connection with:

   a.   The Indemnifying Party's breach of any provision of this Agreement;

   b.   Any injuries to persons (including death) or property caused by the acts or omissions of the Indemnifying Party, its employees, agents, or subcontractors;

   c.   The Indemnifying Party's breach, unauthorized disclosure, or unauthorized use of any Confidential Information, trademarks, copyrights, or patent rights of the Indemnified Party, or any third party;

   d.   any and all claims by third parties against the Indemnified Party, or any of their respective its officers, directors, employees, or agents that the Indemnified Party, or any of its officers, directors, employees, or agents, have breached the proprietary rights, trademarks, copyrights, or patent rights of any third party as a direct result of the Indemnifying Party's performance hereunder; and

   e.   any negligent or intentional acts or omissions of the Indemnifying Party that give rise to claims alleging libelous or slanderous material or material that constitutes invasion of the privacy of any third person.

The Indemnified Party may, at its option, conduct the defense in any third party action arising as described above, and the Indemnifying Party shall cooperate fully with such defense. For purposes of this Section 5, the definition of "Indemnified Party," as applied to Vinq, shall be deemed to include the End Client and its officers, directors, employees, and agents.

An Indemnified Party seeking indemnification under this Section 5 agrees to provide the Indemnifying Party with: (i) prompt notice of any claim for which indemnification is being sought; (ii) the right to control and direct the investigation, defense, resolution and settlement of such claim; and (iii) reasonable cooperation upon the Indemnifying Party's reasonable request at no cost to the indemnified party.

16.   Termination.

a. <u>When this Agreement Terminates</u>. This Agreement shall continue in force until the earlier of (a) the parties' agreement in writing that all Deliverables under all outstanding Statements of Work are complete, (b) thirty (30) days after the completion of all Services in all outstanding Statements of Work, provided that the parties are not then negotiating the terms of a new Statement of Work, or (c) the expiration or termination of the Prime Contract, provided that Vinq agrees to inform Subcontractor of the anticipated termination date of the Prime Contract, or to provide Subcontractor with prompt notice of its expiration or early termination. Vinq may terminate this Agreement for convenience upon seven (7) days written notice; provided, however, that in exercising such termination right, Vinq agrees to pay Subcontractor for all Services rendered through the effective date of termination. Either party may terminate this Agreement upon thirty (30) days' written notice to the other party in the event that the other party materially breaches, defaults, or fails to comply with any term or provision of this Agreement, provided that the other party fails to cure the same within such thirty (30) day period. Vinq may terminate this Agreement if Subcontractor is adjudged insolvent or bankrupt; is the subject of a bankruptcy petition or other proceedings by or against Subcontractor seeking relief, reorganization, or arrangement under the laws relating to insolvency, or upon Subcontractor's liquidation, dissolution, or winding up of its business, whether voluntarily or not.

b. <u>Effect of Termination</u>. The provisions of Sections 1, 13, 14, 15(e), 15(f), 16, 17(b), 18, 19, 20, 21, and 22 shall survive the expiration or termination of this Agreement. Upon early termination of this Agreement for any reason, Vinq shall pay Subcontractor for, and only for, Services performed up to the effective date of termination in accordance with the applicable Statement of Work.

17. <u>No Solicitation or Employment of Personnel</u>. During the term of this Agreement and for a period of six (6) months after its expiration or termination, neither party nor any of its employees, agents, or subcontractors will, without the other party's prior written consent, directly or indirectly (a) solicit any employee of such other party to seek employment or other contractual arrangements with such party or any of such party's employees, agents, or subcontractors or (b) employ or otherwise engage the services of any employee of such other party. The foregoing restrictions shall not prevent either party from placing general employment solicitation in any generally circulated periodical, or from hiring any candidates who may respond to such solicitation.

18. <u>Use of Name</u>. Except with the End Client's express written permission, Subcontractor shall not publish, cause to have published, or use the End Client's name or any information about its relationship with the End Client, including but not limited to, the inclusion of End Client's name in reference lists or for advertising and other promotional purposes.

19. <u>Examination of Books and Records</u>. During the term of this Agreement and for a period of one (1) year thereafter, Vinq and the End Client shall have the right to examine Subcontractor's books, records, and other documentation relating to the account relating to the Services performed hereunder. Subcontractor shall make such information available to Vinq or the End Client during normal business hours upon five (5) Business Days prior written notice to Subcontractor.

20. <u>Notices</u>. All notices and communications required or permitted under this Agreement shall be in writing and sent to the postal address, e-mail address, or facsimile set forth on the signature pages hereto (which may be changed by a party by notice to the other party). Notices via e-mail shall not be effective unless receipt is acknowledged by the other party via a return e-mail or return receipt. Notices shall be deemed to be given (a) on the date of service if served by e-mail or facsimile, (b) on the third business day after mailing if mailed by certified or registered mail, postage prepaid and properly addressed, or (c) on the immediately following business day if sent overnight by a nationally-known courier service.

21. <u>Miscellaneous</u>. This Agreement, the Prime Contract (when available and only to the extent applicable), the Statements of Work, Change Orders (if any), and the documents incorporated by reference in this writing constitute the entire agreement and understanding between the parties and supersede all prior agreements, whether oral or written, between the parties with respect to the subject matter of this Agreement. No amendment, modification, or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by an authorized representative of each party. The failure of a party at any time to require performance of any obligation of the other party shall not affect its right to enforce any provision of this Agreement at a later time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any prior or subsequent breach. Neither party may assign this Agreement, delegate the duties hereunder, or subcontract for the performance of obligations hereunder without the prior written consent of the other party, except that Subcontractor shall be entitled to engage independent contractors in connection with Subcontractor's performance of this Agreement, subject to all and the terms and conditions hereof. Subject to the foregoing, this Agreement shall be binding upon, and inure to the benefit of, the parties and their permitted successors or assigns. The unenforceability of any provision or provisions of this Agreement shall not render unenforceable or impair its remainder. If any provision of this Agreement is deemed invalid or unenforceable in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the offending provision to render it valid, enforceable, and, insofar as possible, consistent with the original intent of the parties. The headings in this Agreement are solely for the convenience of reference and shall not be given any effect in the construction or interpretation of this Agreement. This Agreement may be executed in any number of counterparts, each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall be governed by the internal laws of the State of California exclusive of its conflicts-of-law principles. All disputes relating to or arising out of this Agreement shall be resolved in a state or federal court located in Santa Clara County, California, and the parties consent to the jurisdiction of such courts.

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the day and year first above written.

VINQ, LLC

SUBCONTRACTOR:
Metonymy, Inc., d/b/a place base


By: _Mark-Torrance_____
Name:  Mark Torrance
Title:  Principal
Address:  2025 Park Royal Drive
San Jose, California 95125-4649
Voice: (408) 265-9239
Fax: (408) 516-9479
E-Mail:  mark@vinq.com

By: _Jaron W._____
Name: Jaron Waldman
Title:  President
Address:  8559 Higuera St. Suite B
Culver City, California 90232
Voice: (310) 836-3886
Fax: (310) 836-3556
E-Mail: jwaldman@place-base.com

STATEMENT OF WORK NO. 1

This STATEMENT OF WORK NO. 1 ("Statement of Work") is incorporated by reference and made a part of the Professional Services Subcontract Agreement ("Agreement") dated August ____, 2004 between Vinq, LLC ("Vinq") and Metonymy, Inc. d/b/a place base ("Subcontractor"). This Statement of Work is effective as of the following date: _____ ("Effective Date"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

## SCOPE OF SERVICES

Subcontractor shall contribute to the design, development, implementation, maintainance, and integration of Web applications and user interfaces for the KnowledgePlex® Community Data System (CDS). CDS is a web-based central clearinghouse that maintains a variety of housing and demographic data from multiple sources and provides multiple means of accessing, displaying, and downloading data at geographic scales ranging from the neighborhood to the nation.

More specifically, Subcontractor shall work with Vinq to perform the following Services:

- Design, develop, implement, maintain, and integrate web applications and user interfaces for the CDS.
- Produce and maintain a CDS administrative interface that will allow non-technical administrative staff to control certain site features, add content, and monitor site usage statistics and user feedback provided through the CDS site.
- Produce and maintain a web-based tool for entering, editing, and outputting metadata that is integrated with the CDS administrative interface.
- Integrate metadata, user guides, and analytic briefs with the CDS user interface.
- Prepare functional specifications, technical specifications, screen mockups or prototypes, and database schema.
- Conduct unit and integration tests for site components.
- Develop and implement a security and digital rights access plan for the CDS that prevents massive spidering and other unauthorized acquisition of the CDS site data.

### *Meetings and Reporting*

- In conjunction with other vendors, develop and submit to an End Client representative identified in writing by Vinq (the "Authorized Foundation Representative") a consolidated project work plan at the end of each quarter unless the parties mutually agree to a different date for submittal. The work plan shall set forth a reasonably detailed schedule of the Services to be performed, deliverables, key project dependencies, and decision points for each project phase. Subcontractor shall revise such work plans as needed.

- Attend status meetings, as requested by Vinq, with Vinq project managers, the End Client's project managers, and work with Vinq to prepare Vinq's submission to the Authorized Foundation Representative weekly status reports containing the following information:

a. major work performed,
b. major tasks accomplished,
c. issues encountered,
d. expected tasks for the following week,
e. significant risks that have emerged during the week, and
f. risk mitigation plans.

- Consult and meet with any third-party vendors who may also be involved with the Project, as reasonably requested by Vinq, on various tasks related to the CDS, database design, data display design, metadata design, and user feedback and testing.

## NOTIFICATIONS

Subcontractor shall promptly notify the Authorized Foundation Representative upon the occurrence of (a) impending deadlines and tasks that require End Client action and (b) resource needs, schedule modifications, and budgetary issues.

## MATERIAL CHANGES

Subcontractor shall prepare and submit to the Authorized Foundation Representative a Work Breakdown Schedule (WBS) describing any material change to this Agreement. The WBS shall be approved by both parties. The WBS shall contain the following information:

a. a description of events, issues, or problems that have altered or will alter the original schedule and Services as set forth in this Statement of Work, and
b. detailed schedules for the performance of the new or modified service.

Subcontractor shall submit the WBS on the dates and times mutually agreed upon by the parties or, if the parties do not agree on specific dates or times, at the beginning of each calendar quarter during the term of this Statement of Work.

## DELIVERABLES TO VINQ:

Subcontractor shall work with Vinq to prepare the following Deliverables on or before the following prescribed dates:

| Description of Deliverable | Due Date |
|---|---|
| Project kickoff meeting in Washington, D.C. | July 16, 2004 |
| Present initial results of evaluating ESRI ARC IMS vs. Mapserver for GIS engine | July 16, 2004 |
| Project work plan. | August 1, 2004 |
| **CDS Version 1.0 (a)**: Proposed database schema | August 8, 2004 |
| **CDS Version 1.0 (b):** Draft functional and technical specifications for version 1.0 | August 30, 2004 |
| **CDS Version 1.0 (c):** Beta of Version 1.0 ready for public testing | November 30, 2004 |
| **CDS Version 1.0 (d):** Program/system code, | November 30, 2004 |

| | |
|---|---|
| and technical manuals/guides for site administrators | |
| **CDS Version 1.0 (e):** In-person training session at Fannie Mae Foundation | November 30, 2004 |
| **CDS Version 1.1 (a):** Updated project work plan | December 10, 2004 |
| **CDS Version 1.1 (b):** Functional and technical specifications | January 31, 2005 |
| **CDS Version 1.1 (c):** Version 1.1 ready for public release | April 11, 2005 |
| **CDS Version 1.1 (d):** Updates to program/system code, and technical manuals/guides for site administrators | April 11, 2005 |
| **CDS Version 1.1 (e):** Online/telephonic training session | April 25, 2005 |
| **CDS Version 1.1 (f):** Classroom training materials | April 25, 2005 |
| **CDS Version 1.2 (a):** Updated project work plan | May 2, 2005 |
| **CDS Version 1.2 (b):** Functional and technical specifications | May 16, 2005 |
| **CDS Version 1.2 (c):** Version 1.2 ready for public release | August 8, 2005 |
| **CDS Version 1.2 (d):** Updates to classroom training material, program/system code, and technical manuals/guides for site administrators | August 8, 2005 |
| **CDS Version 1.2 (e):** Online/telephonic training session | August 22, 2005 |
| **CDS Version 1.3 (a):** Updated project work plan | August 29, 2005 |
| **CDS Version 1.3 (b):** Functional and technical specifications | September 16, 2005 |
| **CDS Version 1.3 (c):** Version 1.3 ready for public release | December 5, 2005 |
| **CDS Version 1.3 (d):** Updates to classroom training material, program/system code, and technical manuals/guides for site administrators | December 5, 2005 |
| **CDS Version 1.3 (e):** Online/telephonic training session | December 16, 2005 |
| **Process documentation.** Process documentation covering updates to work plan, project decisions, management documents such as status reports and meeting minutes, and implementation documents and plans outlining | Ongoing. |

| the business processes, roles, responsibilities, and maintenance procedures associated with the solution | |
|---|---|

## LOCATION
Subcontractor shall perform work at Subcontractor's offices in California.

## COMPENSATION
Upon the Vinq's approval of monthly invoices, Vinq shall pay Subcontractor at the rate of **$105** per hour, *provided however*, that the total amount paid shall not exceed **$415,000** (including payment for reimbursable expenses) for Services rendered during 7/16/2004 through 6/30/2006. Each such invoice shall specify Services rendered, the number of hours worked, and reimbursable expenses.   Invoice descriptions of Services provided shall reference the descriptions of Services included in the "Scope of Services" section of this Statement of Work.

*The schedule of compensation shall be as follows:*

### 2004

For Services rendered during 7/16/2004 through 12/31/2004, Vinq shall pay Subcontractor at a rate of **$105.00** per hour for work performed by each individual programmer, *provided, however,* that the total amount paid shall not exceed **$220,000** (including payment for reimbursable expenses) for Services rendered during such period.

### 2005

For Services rendered during 1/1/2005 through 12/31/2005, Vinq shall pay Subcontractor at a rate of **$105.00** per hour for work performed by each individual programmer, *provided, however,* that the total amount paid shall not exceed **$185,000** (including payment for reimbursable expenses) for Services rendered during such period.

### 2006

For Services rendered during 1/1/2006 through 6/30/2006, Vinq shall pay Subcontractor at a rate of **$105.00** per hour, *provided, however,* that the total amount paid shall not exceed **$10,000** (including payment for reimbursable expenses) for Services rendered during such period.

## REIMBURSABLE EXPENSES:
Subject to the foregoing limitations on the total amount to be paid each year and Section 12 of the Agreement, Vinq shall pay Subcontractor for reasonable out-of-pocket expenses approved by Vinq or the Authorized Foundation Representative.   Before submitting an invoice for reimbursable expenses, Subcontractor shall obtain approval from Vinq or from the Authorized Foundation Representative.

-4-

ACCEPTED AND AGREED TO:

VINQ, LLC

SUBCONTRACTOR:
Metonymy, Inc., d/b/a place base

By: _Mark C. Torrance_

Name: Mark Torrance
Title: Principal
Address: 2025 Park Royal Drive
San Jose, California 95125-4649
Voice: (408) 265-9239
Fax: (408) 516-9479
E-Mail: mark@vinq.com

By: _Jaron Wal_

Name: Jaron Waldman
Title: President
Address: 8559 Higuera St. Suite B
Culver City, California 90232
Voice: (310) 836-3886
Fax: (310) 836-3556
E-Mail: jwaldman@place-base.com

# Exhibit D

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

Zella v. E.W. Scripps Co.
C.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
Jeffrey J. ZELLA and Ross Crystal, individuals,
Plaintiffs,
v.
The E.W. SCRIPPS COMPANY, an Ohio Corporation, Scripps Networks, Inc., a Delaware corporation, Television Food Network G.P., a general partnership, Harpo Productions, Inc., an Illinois corporation, King World Productions, Inc., a Delaware Corporation, CBS Television Distribution Group, a unit of CBS Corporation, which is a Delaware corporation, Watch Entertainment, Inc., a New York Corporation, Defendants.
**Case No. CV 06-7055 ABC (JTLx).**

Dec. 18, 2007.

**Background:** Creators of treatment and script for talk/cooking show brought copyright infringement action against television production companies. Defendants filed motion to dismiss.

**Holdings:** The District Court, Audrey B. Collins, J., held that:

(1) individual generic elements of talk/cooking show-i.e., a host, guest celebrities, an interview, and a cooking segment, were not protectable, and

(2) any potentially protectable elements of plaintiffs' show were not substantially similar to defendants' show.

Motion granted.

**[1] Federal Civil Procedure 170A ⊂⊃1832**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal

170AXI(B)5 Proceedings
    170Ak1827 Determination
        170Ak1832 k. Matters Considered in General. Most Cited Cases
On motion to dismiss for failure to state a claim, it is proper for the court to consider matters subject to judicial notice. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; Fed.Rules Evid.Rule 201, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⊂⊃1832**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1832 k. Matters Considered in General. Most Cited Cases
On motion to dismiss for failure to state a claim, court may consider exhibits submitted with the complaint, and documents which are not physically attached to the complaint but whose contents are alleged in the complaint and whose authenticity no party questions. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Evidence 157 ⊂⊃19**

157 Evidence
    157I Judicial Notice
        157k19 k. Matters of Art and Skill. Most Cited Cases
In the context of copyright claims, court may take judicial notice of generic elements of creative works. Fed.Rules Evid.Rule 201, 28 U.S.C.A.

**[4] Evidence 157 ⊂⊃19**

157 Evidence
    157I Judicial Notice
        157k19 k. Matters of Art and Skill. Most Cited Cases
In copyright infringement action, court could take judicial notice of the fact that generic television

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

Page 2

talk show and cooking show elements frequently involved celebrity guest(s) cooking. Fed.Rules Evid.Rule 201, 28 U.S.C.A.

**[5] Copyrights and Intellectual Property 99 &⊃ 82**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k82 k. Pleading. Most Cited Cases
A court may dismiss a copyright infringement claim on a motion to dismiss for failure to state a claim if it concludes that no reasonable jury could find that the works are substantially similar, or if it concludes that the similarities between the two works pertain only to unprotected elements of the works. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[6] Copyrights and Intellectual Property 99 &⊃ 82**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k82 k. Pleading. Most Cited Cases
Fact that court did not have all 150 episodes of television talk/cooking show before it did not preclude court from ruling, on motion to dismiss for failure to state a claim, that cooking show did not infringe plaintiffs' copyrights in proposed treatment and script; presumably plaintiffs alleged the content of the episodes they believed most substantially resembled their copyrighted treatment, and court would not perform plaintiffs' work for them and review all 150 episodes to select those which infringed on plaintiffs' copyrights. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[7] Copyrights and Intellectual Property 99 &⊃ 51**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)1 What Constitutes Infringement
                99k51 k. Nature and Elements of Injury. Most Cited Cases
To state a claim for copyright infringement, plaintiffs must allege: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.

**[8] Copyrights and Intellectual Property 99 &⊃ 67.1**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)1 What Constitutes Infringement
                99k67.1 k. Motion Pictures and Other Audiovisual Works. Most Cited Cases
To assess substantial similarity as a matter of law in copyright infringement action involving television show, court must apply the objective "extrinsic test," which focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events of the two works; in applying the extrinsic test, court must take care to inquire only whether the protectable elements, standing alone, are substantially similar.

**[9] Copyrights and Intellectual Property 99 &⊃ 4.5**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(A) Nature and Subject Matter
            99k3 Subjects of Copyright
                99k4.5 k. Ideas and Concepts in General. Most Cited Cases
General plot ideas are not protected by copyright law.

**[10] Copyrights and Intellectual Property 99**

--- F.Supp.2d ----                                    Page 3
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

⟲12(2)

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(A) Nature and Subject Matter
         99k12 Originality of Work; Creativity
            99k12(2) k. Use of Common Expressions, Historical Facts, or Other Material from Public Domain. Most Cited Cases
Individual generic elements of cooking shows and talk shows-i.e., a host, guest celebrities, an interview, and a cooking segment-are not protectable by copyright law; furthermore, stock elements of a host, guest celebrities, an interview, and a cooking segment can also be characterized as unprotected scenes a faire.

**[11] Copyrights and Intellectual Property 99**
⟲**4.5**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(A) Nature and Subject Matter
         99k3 Subjects of Copyright
            99k4.5 k. Ideas and Concepts in General. Most Cited Cases
When the idea and the expression are indistinguishable, or merged, the expression will only be protected by copyright law against nearly identical copying.

**[12] Copyrights and Intellectual Property 99**
⟲**65**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)1 What Constitutes Infringement
            99k65 k. Dramatic Works, Pantomimes, and Choreographic Works. Most Cited Cases
Although relaxed, informal, and fun mood of plaintiffs' copyrighted treatment and script and defendants' television talk/cooking show was almost identical, any potentially protectable elements of plaintiffs' works were not substantially similar to defendants' show so as to infringe plaintiffs' copyright; plaintiffs' show contained no real discernable theme, while defendants' show, which contained segments on shopping, gift-giving, parenting, relationships, and fashion, was more of a "lifestyle" show that included cooking segments, plaintiffs' show took place exclusively within a celebrity's home, while defendant's show took place in a studio with a live studio audience, and segment sequencing in defendants' show does not resemble the structure of plaintiffs' show.

Stanton L. Stein, Esq., Marcia J. Harris, Esq., Bridgette M. Taylor, Esq., Frieda A. Taylor, Esq., Dreir Stein & Kahan, LLP, Santa Monica, CA, for Plaintiffs, Jeffrey J. Zella and Ross Crystal.
Daniel Scott Schecter, Esq., Michelle J. Correll, Esq., Latham & Watkins, LLP, Los Angeles, CA, for Defendants The E.W. Scripps Company, Scripps Networks, LLC; and Television FoodNetwork G.P.
Lee S. Brenner, Allison S. Rohrer and Tami Kameda, White O'Connor Curry LLP, Los Angeles, CA, for Defendants CBS Television Distribution, King World Productions, Inc., and Harpo Productions, Inc.

### ORDER RE: CBS DEFENDANTS' MOTION TO DISMISS

AUDREY B. COLLINS, District Judge.
  *1 Pending before the Court is Defendants CBS Television Distribution, King World Productions, Inc. and Harpo Productions, Inc.'s (collectively the "CBS Defendants' ") Motion to Dismiss Plaintiffs' Jeffery J. Zella and Ross Crystal ("Plaintiffs' ") First Amended Complaint, filed on August 24, 2007. Plaintiffs opposed on December 3, 2007, and the CBS Defendants replied on December 10, 2007. The Court finds this matter appropriate for resolution without oral argument and VACATES the January 7, 2008 hearing date. *See* Fed.R.Civ.P. 78; Local Rule 7-15. The Court GRANTS Defendants' motion and DISMISSES the CBS Defendants from this case as discussed below.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

## I. INTRODUCTION AND FACTUAL BACK-GROUND

Plaintiffs work in the television and radio media. (Compl. ¶ 25.) In November 2001, Plaintiff Crystal contacted Judy Girard, then the president of the Food Network, about a television show Plaintiffs had created. (*Id.* ¶ 26.)Plaintiff Crystal sent Ms. Girard a letter on November 30, 2001, submitting for her consideration a copy of a one-page treatment and three-page script for a television show entitled *Showbiz Chefs* (the "Work").(*Id.* ¶ 28.)Plaintiffs obtained a federal copyright registration for this treatment on December 10, 2001. (*Id.* ¶ 29, Ex. B.) On December 13, 2001, Ms. Girard rejected Plaintiffs' idea, but did not return the copy of the treatment and script to them. (*Id.* ¶ 30, Ex. C.) On November 5, 2004, the Food Network launched a show called *Inside Dish*, with host Rachael Ray. (*Id.* ¶ 34.)[FN1] Plaintiffs believe that the success of this show sparked interest in creating a syndicated talk show called *Rachael Ray*.(*Id.* ¶ 44.)The show *Rachael Ray* is a one-hour show distributed by the CBS Defendants that has become a "monster hit" according to Plaintiffs. (*Id.* ¶ 45.)

Plaintiffs' treatment of *Showbiz Chefs* indicates that it is

a 30-minute interview/cooking show featuring celebrities cooking their favorite dishes in their own kitchens. In addition to sharing their favorite recipes, celebrity guests will open their homes to the viewer providing a glimpse into their lifestyles. Along the way, we will gain insights into their latest projects-books, films, television series, etc.

*Showbiz Chefs* will be filmed on location in and around the Los Angeles area and will feature a host/interviewer who will participate with the celebrity guest in the cooking experience. A typical episode may include a quick tour of the home/grounds-a few surprises (such as appearances of another celebrity or family member who may not necessarily be scheduled to appear on the episode)-or a clandestine grocery shopping trip to the local market with the celebrity guest. We inevitably adjourn to the kitchen where the celebrity (with the help of the host turned inept but well meaning sous chef) prepares his/her favorite recipe. The mood is relaxed, informal and fun. We discuss the specific ingredients as well as the history (perhaps a family story) behind the recipe.

**\*2** *Showbiz Chefs* final segment will feature an interview with the celebrity about his/her latest project in a comfortable setting (somewhere on the grounds) while the host and celebrity enjoy the celebrity-prepared dish.

(Compl. ¶ 35, Ex. A.) Plaintiffs' also submitted to the Food Network a three-page sample script for an episode that hypothetically includes Ray Romano. (Compl., Ex. A.)

*Rachael Ray* is a talk-style show that featured some episodes with celebrities. For example, Plaintiffs' Complaint mentions: (1) Episode 1161R with Chris Meloni in Ray's kitchen making Bloody Mary Burgers and discussing Meloni's role on *Law and Order: Special Victims Unit;* (2) Episode 1143R featuring former President Bill Clinton discussing childhood obesity as he and Ray prepare a meal in Ray's kitchen; (3) Episode 1154 with cook Paula Deen, the star of her own show on the Food Network and the author of a number of cookbooks, featuring Deen and Ray preparing Mother's Day meals; (4) Episode 1153R with late-night talk show host Craig Ferguson, "comparing notes" on Scottish cuisine; and (5) Episode 1002 with Oprah Winfrey in which they prepare pizza and discuss current projects. (*Id.* ¶ 46.)Plaintiffs also point to three additional episodes in their opposition to the CBS Defendants' motion: (1) Episode 1007 showing Dr. Phil cooking in his home, without Ray, and then cooking with Ray on the set; (2) Episode 2030 showing chef Bobby Flay in his own kitchen without Ray, then with Ray on set, although they do not cook; and (3) Episode 2048 showing chef Nigella Lawson in her own kitchen without Ray, and then cooking on set with Ray. (Compl. ¶ 46; Declaration of Lee S. Brenner ("Brenner Decl.") ¶¶ 4-10, Exs. A-G; Declaration of Allison Rohrer

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

("Rohrer Decl.") ¶¶ 3-8, Exs. A-C.)

Plaintiffs allege that the elements contained in *Showbiz Chefs* are protectable, as well as "the expressive manner in which Plaintiffs selected, arranged, and combined the protectable and non-protectable elements of the Work."(Compl. ¶ 51.) Plaintiffs allege that the CBS Defendants had access to Plaintiffs' Work and that *Rachael Ray* is substantially similar and infringing, (*Id.* ¶¶ 51, 52, 54, 55.)The CBS Defendants have moved to dismiss Plaintiffs' first claim (and only claim) against them for copyright infringement, arguing that, as a matter of law, *Showbiz Chefs* does not contain protectable elements and it is not substantially similar to *Rachael Ray.*

## II. LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."*Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988); *accord Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 248 (9th Cir.1997) ("A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") In other words, a complaint need not contain detailed factual allegations, but it must allege facts sufficient to raise a right to relief that rises above the level of mere speculation and is plausible on its face. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965, 1969, 167 L.Ed.2d 929 (2007). A court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *See NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *see also Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir.1980) (finding that the complaint must be read in the light most favorable to the plaintiff). However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast as factual allegations. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 973 (8th Cir.1968).

**\*3** [1] In ruling on a 12(b)(6) motion, a court generally cannot consider material outside of the complaint (*e.g.,* those facts presented in briefs, affidavits, or discovery materials).*See Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994). A court may, however, consider exhibits submitted with the complaint. *See id.* at 453-54.Also, a court may consider documents which are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions."*Id.* at 454.Further, it is proper for the court to consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201. *See Mir, M.D. v. Little Co. of Mary Hosp.,* 844 F.2d 646, 649 (9th Cir.1988).

## III. THE CBS DEFENDANTS' EVIDENCE AND REQUEST FOR JUDICIAL NOTICE

### A. Copies of Episodes of *Rachael Ray*

[2] Generally, in ruling on a 12(b)(6) motion, a court cannot consider material outside of the complaint, such as facts presented in briefs, affidavits, or discovery materials. *See Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994). A court may, however, consider exhibits submitted with the complaint. *See id.* at 453-54.Also, a court may consider documents which are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions."*Id.* at 454.

The CBS Defendants submit DVD copies of each of the *Rachael Ray* episodes to which Plaintiffs refer in their Complaint, as well as the episodes mentioned in Plaintiffs' Opposition, which are collectively Episodes 1161R, 1143R, 1154, 1153R, 1002, 1007, 2030, and 2048. (*See* Brenner

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

Page 6

Decl. ¶¶ 4-10, Exs. A-G; Rohrer Decl. ¶¶ 3-8, Exs. A-C.) Defendants also submit DVD copies of Episodes 1006 and 1012 as examples of episodes in which no celebrities appear. (Brenner Decl. ¶¶ 4-5, Exs. A-B.)

Plaintiffs allege that the show *Rachael Ray,* as an ongoing series, infringes on Plaintiffs' *Showbiz Chefs,* so the Court may properly consider the content of the show as a documentary facts "whose contents are alleged in [the] complaint,"*Branch,* 14 F.3d at 454.[FN2]Plaintiffs do not object to either the authenticity of the copies of the episodes submitted by the CBS Defendants, or to the accuracy of the content of the episodes. Moreover, the Court finds that it may properly consider not only the episodes to which Plaintiffs specifically refer in the Complaint (Episodes 1161R, 1143R, 1154, 1153R, and 1002), but also the episodes submitted by the CBS Defendants to demonstrate episodes without celebrities (Episodes 1006 and 1012) and episodes to which Plaintiffs referred in their opposition brief (Episodes 1007, 2030, and 2048).

**B. Judicial Notice of Evidence of Other Cooking Shows**

[3] On a motion to dismiss, it is proper for the court to consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201. *See Mir, M.D. v. Little Co. of Mary Hosp.,* 844 F.2d 646, 649 (9th Cir.1988).Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are either "(1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."Fed.R.Evid. 201(b). In the context of copyright claims, the Court may take judicial notice of generic elements of creative works. *See, e.g.,Walker v. Time Life Films, Inc.,* 615 F.Supp. 430, 438 (S.D.N.Y.1985) (taking judicial notice that "members of the New York Police Department are often portrayed as Irish, smokers, drinkers, and third or fourth generation police officers"); *Willis v.*

*Home Box Office,* 2001 WL 1352916, at *2 (S.D.N.Y.2001) ("It does not strain the concept of judicial notice to observe that books, movies and television series are full of such unethical men and women in a variety of businesses [.]").

*4 [4] The CBS Defendants ask the Court to take judicial notice that the following elements of a television show are common and prevalent in public works: (a) a host; (b) guest celebrities, (c) an interview; and (d) a cooking segment. (Request for Judicial Notice ("RJN") at 1:7-13.) The Court grants this request because these elements are generally known and can be verified simply by watching television for any length of time. Plaintiffs cannot reasonably question the existence or accuracy of these generic elements and, in fact, they concede that the Court "may take judicial notice of the fact that there are and have been numerous TV cooking shows and that TV talk show hosts have frequently involved celebrity guest[s] in cooking."(Opp'n at 13:7-9.)

The CBS Defendants also ask the Court to judicially notice various specific shows that contain these elements. (*Id.* at 3 n. 2, Ex. A.) The Court denies this request, however. These shows are not commonly known within this District, nor can their accuracy be verified by the Court, especially since many of them are several years old. Moreover, while Plaintiffs cannot reasonably dispute the generic talk show and cooking show elements of these shows (since one need only watch them to verify that fact), the Court cannot determine whether these shows were ever aired so as to contribute to the commonplace character of the generic show elements.[FN3]In any event, for the purposes of determining whether *Showbiz Chefs* contains protectable elements, the Court need not judicially notice any specific shows containing these generic talk show and cooking show elements because it has judicially noticed the generic character of the elements themselves. Therefore, the Court declines to consider the content of Exhibit A to the CBS Defendants' Request for Judicial Notice.[FN4]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IV. ANALYSIS

The CBS Defendants move to dismiss the Complaint against them because, as a matter of law, *Showbiz Chefs* contains no protectable elements, and there is no substantial similarity between it and *Rachael Ray*.Plaintiffs oppose on two grounds: (1) the Ninth Circuit does not permit the Court to decide substantial similarity on a motion to dismiss because not all 150 *Rachael Ray* episodes are before the Court; and (2) in any event, *Rachael Ray* is substantially similar to *Showbiz Chefs,* creating a factual issue that cannot be decided on a motion to dismiss. The Court finds that *Showbiz Chefs* and *Rachael Ray* are properly before the Court and the Court can assess substantial similarity as a matter of law. Moreover, the Court holds that *Showbiz Chefs* and *Rachael Ray* are not substantially similar as a matter of law and dismisses Plaintiffs' claim against the CBS Defendants with prejudice.

## A. The Court May Assess Copyright Infringement as a Matter of Law on the CBS Defendants' Motion to Dismiss.

[5] Courts have the power to dismiss complaints that either lack a cognizable legal theory or fail to allege sufficient facts to establish the elements of a valid claim for relief. *Balistreri,* 901 F.2d at 699.Plaintiffs have pointed to no law suggesting the a court *lacks* this power in the context of copyright infringement claims. In contrast, the Ninth Circuit has noted that "[t]here is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss."*Christianson v. West Pub. Co.,* 149 F.2d 202, 203 (9th Cir.1945) (specifically approving of the district court's dismissal of a copyright complaint by comparing the two works that were part of the record). For fifty years, courts have followed this rather obvious principle and dismissed copyright claims that fail from the face of the complaint (and in light of all matters properly considered on a mo-

tion to dismiss).*See, e.g., Rodriguez v. Casa Salsa Restaurant,* 260 F.Supp.2d 413, 414 (D.P.R.2003) (motion to dismiss); *Cano v. World of Difference Institute,* 1996 WL 371064, at *12 (N.D.Cal.1996) (motion for judgment on pleadings)[FN5]; *Lake v. Columbia Broad. Sys., Inc.,* 140 F.Supp. 707, 708 (S.D.N.Cal.1956) (noting that "upon this motion to dismiss the Court may assume validity of the copyright and, comparing the literary products incorporated into the complaint, determine as a matter of law whether or not the copyright has been infringed," and dismissing complaint); *Nelson v. PRN Prods.,* 873 F.2d 1141, 1143-44 (8th Cir.1989) (affirming dismissal, stating that "[t]he trial judge could properly determine the matter of substantial similarity as a matter of law and did so by granting defendants' motion to dismiss" because both works were before the court); *Bell v. Blaze Magazine,* 2001 WL 262718, at *3 (S.D.N.Y.2001) ("If the court determines that no reasonable jury could find that the works are substantially similar, or if it concludes that the similarities pertain only to unprotected elements of the work, it is appropriate for the court to dismiss the action because, as a matter of law, there is no copyright infringement.").

*5 Recently, a court in the Northern District of California found no obstacle to addressing substantial similarity as a matter of law:

[P]laintiffs make much of the procedural argument that decisions as to copyright infringement-and in particular, substantial similarity issues-are not proper on 12(c) motions for judgment on the pleadings. Plaintiffs are correct that many times, the issue of substantial similarity is not amenable to resolution without a trial.... However, summary judgment may be granted' if the evidence in the record, combined with every inference reasonably drawn in favor of the non-moving party, demonstrates that no reasonable jury could find substantial similarity.... It follows, therefore, that judgment on the pleadings may be granted where the facts asserted by the non-moving party in its pleadings-including the attached works themselves-and all reasonable inferences from those facts, show the absence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of substantial similarity.

*Identity Arts v. Best Buy Ent. Servs. Inc.,* 2007 WL 1149155, at *5 (N.D.Cal.2007). Therefore, "[i]f after examining the works themselves, this Court determines that there is no substantial similarity, then the plaintiff here can prove no facts in support of his claim which would entitle him to relief-the standard for dismissal under Rule 12(b)(6)."*Boyle v. Stephens, Inc.,* 1998 WL 80175, at *4 (S.D.N.Y.1998) ("A court may, therefore, dismiss a copyright infringement claim on a 12(b)(6) motion if it concludes that no reasonable jury could find that the works are substantially similar, or if it concludes that the similarities between the two works pertain only to unprotected elements of the works."). This Court agrees with this analysis and finds that it may properly address the merits of the CBS Defendants' motion.

[6] Plaintiffs do not necessarily challenge the Court's power to rule on the CBS Defendants' motion to dismiss. Rather, they claim that, because the Court does not have all 150 episodes before it, the above authorities are inapplicable and the Court cannot assess substantial similarity on a motion to dismiss. The Court rejects this contention. Plaintiffs concede that the Court may consider documents incorporated by reference into a complaint. *Branch,* 14 F.3d at 454;*Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir.1998), *superseded on other ground by*28 U.S.C. § 1453(b). Moreover, Ninth Circuit law permits the Court to consider documents not specifically incorporated by reference if the "plaintiff's claim depends on the contents of the document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."*Knievel v. ESPN,* 393 F.3d 1068, 1076 (9th Cir.2005). This rule serves a critical policy interest in "preventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based."*Parrino,* 146 F.3d at

706.[FN6]

*6 Plaintiffs' speculation that some episodes of *Rachael Ray* not before the Court may contain infringing content does not defeat the CBS Defendants' motion. First, Plaintiffs claim they have viewed "many, but not all" of those episodes. If true, as masters of their Complaint, Plaintiffs must allege the best facts for their case. Presumably, Plaintiffs have done so by alleging the content of the episodes they believe most substantially resemble *Showbiz Chefs,* and have even augmented that showing with three additional episodes to which they refer in their opposition brief. That they now suggest that the Court review every episode to save their claims would waste substantial judicial resources undertaking a task Plaintiffs should have undertaken themselves. The Court will *not* perform Plaintiffs' work for them and review all 150 episodes to select those which infringe on Plaintiffs' copyrights.

Plaintiffs cite no authority that the Court may not base its ruling on the eight episodes presented to it. In fact, in *Funky Films, Inc. v. Time Warner Entertainment Co.,* the Ninth Circuit considered a copyright infringement claim involving the television show *Six Feet Under.*462 F.3d 1072 (9th Cir.2006). The Court affirmed summary judgment on the issue of substantial similarity between the plaintiff's work and the *first three* episodes of *Six Feet Under,* even though the plaintiff's claim involved the entire series. *Id.* at 1076.As in *Funky Films,* the Court need not look at all 150 episodes of *Rachael Ray* to determine whether the show is substantially similar to Plaintiffs' one-page treatment and three-page script for *Showbiz Chefs.*

The policy concerns here are particularly acute because Plaintiffs allege that an entire show-made up of individual episodes-infringes on their copyright. Finding that the Court must have all episodes before it to rule on a motion to dismiss would essentially give Plaintiffs a free pass to the summary judgment stage. In other words, future plaintiffs alleging copyright infringement in ongoing works

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
(Cite as: --- F.Supp.2d ----)

Page 9

(i.e., book series or television series), could evade dismissal simply by alleging infringement from common elements by citing only a handful of specific examples in the Complaint. The decision in *Funky Films* implicitly precluded this result. The Court is satisfied that the eight episodes submitted by Defendants accurately reflect the content of the *Rachael Ray* show sufficiently to rule on the CBS Defendants' motion.

**B. Plaintiffs Have Failed to State a Claim for Copyright Infringement Over *Rachael Ray*.**

[7] To state a claim for copyright infringement, Plaintiffs must allege: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."*Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).[FN7] The second prong-at issue here-requires Plaintiffs to allege that "the infringer had access to plaintiff's copyrighted work and that the works at issue are substantially similar in their protected elements."*Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir.2002).

*7 Here, the CBS Defendants do not meaningfully challenge Plaintiffs' allegations of access because, even if access is present, Plaintiffs cannot state a claim if substantial similarity is lacking. *See, e.g., Krofft Tele. Prods. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir.1977) ("No amount of proof of access will suffice to show copying if there are no similarities."), *superseded on other ground by* 17 U.S.C. § 504(b); *Funky Films*, 462 F.3d at 1082 (quoting same). Even if a defendant concedes use of a plaintiff's work, the copyright claim still fails absent substantial similarity. *See, e.g., Bens-Bargains.net, LLC v. XPBargains.com*, 2007 WL 2385092, at *3 (S.D.Cal.2007) (holding that "Plaintiff must prove the existence of a triable issue of material fact with respect to substantial similarity, regardless of how strong its evidence is that Defendants *in fact* copied ...." (emphasis in orig.)); *see also Narell v. Freeman*, 872 F.2d 907, 910 (9th

Cir.1989) ("A finding that a defendant copied a plaintiff's work, without application of a substantial similarity analysis, has been made only when the defendant has engaged in a virtual duplication of a plaintiff's entire work.").

[8] To assess substantial similarity as a matter of law, the Court must apply the objective "extrinsic test." *Funky Films*, 462 F.3d at 1077.[FN8] The extrinsic test focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events of the two works."*Id.* (quotation marks and citation omitted)."In applying the extrinsic test, this court compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters."*Id.* (quotation marks and citation omitted).

### 1. The Generic Elements of a Talk/Cooking Show Are Not Protectable.

In applying the extrinsic test, the Court "must take care to inquire only whether the *protectable elements, standing alone,* are substantially similar."*Funky Films*, 462 F.3d at 1077 (quoting *Cavalier*, 297 F.3d at 822) (emphasis in original). This requires the Court to "filter out and disregard the non-protectable elements in making [the] substantial similarity determination."*Id.* The protectable elements must demonstrate "not just 'similarity,' but 'substantial similarity,' and it must be measured at the level of the concrete 'elements' of each work, rather than at the level of the basic 'idea,' or 'story' that it conveys."*Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1179 (C.D.Cal.2001).

[9][10] Plaintiffs here do not claim that the individual generic elements of cooking shows and talk shows-i.e., a host, guest celebrities, an interview, and a cooking segment-are protectable elements of *Showbiz Chefs.*Nor could they, since "[n]o one can own the basic idea for a story. General plot

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

ideas are not protected by copyright law; they remain forever the common property of artistic mankind."*Berkic v. Crichton,* 761 F.2d 1289, 1293 (9th Cir.1985). In the context of fictional plot lines, courts have declined protection of ideas far more developed than Plaintiffs' one-page treatment and three-page script for *Showbiz Chefs.See, e.g., Funky Films,* 462 F.3d at 1081 (finding no protection for similar plots involving "the family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business."); *Kouf v. Walt Disney Pictures & Tele.,* 16 F.3d 1042, 1044-45 (9th Cir.1994) (finding no protection for similar plots of shrunken kids and the "life struggle of kids fighting insurmountable dangers"); *Berkic,* 761 F.2d at 1293 (finding no protection for similar plots of "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and the general story of the "adventures of a young professional who courageously investigates and finally exposes, the criminal organization.").

*8 Plaintiffs' unscripted program does not alter this analysis. For example, in *Bethea v. Burnett,* the court reviewed the two "plots" of the reality-based shows *C.E.O.* and *The Apprentice.*2005 WL 1720631, at *11 (C.D.Cal.2005). The Court concluded that

[a]t the most abstract level, or at the level of "ideas," there is some similarity between *C.E.O.* and *The Apprentice.*For example, Plaintiffs claim that the "plot" of both reality television programs is similar because both programs depict a group of dynamic contestants from varied backgrounds competing in business challenges in a dynamic corporate environment for promotions and benefits and, ultimately, a real job as a top-level executive of a corporation ..., However, Plaintiffs' alleged similarity is nothing more than a string of generic "ideas" which is not protected by copyright law.

*Id.* at *11.Notably, courts have denied protection to the generic elements of a host and of con-

ducting interviews about particular topics. *See, e.g., id.* at *13 (noting that "Plaintiffs cannot copyright the idea of having a well-known business leader, or even more specifically Donald Trump, host a reality television program."); *Bell,* 2001 WL 262718, at *4 ("The mere fact that some of the formats are similar (for example, the interview format) or the fact that the subject matter is similar (both works included articles on the weather, current events, hip hop music, prison life, ethnic targeting and drug crimes) do not give rise to valid copyright claims."); *Falotico v. WPVI-Channel 6,* 1989 WL 143238, at *3-4 (E.D.Pa.1989) (finding no protection for works that "concern the general subject of celebrities who came from South Philadelphia, both spotlight celebrities from that geographic area, and both cover similar facts about the lives of those celebrities.").

The stock elements of a host, guest' celebrities, an interview, and a cooking segment can also be characterized as unprotected *scenes a faire,* or "situations and incidents which flow naturally from [the] basic plot premise" of a cooking-and-home-related talk show. *Berkic,* 761 F.2d at 1293;*see also Rice v. Fox Broad. Co.,* 330 F.3d 1170, 1177 (9th Cir.2003) (finding that "the sequencing of first performing [a magic] trick and then revealing the secrets behind the trick is subject to the limiting doctrines of merger and *scenes a faire.*"); *Williams v. Crichton,* 84 F.3d 581, 589 (2d Cir.1996) (holding similarities of a "dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers ... are classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur zoo.").

Here, any similarities from Plaintiffs' *Showbiz Chefs* and the CBS Defendants' *Rachael Ray* are *scenes a faire* that naturally flow from the interview and talk-show format. For example, discussion of the celebrity's current projects is a natural outgrowth of a talk show. So is a tour of the celebrity's home, including the kitchen, especially in the context of a "lifestyle" show like *Rachael Ray.*Cooking

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

segments may individualize the talk-show structure somewhat, but they still represent the outgrowth of the generic talk show, especially when the host can, in fact, cook. The alleged specific similarities of two shows with cooking, interviewing celebrities, and discussing celebrity projects are *scenes a faire* not protected by copyright law.

*9 [11] Similarly, the doctrine of "merger" precludes protection for these elements expressed in the standard form of a talk show. "[W]hen the idea and the expression are indistinguishable, or 'merged,' the expression will only be protected against nearly identical copying."*Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1444 (9th Cir.1994). For example, one California court found that a show featuring a host, a studio audience, studio guests, and the host showing outtakes on a large screen while adding commentary was not protected because there were only a limited number of ways in which the format of an outtakes show could be expressed. *See dick clark co. v. Alan Landsburg Prods.,* 1985 WL 1077775, at * 3 (C.D.Cal.1985)."The formats of the two shows look similar, but so do the formats of virtually every television news show. The 'look' of a show is not the proper subject of copyright protection. The scope of copyright protection was never intended to go this far."*Id.* at *4.

Here, there are only a finite number of ways in which to express the idea of a talk/cooking show with celebrities. Placing the host in a studio, inviting celebrity guests into the studio, and discussing current projects is naturally expressed by having the sort of common talk show format present in *Rachael Ray.*Presenting segments in which the host and celebrities cook in the studio is also only one of a limited number of ways to express the idea of a cooking show. As the court in *dick clark* stated, the formats of *Showbiz Chefs* and *Rachael Ray* may look similar, but so does every talk show to some extent. Extending copyright protection over the generic format of a cooking/talk show would stretch the bounds of copyright law beyond what it

was intended to cover. As a result, Plaintiffs cannot establish infringement over these basic elements of a talk show/cooking show.

### 2. *Any Protectable Elements in Plaintiff's Show Are Dissimilar to Rachael Ray.*

[12] Even assuming some elements of Plaintiffs' Show are protectable, *Showbiz Chefs* is not substantially similar to *Rachael Ray.*Again, the Court must apply the objective "extrinsic test" and determine whether there are "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in *Showbiz Chefs* and *Rachael Ray.Funky Films,* 462 F.3d at 1077.

#### a. *Plot*

"Plot" is defined at the "sequence of events by which the author-expresses his theme or idea" that is sufficiently concrete to warrant a finding of substantial similarity if it is common in both works. 4 *Nimmer on Copyright* § 13.03[A][1][b], at 13-42 (2003). Although not a "plot," the sequencing of *Showbiz Chefs* and *Rachael Ray* contain no true similarity outside of the commonplace elements discussed above. The only commonalities are the talk show format that features a host, guest celebrities, and cooking. *Rachael Ray* contains segments on shopping, gift-giving, parenting, relationships, and fashion, along with cooking segments, either with Rachael Ray alone or with a guest, but always in the studio. *Showbiz Chefs,* however, features segments set almost exclusively in the celebrity's home, whether the host and celebrity are in an interview, eating, or cooking (except for a clandestine trip to the supermarket). While *Rachael Ray* sometimes includes a segment of a celebrity cooking alone in his or her home, this acts as more of an introduction to the segments set in the studio, rather than the centerpiece of the show. In short, the ordering of segments in *Rachael Ray* does not resemble the ordering in *Showbiz Chefs.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                      Page 12
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

#### b. *Theme*

**\*10** *Showbiz Chefs* contains no real discernable theme, while *Rachael Ray* is more of a "lifestyle" show that includes cooking segments. For example, host Rachael Ray dispenses household advice on myriad topics like shopping, fashion, and parenting, while at the same time inviting celebrities to discuss these topics or to share their own experiences. The "theme" includes what the CBS Defendants call a "can do" attitude, i.e., "if you try, you can do it" and presenting solutions to everyday problems. (Mot. at 21:19-21.) As the CBS Defendants describe the show, "Rachael Ray provides this inspirational 'can do' message and advice to those who need help-e.g., to mothers who do not think that they have the time or ability to make a family dinner, to women with low self-esteem and bad shopping habits, to those who need to redecorate their homes, to those who do not know how to cook a healthy meal for their children, to those who need to buy gifts on a tight budget, to those who need wedding advice, and to those who need fashion advice,"(*Id.* at 21:20-27.)

The Court agrees with the CBS Defendants' essential point that the *Rachael Ray* show is more of a general lifestyle show than simply a cooking show featuring celebrities. *Showbiz Chefs,* in contrast, is much more specialized, seeking apparently to entertain the audience with celebrity interviews and perhaps impart some knowledge of cooking in the process. The theme seems to be an invitation to look inside celebrity homes, and perhaps get a glimpse of celebrity lifestyles. The focus, however, is not on the lifestyles of the viewers or audience. As such, the themes of the two shows appear to differ substantially.

#### c. *Dialogue*

The dialogue in *Rachael Ray* does not resemble the dialogue in Plaintiffs' three-page script for *Showbiz Chefs.*

#### d. *Mood*

The CBS Defendants implicitly concede that the mood of *Rachael Ray* and *Showbiz Chefs* is almost identical. Plaintiffs describe *Showbiz chefs* as "relaxed, informal and fun." (FAC, Ex. A.) *Rachael Ray* evokes a similar mood. The upbeat mood flowing from a cooking/talk show, however, is merely another example of *scenes a faire* and merger, common to all cooking/talk shows (indeed, it is difficult to imagine a somber show of this nature).*See Rice,* 330 F.3d at 1177 (holding that the mood of secrecy and mystery is both merged into and constitutes *scenes a faire* of a show about the "mysteries of magic"); *Olson v. National Broad. Co.,* 855 F.2d 1446, 1451 (9th Cir.1988) (finding that the comic mood is "common to the genre of action-adventure television series and movies therefore do not demonstrate substantial similarity."). Therefore, the relaxed, fun mood of the two shows is not a protectable element, even though it may be substantially similar.

#### e. *Setting*

The setting of the two shows is generally different. *Showbiz Chefs* takes place exclusively within a celebrity's home (and perhaps a trip to the market), while *Rachael Ray* takes place in a studio with a live studio audience, which plays a role in the format of the show. Sometimes *Rachael Ray* episodes contain segments of celebrities cooking in their own homes, but, as noted above, the celebrities are alone and these scenes are minor introductions to the larger in-studio segments with the celebrities. While this may result in some overlap between the shows, it is not enough for a reasonable jury to find that the shows are substantially similar.

#### f. *Characters*

**\*11** The central "characters" in each show are the hosts and the celebrities. As discussed above, the generic idea to have a host is not protectable,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                              Page 13
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

see *Bethea,* 2005 WL 1720631, at *13, and Plaintiffs' sketch of the host of *Showbiz Chefs* as an "inept but well meaning sous chef" bears no resemblance to Rachael Ray, the host of *Rachael Ray.*Ray is presented as a competent celebrity chef in her own right, often presenting segments where she cooks alone for viewers. She also goes beyond cooking and performs an opening monologue, gives advice, and interacts with the studio audience. These features are absent from Plaintiffs' *Showbiz Chefs* treatment and script. Moreover, the portrayal of celebrities appears to be different, since some of the *Rachael Ray* episodes featuring celebrities appear to center on the *celebrity's* novice cooking skills and Ray's assistance in improving them. And in those episodes where the celebrity is a chef (e.g., Bobby Flay and Nigella Lawson), Ray adds her skills and works alongside the celebrity chef as a team effort, rather than performing ineptly, as the host does in *Showbiz Chefs.*Therefore, the "characters" of the two shows are not substantially similar as a matter of law.

### g. *Sequence of Events*

As discussed in the context of plot, the segment sequencing in *Rachael Ray* does not resemble the structure of *Showbiz Chefs.* *Showbiz Chefs* includes two large segments in which the host cooks with and then interviews the celebrity in the celebrity's home. Plaintiffs have not pointed out any episodes of *Rachael Ray* in which this sequence occurs, and in fact, the topics in each *Rachael Ray* episode change and the show does not follow any set format. Some episodes feature no celebrities at all. No reasonable jury could conclude that the sequence of events in the two shows is substantially similar.

Each factor relevant to the extrinsic test militates so strongly in the CBS Defendants' favor that no reasonable jury could conclude that *Rachael Ray* and *Showbiz Chefs* are substantially similar.

### 3. *Plaintiffs Have Failed to State a Claim under* Metcalf v. Bochco.

Plaintiffs concede that *Showbiz Chefs* contain a number of generic elements that are not protectable. (Opp'n at 13:7-18.) The Court has also concluded that any potentially protectable elements of *Showbiz Chefs* are not substantially similar to *Rachael Ray.*Despite this, Plaintiffs contend that, even if the component parts of *Showbiz Chefs* are not protectable (or, if the protectable elements are dissimilar to *Rachael Ray* ), "the particular sequence in which they place a number of elements (each of which individually may be unprotect [a]ble) can itself be a protect[a]ble element," citing *Metcalf v. Bochco,* 294 F.3d 1069, 1074-1075 (9th Cir.2002).

In *Metcalf,* the Ninth Circuit determined that "[t]he particular sequence in which an author strings a *significant* number of unprotectable elements can itself be a protectable element."*Id.* at 1074 ("Each note on a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection.") (emphasis added). This holding was based on the "striking" similarities between the plaintiffs' and defendants' works:

*12 Both the Metcalf and Bochco works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and de-

--- F.Supp.2d ----
Page 14
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)
**(Cite as: --- F.Supp.2d ----)**

voted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician.

*Id.* at 1073-74.As a result of this resemblance, a jury "could easily infer that the many similarities between plaintiffs' scripts and defendants' work were the result of copying, not mere coincidence."*Id.* at 1075.

Many courts have been reluctant to expand this concept beyond the clear-cut case presented in *Metcalf.See, e.g., Identity Arts,* 2007 WL 1149155, at *4 ("However, in *Metcalf,* the 'many' generic similarities and patterns present in the works in question were much more voluminous and specific than in this case."); *Bethea,* 2005 WL 1720631, at *14-15 (rejecting a *Metcalf* argument and holding that, "[w]hen taken separately or as a whole, the common elements of *C.E.O.* and *The Apprentice* simply do not allow for a reasonable inference that the works are substantially similar in expressive content."); *Rice,* 330 F.3d at 1178-79 (rejecting the plaintiff's *Metcalf* argument because the case did not involve the "same pattern of generic similarities").

Here, Plaintiffs fail to point to any string of unprotected elements in *Rachael Ray* that resembles *Showbiz Chefs* in the sort of magnitude contemplated by the *Metcalf* court. Rather, Plaintiffs point out random similarities between *Showbiz Chefs* and *Rachael Ray* to support their *Metcalf* claim. Courts have routinely rejected *Metcalf* claims over random similarities. *See, e.g., Flynn v. Surnow,* 70 U.S.P.Q.2d 1231, 1238 (C.D.Cal.2003) (rejecting a *Metcalf* theory because the alleged similarities are "randomly scattered throughout the works and have no concrete pattern or sequence in common."); *Kouf,* 16 F.3d at 1045-46 ("And, we are equally unimpressed by Koufs compilation of random similarities scattered throughout the works [.])" (internal quotation marks omitted); *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984) (rejecting a list of similarities between works because "they are inherently subjective and unreliable. We are particu-

larly cautious where, as here, the list emphasizes random similarities scattered throughout the works.").

**\*13** Plaintiffs' claimed similarities between *Rachael Ray* and *Showbiz Chefs* consist of randomly selected similarities of generic elements: "*Showbiz Chefs* paints a television show where in each episode the host engages a celebrity in a home or restaurant setting, with cooking that is personal to the guest and provides the audience a glimpse into their lifestyles." (Opp'n at 11:4-6.) [FN9] These random elements (i.e., a talk show, cooking, a host, a celebrity, and kitchens) appear at different points in *Showbiz Chefs* and *Rachael Ray* and Plaintiffs cannot merely cobble them together to make a *Metcalf* argument. To do so would give Plaintiffs a monopoly over these generic elements expressed as a television talk show featuring celebrity guests and cooking. Therefore, the Court rejects Plaintiffs' attempt to bring their claim under *Metcalf.*

## V. CONCLUSION

The Court finds that it may rule on Plaintiffs' copyright claim against the CBS Defendants as a matter of law. They have attached to their Complaint the one-page synopsis and three-page script for *Showbiz Chefs,* so the Court may consider it on a motion to dismiss. The Court may also consider the *Rachael Ray* show, as its content comprises the basis for Plaintiffs' claim and the CBS Defendants have, provided copies of episodes. The Court holds that no reasonable jury could conclude that *Rachael Ray* is substantially similar to any protectable elements of *Showbiz Chefs* or to the order in which Plaintiffs have presented non-protectable elements in *Showbiz Chefs.*

Therefore, the Court GRANTS the CBS Defendant's Motion to Dismiss and DISMISSES with prejudice Plaintiffs' first claim for copyright infringement against them. Because Plaintiffs allege no other claims against the CBS Defendants, the Court DISMISSES Defendants CBS Television

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Distribution, King World Productions, Inc. and Harpo Productions, Inc. from this case.

**IT IS SO ORDERED.**

FN1. *Inside Dish* is not the subject of the instant motion.

FN2. The "content" of the ongoing *Rachael Ray* show are its episodes, which the Court may properly consider under the rule in *Branch.* Plaintiffs concede that the episodes provide the infringing content by citing specific episodes in their Complaint as examples of infringement. (Compl. ¶¶ 45-46.)

FN3. The CBS Defendants' citations to contrary authority does not persuade the Court to rule otherwise. *See, e.g., Sobhani v. @radical.media Inc.,* 257 F.Supp.2d 1234, 1235-36 n. 1 (C.D.Cal.2003) (judicially noticing the film *Castaway* and commercials for the fast food chain Jack-in-the-Box); *Felix the Cat Prods. Inc. v. New Line Cinema Corp.,* 54 U.S.P.Q.2d 1856, 1857 (N.D.Cal.2000) (judicially noticing the film *Pleasantville* ); *Twentieth Century Fox Film Corp. v. Marvel Ents.,* 155 F.Supp.2d 1, 41 n. 71 (S.D.N.Y.2001) (judicially noticing the film *Star Wars* ). In *Sobhani,* the specific content of the film *Cast Away* was noticed because the commercials at issue specifically parodied the film. 257 F.Supp.2d at 1235-36 n. 1. In *Felix the Cat,* the court noticed the film *Pleasantville* because it was at issue in that trademark case. 54 U.S.P.Q.2d at 1857. In *Marvel,* the court noticed the film *Star Wars* as an unquestionable representation of the generic storyline of a mentor-mentee relationship in science fiction, even though the court could have simply noticed the generic aspects of the mentor-mentee relationship without resorting to noticing a specific film in which those elements were

presented. 155 F.Supp.2d at 41 n. 71. Here, the Court finds it improper and unnecessary to notice specific shows embodying generic talk show and cooking show elements.

FN4. For these same reasons, the Court also declines to notice Exhibits B, C, D, E, F, G, and H attached to the CBS Defendants' Request for Judicial Notice, and Exhibit A attached to the CBS Defendants' Notice of Lodging, as these exhibits also purport to evidence the commonplace and generic nature of the talk show and cooking show elements.

FN5. Plaintiffs attempt to discount the CBS Defendants' reliance on this case because it was a motion for judgment on the pleadings, not a motion to dismiss. However, the legal standard for these motions is identical, the only difference being the stage in the case at which they are brought. *See Qwest Commc'ns Corp. v. City of Berkeley,* 208 F.R.D. 288, 291 (N.D.Cal.2002) ("Rules 12(b)(6) and 12(c) are substantially identical; both permit challenges to the legal sufficiency of the opposing party's pleadings."); *Strigliabotti v. Franklin Resources, Inc.,* 398 F.Supp.2d 1094, 1097 (N.D.Cal.2005) ("Rules 12(b)(6) and 12(c) are substantially identical.... Under either provision, a court must determine whether the facts alleged in the complaint, to be taken for these purposes as true, entitle the plaintiff to a legal remedy.").

FN6. The Eleventh Circuit has explained the rationale behind the Ninth Circuit's "incorporation by reference" doctrine as follows:

[T]he rationale is that when a plaintiff files a complaint based on a document but fails to attach that document to a complaint, the defendant may so attach the document, and therefore, the document,

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)

**(Cite as: --- F.Supp.2d ----)**

as one that could have or rather in fairness should have been attached to the complaint, is considered part of the pleadings and thus may be reviewed at the pleading stage without converting the motion into one for summary judgment. In short, the theory is that such a document is not "outside the pleadings," and thus it may be considered at the 12(b)(6) stage without a transformation into the summary judgment posture[.]

*Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1280 n. 16 (11th Cir.1999).

> FN7. The CBS Defendants do not challenge Plaintiffs' allegations that they own a valid copyright in *Showbiz Chefs.*

> FN8. The substantial similarity inquiry generally requires the application of both an "extrinsic test" and "intrinsic test." *Funky Films,* 462 F.3d at 1077.Only the extrinsic test is assessed prior to a jury trial (i.e., in a motion to dismiss or on summary judgment) because "the intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury."*Id.* However, "a 'plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests.'"*Id.* (quoting *Kouf v. Walt Disney Pictures & Tele.,* 16 F.3d 1042, 1045 (9th Cir.1994)).

> FN9. The Court notes that this description of *Showbiz Chefs* is misleading at best. Plaintiffs' treatment and script does not depict a show set in any "home", but specifically in the celebrity's home, and does not mention a restaurant setting at all.

C.D.Cal.,2007.

Zella v. E.W. Scripps Co.

--- F.Supp.2d ----, 2007 WL 4643888 (C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

Westlaw.

Slip Copy
Slip Copy, 2008 WL 239581 (D.D.C.)
(Cite as: Slip Copy)

Corsi v. Eagle Publishing, Inc.
D.D.C.,2008.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Jerome CORSI, et al., Plaintiff,
v.
EAGLE PUBLISHING, INC., Defendant.
No. 1:07-cv-02004-ESH.

Jan. 30, 2008.

John M. Shoreman, McFadden & Shoreman, PC, Washington, DC, for Plaintiffs.
Mark Bailen, Baker & Hostetler LLP, Washington, DC, for Defendant.

### MEMORANDUM OPINION

ELLEN SEGAL HUVELLE, District Judge.

*1 Plaintiffs are five authors who have publishing contracts, each of which contains a mandatory arbitration clause, with Regnery Publishing, Inc. ("Regnery"). Dissatisfied with Regnery's marketing and distribution tactics on the grounds that they have allegedly deprived plaintiffs of potential royalty income, plaintiffs have filed suit. But instead of suing Regnery, the only signatory to the contracts, plaintiffs have sued Regnery's parent company, Eagle Publishing, Inc. ("Eagle"), in a transparent attempt to avoid mandatory arbitration. In this suit, the authors allege that Eagle "orchestrates and participates" in a "scheme to divert book sales away from retail outlets and to wholly-owned subsidiary organizations within the Eagle conglomerate."(Compl. at 2.) They assert eight causes of action for 1) fraud; 2) inducement to breach of contract; 3) interference with contractual relations; 4) interference with prospective business advantage; 5) unjust enrichment; 6) accounting; 7) unfair trade practices in violation of the D.C. Consumer Protection Procedures Act, D.C.Code § 28-3901; and 8) damage to commercial reputation.

Defendant has filed a motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(7) for failure to join Regnery, a necessary and indispensable party under Rule 19. In the alternative, defendant moves to dismiss all counts for failure to state a claim under Rule 12(b)(6).

Having considered the arguments of the parties and relevant law, the Court will grant defendant's motion under Rule 12(b)(7). The crux of plaintiffs' action is their claim that Regnery breached the publishing contracts, and since Regnery cannot be joined in this action because of the arbitration clause, this case must be dismissed.

### BACKGROUND

Plaintiffs each have a written contract with their publisher, Regnery, which is a wholly-owned subsidiary of Eagle. Defendant Eagle has no contractual relationship with any plaintiff. Under plaintiffs' contracts, they have granted and assigned to Regnery "the exclusive right, title and interest to print, publish and market" the authors' books. *(See, e.g.,* Def.'s Mot. Ex. 1 ¶ 1.) The contracts provide for royalties based on sales to the book trade *(i.e.,* retail market), to the book trade at discounts, and to "additional markets outside regular bookstores or outside of the book trade...." (Compl. ¶¶ 19-21; *see, e.g.,* Def.'s Mot. Ex.1 ¶ 2(e).) The contract fails to specify how the books are to be marketed or distributed, but sales to "additional markets" yield lower royalties than retail sales. *(See, e.g.,* Def.'s Mot. Ex. 1 ¶¶ 2(d), (e).) Each of the contracts also contains an arbitration provision that requires that:

Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia and the rules of the American Arbitration Association.

*2 (Def.'s Mot. Ex. 1 ¶ 14.)

One of the plaintiffs in this case, Richard Min-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2
Slip Copy, 2008 WL 239581 (D.D.C.)
(Cite as: Slip Copy)

iter, is already involved in an arbitration proceeding with Regnery as a result of Regnery's claim that Miniter breached the contract by failing to produce a manuscript of a second book for publication. *(Id.* Ex. 9.) In response, Miniter filed counterclaims, asserting claims that are virtually identical to those made by plaintiffs here. Specifically, Miniter contends that Regnery breached the contract by allegedly failing to make royalty payments and by "its improper diversion of books from retail sales and to affiliate and/or subsidiary organizations for no charge, or for a substantially reduced charge, in order to avoid royalty payments."*(Id.* Ex. 10 ¶ 8.)

In September 2007, Miniter moved to join the remaining four plaintiffs in this case on the grounds that they would be asserting identical claims against Regnery *(id.*Ex. 11), but the arbitrator denied the motion without prejudice on the grounds that the authors' contracts involved separate and distinct facts and that any joinder would unnecessarily delay the proceeding. *(Id.* Ex. 12 at 1.) The arbitrator noted, however, that the other four authors were free to initiate their own claims against Regnery. *(Id.* at 2.) Consistent with the arbitrator's observation, plaintiffs have indicated in their opposition that "the Authors are not barred from re-filing their arbitration claims against Regnery in a separate proceeding and are preparing to do so."(Pls.' Opp'n at 3.)

Despite their concession that arbitration is available to address their grievances over Regnery's alleged contractual breaches, plaintiffs have sought out a new forum and a new defendant by filing suit on November 6, 2007, against only Eagle. They claim that Eagle's marketing and distribution strategies deprive them of potential royalty income by distributing Regnery's books in ways that divert plaintiffs' books away from the traditional retail sales that produce the highest royalties. Specifically, plaintiffs assert that Eagle distributes Regnery's books by direct mail and over the Internet, gives the books as free gifts to new subscribers of Eagle's periodicals and donates plaintiffs' books to

nonprofits, all of which reduces or eliminates royalties that otherwise could have been realized from retail sales. *(See* Compl. ¶¶ 14-17.) Plaintiffs also complain that "Eagle's vertically integrated business model exploits, manipulates and defrauds" plaintiffs *(id .* ¶ 18), because "Regnery, at Eagle's direction, funnels books that otherwise would be available for retail sale to its Eagle affiliates under the 'additional markets' clause," and by so doing, "Regnery, at Eagle's direction, undertakes to minimize retail sales ..., while maximizing sales to 'additional' markets."*(Id.* ¶¶ 23, 24.)

To stave off defendant's motion to dismiss, plaintiffs argue that Regnery is neither necessary nor indispensable because "the interests of Eagle and Regnery are identical in this litigation," so Eagle can "adequately protect" Regnery's interests involving the publishing contracts. (Pls.' Opp'n at 4.) Plaintiffs also assert inconsistently and incorrectly that Regnery will not be prejudiced by this action, since "any findings against Eagle will lack *res judicata* effect against Regnery."*(Id.)* Finally, they contend that even if Regnery were deemed to be a "necessary party" within the meaning of Rule 19(a), the action should proceed for equitable reasons under Rule 19(b), because otherwise, they would have no adequate remedy against Eagle. *(Id.* at 4-5.)None of these arguments has merit.[FN1]

> FN1. In their response to defendant's motion to dismiss, plaintiffs offer no rebuttal to defendant's argument for dismissal of the claims for unjust enrichment (Count V), accounting (Count VI) and damage to commercial reputation (Count VIII). These arguments will therefore be treated as conceded, and these counts will be dismissed under Rule 12(b)(6), as well as 12(b)(7).*See Hopkins v. Women's Div., General Bd. of Global Ministries,* 238 F.Supp.2d 174, 178 (D.D.C.2002) (citing *FDIC v. Bender,* 127 F.3d 58, 67-68 (D.C.Cir .1997) ("It is well understood in this Circuit that when a plaintiff files an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").*See also Day v. D.C. Dep't of Consumer & Regulatory Affairs,* 191 F.Supp.2d 154, 159 (D.D.C.2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

## ANALYSIS

### I. Legal Standard under Rule 19

**\*3** Rule 19 sets forth a two-part test that mandates joinder of a party or dismissal of the suit if the absent party meets the description of a necessary party under Rule 19(a) and is deemed indispensable under Rule 19(b).*See Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Washington,* 699 F.2d 1274, 1278-79 (D.C.Cir.1983). Under Rule 19(a), a party is necessary if without it (1) "complete relief cannot be accorded among those already parties," or (2) the absent party "claims an interest relating to the subject of the action and is so situated that the disposition of the action in [that party's] absence may" either "(i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."Fed.R.Civ.P. 19(a); *see also Cloverleaf Standardbred,* 699 F.2d at 1278-79 (all three criteria for Rule 19(a) were met when plaintiff voluntarily dismissed a claim against one of two parties in order to maintain diversity jurisdiction, leaving only the absent party's bank as defendant, on the grounds that "evidence regarding the nature of the banking relationship between [the absent party] and [the bank] will be central to resolution of this dispute."). Although only one of the above elements is required to meet the Rule 19(a) test, defendant has

succeeded in proving that Regnery is a necessary party under all three criteria.

A court, however, may not "dismiss for nonjoinder simply because an absentee fits Rule 19(a)'s description," *Cloverleaf Standardbred,* 699 F.2d at 1277, because after determining that an absentee meets the Rule 19(a) criteria, the analysis must proceed to Rule 19(b) to determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."Fed.R.Civ.P. 19(b).Rule 19(b) lists four non-exclusive factors for consideration, including (1) the "extent a judgment rendered in the [party's] absence might prejudice that [party] or those already parties;" (2) "the extent to which ... any prejudice could be lessened or avoided;" (3) "whether a judgment rendered in the [party's] absence [would] be adequate;" and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."Fed.R.Civ.P. 19(b)(1)-(4). In making this determination, a court has "substantial discretion in considering which factors to weigh and how heavily to emphasize certain considerations in deciding whether the action should go forward in the absence of someone needed for a complete adjudication of the dispute."*Cloverleaf Standardbred,* 699 F.2d at 1277.

### A. Regnery is a "Necessary" Party under Rule 19(a)

Given the allegations in plaintiffs' complaint, it is beyond dispute that Regnery is a necessary party under any of the three tests set forth in Rule 19(a). Underlying all of plaintiffs' claims is their contractual relationship with Regnery and Regnery's alleged breach of its obligations under these contracts. Regnery, not Eagle, is the signatory to the contracts, and in the absence of proof of a breach by Regnery, plaintiffs' claims cannot succeed. For instance, plaintiffs cannot pursue a claim for interference with prospective business advantage or interference with contractual relations without proof

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of a breach of contract. *See Bannum Inc. v. Citizens for a Safe Ward Five, Inc.,* 383 F.Supp.2d 32, 43, 45 (D.D.C.2005) (claims of tortious interference with a contract and interference with a prospective economic advantage both require plaintiff to show that a breach occurred and damage resulted). Moreover, even though plaintiffs allege that Regnery acted at "Eagle's direction" (Compl.¶¶ 23-24), that Regnery's breach of the royalty provisions was "procured by Eagle" (Pls.' Opp'n at 7), and that Eagle "ratified the false statements and concealments" of Regnery (Compl.¶ 29), it is still the case that the gravamen of plaintiffs' complaint is that Regnery breached its contracts with the authors and made false statements.[FN2] Each of the claims, regardless of the legal labels attached to it, involves Regnery's conduct under the contracts, and all of the charges against Eagle are inseparable from claims that plaintiffs are required to raise in an arbitration proceeding. Thus, each claim in this case implicates Regnery's conduct under the contracts, and any findings involving these contracts will necessarily affect Regnery's rights.

> FN2. Perhaps realizing the difficulty of identifying any misrepresentations by Eagle and not being able to rely only on alleged misrepresentations by Regnery in a suit against Eagle, plaintiffs have attempted to recast their fraud claims in Count I by asserting that they have "effectively pled the elements of civil conspiracy" (Pls.' Opp'n at 6) insofar as Eagle is alleged to have participated in a fraudulent scheme with its "subsidiaries." (Compl.¶¶ 27-29.) By this sleight-of-hand, plaintiffs now contend that they need not allege any "direct misrepresentations from Eagle...." (Pls.' Opp'n at 7.)

Of course, plaintiffs cannot simply rewrite their complaint without filing an amended complaint, but even if this were possible, any charge of a conspiracy involving Eagle and Regnery would fail because a single entity consisting of a corporation and its wholly-owned subsidiary cannot conspire with

itself. *See, e.g., Dickerson v. Alachua County Com'n,* 200 F.3d 761, 767 (11th Cir.2000); *Travis v. Gary Cmty. Mental Health Ctr., Inc.,* 921 F.2d 108, 110 (7th Cir.1990).

*\*4* The finding that Regnery is a necessary party also finds support in the many court decisions that have concluded that an absent contracting party, such as Regnery, must be joined under Rule 19(a).*See, e.g., Carnero v. Boston Scientific Corp.,* 433 F.3d 1, 18-19 (1st Cir.2006) (subsidiary was indispensable where it was a signatory to the agreement, it paid the plaintiff, and it allegedly breached the contract); *Rivera Rojas v. Loewen Group Int'l, Inc.,* 178 F.R.D. 356, 362 (D.P.R.1998) (subsidiary was a necessary party in a suit against a parent where it "has an interest in the litigation of these issues which pertain to contracts to which [the subsidiary] is a party ... [and][i]t should be afforded the opportunity to defend against these allegations."); *Travelers Indem. Co. v. Household Int'l Inc.,* 775 F.Supp. 518, 527 (D.Conn .1991) ("[P]recedent supports the proposition that a contracting party is the paradigm of an indispensable party."); and *Burger King Corp. v. Am. Nat'l Bank of Trust Co. of Chicago,* 119 F.R.D. 672, 675 (N.D.Ill.1988) ("If the absent party has a legally protected interest *in* the subject matter of the action-*i.e.,* he is a party to a contract at issue-he falls squarely within the terms of Rule 19(a)(2).").

Ignoring this overwhelming weight of authority, plaintiffs instead argue that Eagle will "adequately protect" Regnery's interests because Eagle and Regnery have "identical" interests in this litigation, and "[i]t can easily be concluded here that Eagle will serve as a proxy for Regnery and protect its interests."(Pls .' Opp'n at 4.) Regrettably, the only case plaintiffs cite in support of this novel position-*Nat'l Union Fire Ins. Co. v. Rite Aid,* 210 F.3d 246 (4th Cir.2000)-explicitly rejected this very argument, holding that "[t]he prejudice to [parent company] Rite Aid if this suit is not dismissed is particularly strong given that Rite Aid negotiated and entered into the policy, and this suit concerns

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rite Aid's conduct" regarding its contract with plaintiff. *Id.* at 252-53.

Plaintiffs' alternative argument that any findings against Eagle will not bind Regnery because Regnery is not a party to this action is equally unpersuasive, as well as flatly inconsistent with plaintiffs' contention that Eagle can act as Regnery's "proxy." (Pls.' Opp'n at 4.) Obviously, since the issue of whether Regnery breached the contracts is central to this case, it may well be that that issue cannot be relitigated in any arbitration proceeding under principles of collateral estoppel or *res judicata* if Regnery and Eagle are, as plaintiffs seem to assume, in privity. *See, e.g., Mars Inc. v. Nippon Conlux Kabushiki-Kaisha,* 58 F.3d 616, 619 (Fed .Cir.1995) (applying the doctrine of claim preclusion based on a finding that the parent and wholly-owned subsidiary were in privity); *Central Transport, Inc. v. Four Phase Systems, Inc.,* 936 F.2d 256, 260 (6th Cir.1991) (subsidiaries of parent were in privity for issue preclusion purposes); and *Astron Industrial Assoc's v. Chrysler Motors Corp.,* 405 F.2d 958, 961 (5th Cir.1968) (a parent company that later commenced suit against a third party with whom its subsidiary had already litigated was in privity with wholly-owned subsidiary for purposes of *res judicata*).[FN3]

> FN3. Moreover, even if it is arguable that Regnery is not bound by any decision in this case, Regnery may still have no opportunity to protect its interests if plaintiffs choose not to invoke their arbitration rights against Regnery.

**\*5** In sum, Regnery is a necessary party under Rule 19(a), and thus, the Court must now address whether Regnery is indispensable under Rule 19(b).

**B. Regnery is "Indispensable" under Rule 19(b)**

Even though Regnery is necessary under Rule 19(a) but cannot be joined because of the arbitration clause in the contracts, the Court still has the option to decide "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."Fed.R.Civ.P. 19(b). In addressing this issue, plaintiffs rely only on one of the four factors set forth in Rule 19(b), arguing that this action should be permitted to proceed because "no forum exists for the Authors to seek relief against Eagle if this action is dismissed."(Pls.' Opp'n at 5.) This, however, is not the issue. Rather, under Rule 19(b)(4), the inquiry is whether plaintiffs "will have an adequate remedy," regardless of who the defendant is. *See also Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 109 (1968) (directing courts to examine as part of their Rule 19(b) inquiry "whether the plaintiff has an interest in having a forum," where the strength of this interest "depends on whether a satisfactory alternative forum exists").

Obviously, plaintiffs have a remedy. They may pursue arbitration against Regnery, and they may, as Miniter has already done, raise the very claims they have asserted here. Even plaintiffs recognize that they can institute arbitration proceedings against Regnery (and they suggest that they intend to do so) *(see* Pls.' Opp'n at 3), but they offer *no* explanation for why this remedy would not be adequate or why the Court should determine that they are being prejudiced if they are limited to arbitrating against Regnery.

Even though plaintiffs appeal to the Court's equitable powers, each plaintiff voluntarily entered into a publishing contract with Regnery, and all parties contracted to resolve their disputes in arbitration, not in court. Given these facts, there is no legal or equitable reason for the Court to exercise its discretion under Rule 19(b) to permit the plaintiffs to evade their contractual obligations by instituting suit against a non-party to the contract.

**CONCLUSION**

For the above reasons, the Court will dismiss with prejudice Counts V, VI and VIII for failure to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 239581 (D.D.C.)
**(Cite as: Slip Copy)**

state a claim under Rule 12(b)(6) and will dismiss
without prejudice the remaining counts under Rules
12(b)(7). The defendant's motion [# 3] is hereby
granted, and the above-captioned case is dismissed.

D.D.C.,2008.
Corsi v. Eagle Publishing, Inc.
Slip Copy, 2008 WL 239581 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit F

Westlaw.

Not Reported in F.Supp.                                                                              Page 1
Not Reported in F.Supp., 1998 WL 1473633 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Miller v. Andrew Jergens Co.
C.D.Cal.,1998.
Only the Westlaw citation is currently available.
United States District Court, C.D. California.
Clifford MILLER
v.
THE ANDREW JERGENS COMPANY, Colgate-
Palmolive Co., Chesebrough-Pond's, the Dial Cor-
poration, and Procter & Gamble Company
**No. CV-98-1945 CAS RCX.**

May 20, 1998.

Clifford Miller, Plaintiff, in pro per.
Barbara A. Reeves, for Defendant.

Presiding: Honorable CHRISTINA A. SNYDER,
U.S. District Judge, JIM HOLMES, Deputy Clerk,
CARMELITA LEE, Court Reporter.

PROCEEDINGS: DEFENDANT COLGATE-
PALMOLIVE COMPANY'S MOTION TO DIS-
MISS
SNYDER, J.

I. *Introduction*

*1 Plaintiff Clifford Miller filed a complaint in
this Court, purportedly for violation of his copy-
rights. The complaint appears to relate to two al-
leged U.S. copyrights, as evidenced by the copy of
a "Report on the Filing or Determination of an Ac-
tion or Appeal Regarding a Copyright" attached to
the complaint. By a separate order, this action has
been consolidated with case number CV-98-2786,
which plaintiff filed against Chesebrough-Pond's in
the San Bernadino Superior Court and which was
subsequently removed to this Court.

Defendant Colgate-Palmolive Company
("Colgate") filed a motion to dismiss based on fail-
ure to state a claim upon which relief can be gran-
ted, Fed.R.Civ.P. 12(b)(6), and for improper ser-

vice, Fed.R.Civ.P. 12(b)(5).

II. *Failure to State a Claim*

A. *Standard for a Rule 12(b)(6) Motion*

A motion pursuant to Fed.R.Civ.P. 12(b)(6)
tests the legal sufficiency of the claims asserted in
the complaint. A court must not dismiss a com-
plaint for failure to state a claim "unless it appears
beyond doubt that the plaintiff can prove no set of
facts in support of his claim which would entitle
him to relief."*Conley v. Gibson,* 355 U.S. 41,
45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Cahill v.
Liberty Mutual Ins. Co.,* 80 F.3d 336, 338 (9 th
Cir.1996).

In a motion pursuant to Fed.R.Civ.P. 12(b)(6),
a court must accept as true all material allegations
in the complaint, as well as all reasonable infer-
ences to be drawn from them. *Cahill,* 80 F.3d at
338;*NL Industries, Inc. v. Kaplan,* 792 F.2d 896,
898 (9 th Cir.1986). The complaint must be read in
the light most favorable to the plaintiff. *Russell v.
Landrieu,* 621 F.2d 1037, 1039 (9 th Cir.1980).
However, a court need not accept as true unreason-
able inferences or conclusory legal allegations cast
in the form of factual allegations. *Western Mining
Council v. Watt,* 643 F.2d 618, 624 (9 th Cir.1981),
cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70
L.Ed.2d 474 (1981). Furthermore, unless a court
converts a Rule 12(b)(6) motion into a motion for
summary judgment, a court cannot consider materi-
al outside of the complaint (e.g., facts presented in
briefs, affidavits, or discovery materials).*Levine v.
Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9 th
Cir.1991). A court may, however, consider exhibits
submitted with the complaint and matters that may
be judicially noticed pursuant to Federal Rule of
Evidence 201. *Hal Roach Studios, Inc. v. Richard
Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9 th
Cir.1989); *Mack v. South Bay Beer Distributors,
Inc.,* 798 F.2d 1279 (9 th Cir.1986).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1998 WL 1473633 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.)

Plaintiff's complaint, filed in state court, appears to allege causes of action for copyright infringement and misappropriation of trade secrets.

### B. Copyright Infringement

To state a cause of action for copyright infringement, a plaintiff must allege that he owns a valid copyright, registered with the U.S. Register of Copyrights, and that defendants copied original elements of plaintiff's work.*Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Miller alleges that he owns "U.S. Coperights" (sic), but he has failed to identify his registered copyrights. Furthermore, he has not alleged any facts to support his claim that any of the defendants violated his copyrights. Therefore, his claim for copyright infringement is dismissed pursuant to Rule 12(b)(6).

### C. Misappropriation of Trade Secrets

*2 In his complaint, plaintiff alleges that "each defendant (sic) got from the plaintiff in wrighting (sic) telling how to use make and package the proposed product then for some reason the denfendants (sic) took it up, on (sic) them selfs (sic) to make and sale (sic) the proposed product and maid (sic) know (sic) effort to compensate the plaintiff."To the extent that this is an attempt to plead a claim for misappropriation of trade secrets, it is insufficient.

In order to state a claim for misappropriation of trade secrets, plaintiff must show: (1) that he had information which derived economic value from not being generally known to the public and which was the subject of efforts that are reasonable under the circumstances to maintain their secrecy; and (2) that defendants improperly came into possession of the secret, or acquired the information under circumstances giving rise to a duty to maintain its secrecy or limit its use. Cal. Civ.Code § 3426 et. seq. Even when read in the light most favorable to plaintiff, Miller's complaint fails to allege facts sufficient to support a misappropriation of trade

secrets claim. Therefore, to the extent that the complaint attempts to allege such a claim, it is dismissed pursuant to Rule 12(b)(6).

### III. Insufficiency of Service of Process

Service of process in federal court is governed by Fed.R.Civ.P. 4. Service upon a corporation shall be effected either (1) "pursuant to the law of the state in which the district court is located, or in which service is effected for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State;"Fed.R.Civ.P. 4(e)(1), or (2)"by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant ."Fed.R.Civ.P. 4(h)(1).

Because the Court dismisses Miller's complaint pursuant to Rule 12(b)(6), the Court need not rule on defendant's Rule 12(b)(5) motion. Plaintiff is instructed to comply with Fed.R.Civ.P. 4 in the service of all future complaints.

### IV. Conclusion

For the foregoing reasons, plaintiff's complaint is hereby dismissed. However, as a general rule, leave to amend a complaint which has been dismissed should be freely granted. Fed.R.Civ.P. 15(a). Accordingly, plaintiff shall have thirty (30) days in which to file a first amended complaint curing the defects noted in this order. The complaint shall be sufficient in and of itself and shall not refer back to or incorporate the original complaint. Furthermore, in accordance with the Court's order consolidating this case with case number CV-98-2786, plaintiff is instructed to file only one complaint, naming all defendants and setting forth all of his causes of action. The first amended complaint shall bear the case number CV-98-1945.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1998 WL 1473633 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

C.D.Cal.,1998.
Miller v. Andrew Jergens Co.
Not Reported in F.Supp., 1998 WL 1473633
(C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit G

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2006 WL 1319515 (E.D.Tenn.)
**(Cite as: Slip Copy)**

C

Vincit Enterprises, Inc. v. Zimmerman
E.D.Tenn.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Tennessee, South-
ern Division.
VINCIT ENTERPRISES, INC., d/b/a Unisan LLC,
Plaintiff,
v.
Gene ZIMMERMAN, Defendant.
**No. 1:06-CV-57.**

May 12, 2006.

John P. Konvalinka, Matthew D. Brownfield,
Grant, Konvalinka & Harrison, PC, Chattanooga,
TN, for Plaintiff.
John W. Mrosek, Fayetteville, GA, Michael K. Al-
ston, Ryan W. Mitchem, Husch & Eppenberger,
LLC, Chattanooga, TN, for Defendant.

*MEMORANDUM*

MATTICE, J.

*1 Plaintiff Vincit Enterprises, Inc. ("Vincit")
brings this action against Defendant Gene Zimmer-
man ("Zimmerman") pursuant to the Court's di-
versity jurisdiction under 28 U.S.C. § 1332, al-
leging causes of action for breach of contract, in-
tentional interference with business relationships,
unfair competition, and misappropriation of trade
secrets and seeking injunctive relief to prevent Zi-
mmerman from contacting or soliciting customers
of Vincit or disclosing or using trade secrets in vi-
olation of his employment agreement.

Before the Court is Defendant Zimmerman's
Motion to Dismiss or, in the Alternative, Motion
for Summary Judgment. For the reasons explained
below, Defendant's Motion to Dismiss will be
GRANTED IN PART and DENIED IN PART, and
the Court will RESERVE ruling on Defendant's
Motion for Summary Judgment.

I. STANDARD

Federal Rule of Civil Procedure 12(b)(6)
provides for the dismissal of a complaint that fails
to state a claim upon which relief can be granted.
The purpose of Rule 12(b)(6) is to permit a defend-
ant to test whether, as a matter of law, the plaintiff
is entitled to relief even if everything alleged in the
complaint is true. *Mayer v. Mylod,* 988 F.2d 635,
638 (6th Cir.1993). A complaint should not be dis-
missed for failure to state a claim unless "it appears
beyond doubt that the plaintiff can prove no set of
facts in support of his claim which would entitle
him to relief."*Conley v. Gibson,* 355 U.S. 41,
45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Arrow v.
Fed. Reserve Bank,* 358 F.3d 392, 393 (6th
Cir.2004). The complaint must contain either
"direct or inferential allegations respecting all the
material elements to sustain a recovery...."*Scheid v.
Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434,
436 (6th Cir.1988) (internal quotations and cita-
tions omitted). The Court must determine not
whether the plaintiff will ultimately prevail but
whether the plaintiff is entitled to offer evidence to
support his claims. *Scheuer v. Rhodes,* 416 U.S.
232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In
making this determination, the Court must construe
the complaint in the light most favorable to plaintiff
and accept as true all well-pleaded factual allega-
tions. *Arrow,* 358 F.3d at 393;*Mixon v. Ohio,* 193
F.3d 389, 400 (6th Cir.1999). The Court need not
accept as true mere legal conclusions or unwarran-
ted factual inferences. *Id.*

II. FACTS

Construing the complaint in the light most fa-
vorable to Plaintiff and accepting as true all well-
pleaded factual allegations, the relevant facts are as
follows.

Vincit is a Tennessee corporation engaged in
chemical and poultry equipment sales. (Court Doc.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

No. 1-4, Compl. ¶¶ 1, 4.) Zimmerman entered into an employment agreement (the "Employment Agreement") with Vincit on April 20, 2001. (*Id.* ¶ 5 & Ex. A.) Relevant paragraphs of the Employment Agreement provide as follows:

8.

*TRADE SECRETS*

Employee shall not at any time or in any manner, divulge, disclose, or communicate to any person, firm or corporation in any manner whatsoever any information concerning any matters affecting or relating to the business of employer, including without limiting the foregoing, any of its customers, the prices it obtains or has obtained from the sale of, or at which it sells or has sold its products, or any other information concerning the business of employer, its manner of operation, its plans, processes, or other data without regard to whether all of the foregoing matters will be deemed confidential, material, or important, the parties hereto stipulating that as between them, the same are important, material, and confidential and gravely affect successful conduct of the business of employer, and employer's good will, and that any breach of the terms of this paragraph shall be a material breach of the agreement, subjecting employee to suit for all damages, including consequential damages, for the breach and any other legal or equitable remedy available.

9.

*TRADE SECRETS AFTER TERMINATION OF EM-PLOYMENT*

**\*2** All of the terms of paragraph 8 shall remain in full force and effect for the period of two (2) years after the termination of employee's employment by employer, two (2) years after expiration of

this agreement, or his discharge for cause under paragraph 10.

13.

*NON-SOLICITATION COVENANT*

It is expressly recognized and acknowledged by employee that employer has developed and established a valuable and extensive trade in its products, that its customers have been established and maintained at substantial expense and are of great value to employer and that, by reasons of the employee's employment with employer, employee will become familiar with method of operation of company and obtain knowledge of trade secrets, technical information, chemical formulas, and other confidential information pertaining to such customers which have heretofore been developed and are assigned to the employee for his supervision. By reason of the foregoing, and in order for the employer to protect such valuable trade secrets, the employee agrees that during the term of the employee's employment with company and for a period of two years after termination of his employment for any reason whatsoever, he will not on his own behalf, or on the behalf of any competitor or employer, directly or indirectly engage in the business of selling, soliciting, or promoting the sale of any products which compete with the employer's products, promoted or sold by the employee while employed by employer to any person, firm, corporation, or institution with whom the employee had sold or serviced as an employee of the company at any time during the two years immediately preceding termination of employee's employment hereunder. If the scope of any restriction contained in this paragraph is too broad to permit enforcement of such restriction to its full extent, then such restriction shall be enforced to the maximum extent permitted by law, and the employee hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to en-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

force such restrictions. The employee will promptly upon termination of his employment with Vincit Enterprises Inc. D.B.A. Unisan LLC, deliver to Vincit Enterprises Inc. D.B.A. *Unisan LLC,* all lists and documents in his possession naming or identifying customers or prospective customers of Vincit Enterprises Inc. D.B.A. *Unisan LLC,* and all information in his possession relating to products of Vincit Enterprises Inc. D.B.A. *Unisan LLC.*

(*Id.* Ex. A.) Paragraph 17 provides that any dispute will be governed by Tennessee law. (*Id.*)

On November 9, 2005, Zimmerman gave notice of his retirement from Vincit effective as of November 4, 2005. (*Id.* ¶ 6.) Vincit alleges that Zimmerman is currently employed by, or is otherwise providing services to, Duchem, Inc. ("Duchem"), an entity that competes with Vincit. (*Id.* ¶ 11.)Zimmerman has been seen in the company of Duchem personnel at the premises of Tyson Foods in Nashville, Arkansas. (*Id.* ¶ 12.)When Zimmerman was employed with Vincit, he serviced the Tyson Foods account on behalf of Vincit. (*Id.*)

*3 While employed with Vincit, Zimmerman had access to and acquired confidential information relating to the products, pricing, customers, sales methods, manner of operation, plans, processes, and other trade secrets and proprietary information of Vincit. (*Id.* ¶ 13.)Such information is essential to Vincit's business interests. (*Id.*) At all relevant times, Zimmerman was aware of the existing and prospective business and contractual relationships that Vincit maintains with its customers. (*Id.* ¶ 14.)

III. DISCUSSION

Defendant argues that, for various reasons, all five counts of the complaint should be dismissed for failure to state a claim upon which relief can be granted.

A. Insufficient Allegations

Defendant argues that Plaintiff's causes of ac-

tion for breach of contract, intentional interference with business relationships, unfair competition, and misappropriation of trade secrets under the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn.Code Ann. §§ 47-25-1701 to 47-25-1709, should be dismissed because the allegations in the complaint are insufficient to state such causes of action.

1. Count One-Breach of Contract

First, Defendant contends that the allegations of the complaint are insufficient with regard to Plaintiff's cause of action for breach of contract.

The elements of a *prima facie* case of breach of contract are as follows: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of the contract. *ARC LifeMed, Inc. v. AMC-Tenn., Inc.,* 183 S.W.3d 1, 26 (Tenn.Ct.App.2005). Defendant contends that Plaintiff has failed to make sufficient allegations that Zimmerman breached the Employment Agreement with regard to either the solicitation of Vincit customers or the disclosure of Vincit trade secrets.

First, Defendant contends that the complaint fails to sufficiently allege that Zimmerman breached the Employment Agreement by soliciting Tyson Foods. In support of this contention, Defendant argues that the Employment Agreement restricts only Zimmerman's ability to sell, solicit, or promote the sale of products that compete with products sold by Vincit and that the allegations in paragraph 12-that Zimmerman was seen "in the company of Duchem personnel at the premises of Tyson Foods"-indicate only simple contact, not solicitation.

The Court disagrees with Defendant's contention. As noted above, the allegations in the complaint need not be direct; inferential allegations are sufficient. *Scheid,* 859 F.2d at 436. Although Plaintiff does not directly allege that Zimmerman

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

solicited Tyson Foods on behalf of Duchem, the allegations in the complaint are sufficient to allow the Court to infer an allegation that such solicitation took place and is the basis of Plaintiff's breach of contract claim. The complaint alleges that Defendant is employed by Duchem, that he was seen with other Duchem personnel at Tyson Foods, that Tyson Foods was one of the accounts serviced by Defendant when he worked at Vincit, and that Defendant has solicited Vincit clients. (Compl.¶¶ 11-12, 18.) While the allegations in paragraph 12, taken alone, might be insufficient to allege solicitation, all of the allegations taken together are sufficient to support an inferential allegation that Zimmerman solicited Tyson Foods. Thus, the Court concludes that Plaintiff adequately alleges that Zimmerman breached the non-solicitation covenant of the Employment Agreement.

*4 Second, Defendant contends that, to the extent that Plaintiff's breach of contract claim is based on Zimmerman's disclosure of trade secrets, Vincit has failed to allege any breach by Zimmerman because the restrictions in the Employment Agreement, by their terms, do not apply to Zimmerman as a result of the circumstances surrounding the end of his employment with Vincit. In support of this position, Vincit points to paragraph 9 of the Employment Agreement, which states that the trade secret prohibitions "remain in full force and effect for the period of two (2) years after the termination of employee's employment by employer, two (2) years after expiration of this agreement, or his discharge for cause under paragraph 10."(Compl. Ex. A ¶ 9.) Defendant contends that the prohibitions regarding trade secrets do not apply to him because he was not terminated by Vincit or discharged for cause and the Employment Agreement did not expire until April 20, 2006; rather, Zimmerman terminated the Employment Agreement on November 4, 2005, by announcing his retirement.

The Court cannot agree at this time with Defendant's contention. While it may be true that Zimmerman's retirement does not fall within the terms of paragraph 9, further factual development likely is necessary to resolve this issue. The Court is unwilling to declare at this stage of litigation that it can envision no set of facts under which Plaintiff could prevail on this claim. Accordingly, the Court will not dismiss Plaintiff's breach of contract cause of action for failure to state a claim.

2. Count Two-Intentional Interference with Business Relationships

Second, Defendant contends that the allegations of the complaint are insufficient with regard to Plaintiff's cause of action for intentional interference with business relationships.

The elements of a *prima facie* case of intentional interference with a business relationship are as follows: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Trau-Med of Am., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 701 (Tenn.2002). Defendant argues that Plaintiff fails to sufficiently allege that Zimmerman had specific knowledge of the business relationship between Vincit and Tyson Foods, intended to cause the breach or termination of that business relationship, or had an improper motive or used improper means. Defendant acknowledges that Plaintiff has alleged these elements but contends that the allegations are unsubstantiated and conclusory. Further, Defendant contends that Plaintiff does not sufficiently allege an improper motive or means because Zimmerman's actions did not breach the Employment Agreement.

*5 First, with regard to Zimmerman's specific knowledge of the business relationship between

Vincit and Tyson Foods, the complaint alleges that Tyson Foods "was one of the accounts serviced by Defendant Zimmerman during his employment with Vincit" and that "Defendant Zimmerman was aware of the existing and prospective business and contractual relationships which Vincit maintains with its customers."(Compl. ¶¶ 12, 14; *see also id.* ¶ 25.)The Court concludes that Plaintiff sufficiently alleges that Defendant had knowledge of the business relationship between Vincit and Tyson Foods as a result of the fact that he serviced the Tyson Foods account for Vincit.

Second, with regard to Zimmerman's intent to cause the breach or termination of the business relationship between Vincit and Tyson Foods, the complaint alleges that Defendant is employed by Duchem, that he was seen with other Duchem personnel at Tyson Foods, that Tyson Foods was one of the accounts serviced by Defendant when he worked at Vincit, and that Defendant solicited Vincit clients with the intent to cause the breach or termination of Vincit's existing business relationships. (Compl.¶¶ 11-12, 18, 26.) The Court concludes that Plaintiff sufficiently alleges that Defendant intended to cause the breach or termination of the business relationship between Vincit and Tyson Foods. Although the complaint does not directly allege that Zimmerman sought to interfere with the relationship between Vincit and Tyson Foods, all of the allegations of the complaint, when taken together, are sufficient to allow the Court to infer facts that support the allegation of interference.

Third, with regard to Zimmerman's improper motive or use of improper means, as explained above, the complaint does sufficiently allege a breach of contract. *See infra* Part III.A.1. As a result, the Court concludes that Plaintiff sufficiently alleges this element of the cause of action.

Accordingly, because the complaint sufficiently alleges that Zimmerman had knowledge of the business relationship between Vincit and Tyson Foods, intended to cause the breach or termination of that business relationship, and had an improper

motive or used improper means, the Court will not dismiss Plaintiff's cause of action for intentional interference with business relationships for failure to state a claim.

### 3. Count Three-Unfair Competition

Third, Defendant contends that the allegations of the complaint are insufficient with regard to Plaintiff's cause of action for unfair competition.

The elements of a *prima facie* case of unfair competition are as follows: (1) the defendant engaged in conduct that amounts to a recognized tort and (2) that tort deprives the plaintiff of customers or other prospects. *B & L Corp. v. Thomas & Thorngren, Inc.,* 162 S.W.3d 189, 216 (Tenn.Ct.App.2004). Defendant argues that Plaintiff has failed to sufficiently allege the elements of unfair competition because Plaintiff has not sufficiently alleged that Zimmerman's conduct amounts to a recognized tort. The Court, however, has already concluded that Plaintiff has sufficiently alleged the tort of intentional interference with business relationships. Therefore, the Court will not dismiss Plaintiff's unfair competition cause of action for failure to state a claim.

### 4. Count Four-Misappropriation of Trade Secrets Under TUTSA

*6 Fourth, Defendant contends that the allegations of the complaint are insufficient to state a cause of action for misappropriation of trade secrets under TUTSA.

The elements of a *prima facie* case under TUTSA are as follows: (1) the existence of a trade secret; and (2) misappropriation of that trade secret.*Hauck Mfg. Co. v. Astec Indus., Inc.,* 376 F.Supp.2d 808, 816 (E.D.Tenn.2005). A "trade secret" is "information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1319515 (E.D.Tenn.)
(Cite as: Slip Copy)

Page 6

plan that: (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily accessible by proper means by other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."Tenn.Code Ann. § 47-25-1702(4). "Misappropriation," as is relevant to the instant case, is the "disclosure or use of a trade secret of another without express or implied consent by a person who: ... (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was: ...*(b)* Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use...."Tenn.Code Ann. § 47-25-1702(2).

First, Defendant argues that Plaintiff has failed to allege the existence of any "trade secret," as defined above. Plaintiff does allege that "Defendant Zimmerman had access to and acquired confidential information relating to the products, pricing, customers, sales methods, manner of operation, plans, processes, and other trade secrets; and proprietary information of Vincit. That information is essential to Vincit's business interests."(Compl.¶ 13.) Plaintiff also alleges that the Employment Agreement prohibited Zimmerman's disclosure of this information. (*Id.* ¶ 7 & Ex. A.) Defendant is correct, however, that Plaintiff fails to allege that such information had "independent economic value." The non-solicitation covenant of the Employment Agreement states that Plaintiff's customers and its trade in its products "are of great value" and that its trade secrets are "valuable." (*Id.* Ex. A ¶ 13.) These recitals in the Employment Agreement, however, are insufficient to allege that Plaintiff's trade secrets had "independent economic value." Additionally, although Plaintiff does allege that Zimmerman was prohibited from disclosing such information by way of the Employment Agreement, Plaintiff does not allege that it used reasonable efforts to maintain the secrecy of the information beyond what was required of Zimmerman. The fact that Zimmerman was prohibited from disclosing such information

does not lead to an inference that all other employees (or Plaintiff's customers) were prohibited from disclosing such information or that Plaintiff took other steps to ensure that the secrecy of such information was maintained. Thus, the complaint fails to allege sufficiently the existence of a trade secret.

**\*7** Second, Defendant argues that Plaintiff has failed to allege that Defendant misappropriated the alleged trade secrets. Plaintiff does allege that the "actions of Zimmerman as set forth above constitute misappropriation and trade secret theft...." (Compl.¶ 35.) Plaintiff does not, however, provide any factual allegations related to Zimmerman's misappropriation. The allegation that Zimmerman was in the company of Duchem personnel at Tyson Foods is not sufficient, even taking into account all possible inferences stemming from that allegation. An allegation that Zimmerman was talking to his former customer in the presence of colleagues from his new employer does not support an inference that he used or disclosed any trade secrets of Vincit, and there are no direct factual allegations in the complaint that Zimmerman in fact used or disclosed any such trade secrets. Without any direct or inferential allegations of a disclosure by Zimmerman of Vincit's alleged trade secrets, the complaint fails to allege sufficiently Zimmerman's misappropriation.

Accordingly, because the complaint fails to allege sufficiently the elements of misappropriation of a trade secret under TUTSA, Plaintiff's cause of action under TUTSA must be DISMISSED WITH PREJUDICE.

B. Preemption by TUTSA

Defendant argues that Plaintiff's causes of action for common law misappropriation of a trade secret, intentional interference with business relationships, and unfair competition should be dismissed to the extent they are preempted by TUTSA.

TUTSA "displaces conflicting tort, restitution-

ary, and other law of this state providing civil remedies for misappropriation of a trade secret."Tenn.Code Ann. § 47-25-1708(a). TUTSA does not affect, *inter alia,* contractual remedies or civil remedies not based on misappropriation of a trade secret. § 47-25-1708(b). TUTSA "has been uniformly interpreted to preempt previously existing misappropriation of trade secret actions, whether statutory or common law."*Hauck Mfg. Co. v. Astec Indus., Inc.,* 375 F.Supp.2d 649, 654 (E.D.Tenn.2004). Thus, it is clear that Plaintiff's cause of action for common law misappropriation of trade secrets is preempted by TUTSA and must be dismissed.

TUTSA also preempts other causes of action if proof of those causes of action, in whole or in part, would constitute misappropriation of a trade secret.*Hauck Mfg.,* 375 F.Supp.2d at 658. Thus, causes of action that will succeed or fail based on proof of the existence of a trade secret are preempted by TUTSA. *Id.* In the instant case, it appears that Plaintiff's causes of action for intentional interference with business relationships and unfair competition are primarily based on Zimmerman's alleged solicitation of Vincit's customers or otherwise on Zimmerman's alleged breach of the Employment Agreement. The solicitation of customers is not related to trade secrets, and contractual remedies are specifically excluded from preemption; thus, to the extent that the causes of action for intentional interference with business relationships and unfair competition are based on Zimmerman's solicitation of Vincit customers or otherwise on his alleged breach of the Employment Agreement, the causes of action are not preempted by TUTSA. To the extent, however, that such causes of action are based on Zimmerman's alleged misappropriation of trade secrets-apart from any alleged breach of the Employment Agreement related to trade secrets as defined in that document-the causes of action are preempted by TUTSA.

**\*8** Accordingly, Plaintiff's cause of action for common law misappropriation of trade secrets will

be DISMISSED WITH PREJUDICE, and Plaintiff's causes of action for intentional interference with business relationships and unfair competition will be DISMISSED WITH PREJUDICE to the extent that such causes of action are based on Zimmerman's alleged misappropriation of Vincit's trade secrets. Plaintiff's causes of action for intentional interference with business relationships and unfair competition remain pending as they relate to any alleged breach of the Employment Agreement by Zimmerman.

C. Injunctive Relief

Defendant also argues that count five of Plaintiff's complaint, which seeks injunctive relief, should be dismissed to the extent it relates to the misappropriation of trade secrets.

First, as the Court reads count five, it relates only to Plaintiff's breach of contract claim and not to Plaintiff's claims of misappropriation of trade secrets under TUTSA and Tennessee common law. Thus, because the Court will allow Plaintiff's breach of contract claim to stand, there is no need to alter count five. Second, even if count five could be read to seek injunctive relief related to Plaintiff's claims of misappropriation of trade secrets under TUTSA and Tennessee common law, there is no need to alter or dismiss any portion of count five. The Court has already concluded that it will dismiss Plaintiff's claims of misappropriation of trade secrets, and it is understood that any relief sought by Plaintiff, including the injunctive relief in count five, can only be granted with respect to claims that remain pending.

IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In addition to seeking dismissal of the causes of action in the complaint pursuant to Rule 12(b)(6), Defendant's motion also seeks summary judgment with respect to all of Plaintiff's causes of action pursuant to Federal Rule of Civil Procedure

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 8
Slip Copy, 2006 WL 1319515 (E.D.Tenn.)
**(Cite as: Slip Copy)**

56. Defendant Zimmerman has submitted his affidavit in support of his motion for summary judgment. Plaintiff contends that it should be allowed to engage in discovery before being required to respond to Defendant's summary judgment motion. The Court agrees.

In *Celotex Corp. v. Catrett,* the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, *after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case ...:"477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (emphasis added). Further, the Sixth Circuit has stated as follows:

The general rule is that summary judgment is improper if the nonmovant is not afforded a sufficient opportunity for discovery. The nonmovant bears the obligation to inform the district court of his need for discovery, however.... Thus, before a summary judgment motion is decided, the non-movant must file an affidavit pursuant to Fed.R.Civ.P. 56(f) which details the discovery needed, or file a motion for additional discovery.

**\*9** *Vance ex rel. Hammons v. United States,* 90 F.3d 1145, 1148-49 (6th Cir.1996) (citations omitted).Federal Rule of Civil Procedure 56(f) permits a court to allow discovery prior to ruling on a motion for summary judgment if "it appear[s] from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition...."Rule 56(f) has been interpreted to require that the party filing the affidavit indicate "its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information."*Gettings v. Bldg. Laborers Local 310,* 349 F.3d 300, 305 (6th Cir.2003); *Cacevic v. City of Hazel Park,* 226 F.3d 483, 488 (6th Cir.2000).

In this instance, Plaintiff filed both an affidavit and a motion. Defendant argues that the affidavit is not sufficient to meet the requirements of Rule 56(f), but the Court disagrees. The affidavit submitted by Plaintiff states that Plaintiff cannot "present by affidavit facts essential to justify Plaintiff's opposition to the Motion for Summary Judgment."(Court Doc. No. 14, Brownfield Aff. ¶ 3.) It further implicitly identifies at least some of the material facts it hopes to uncover. Plaintiff states its need to take the deposition of Zimmerman, whose affidavit was submitted in support of the motion for summary judgment. Zimmerman's affidavit contains many material statements that go directly to the heart of this case, so Plaintiff's statement that it must depose Zimmerman in connection with this affidavit is sufficient to identify the material facts they wish to uncover. Although the affidavit does not specify why Zimmerman's deposition has not already been taken, it is clear that such a deposition would not have been possible prior to the initiation of this litigation.

With respect to the other material facts that Plaintiff states it wishes to uncover-discovery from Duchem regarding their solicitation of business from Tyson Foods and discovery from Tyson Foods regarding Zimmerman's contact as a representative of Duchem-it is evident to the Court that such facts are material and relevant, contrary to Defendant's assertion. Further, as to why Plaintiff has not previously discovered such information, although perhaps not stated as clearly as possible in Plaintiff's motion or Rule 56(f) affidavit, the Court believes that the deposition of Zimmerman, or other initial discovery, must take place before Plaintiff will know precisely which representatives of Duchem and Tyson Foods it must depose.

In summary, Plaintiff has adequately set forth its need for discovery before responding to Defendant's Motion for Summary Judgment. Accordingly, Plaintiff's Motion to Allow Discovery to Respond to Defendant's Motion for Summary Judgment will be GRANTED. The Court will RESERVE ruling on Defendant's Motion for Summary Judgment and allow Plaintiff to take discovery before being required to respond to Defendant's motion.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 9
Slip Copy, 2006 WL 1319515 (E.D.Tenn.)
**(Cite as: Slip Copy)**

V. CONCLUSION

    **\*10** For the reasons explained above, Defendant's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion to Dismiss will be granted with respect to Plaintiff's claims of misappropriation of trade secrets under TUTSA and Tennessee common law and with respect to Plaintiff's claims of intentional interference with business relationships and unfair competition to the extent that those claims are based on Zimmerman's alleged misappropriation of trade secrets, and those claims will be DISMISSED WITH PREJUDICE. The Motion to Dismiss will be denied with respect to Plaintiff's claim of breach of contract and with respect to Plaintiff's claims of intentional interference with business relationships and unfair competition to the extent that those claims are not based on Zimmerman's alleged misappropriation of trade secrets.

    Further, Plaintiff's Motion to Allow Discovery to Respond to Defendant's Motion for Summary Judgment will be GRANTED, and the Court will RESERVE ruling on Defendant's Motion for Summary Judgment.

    A separate order will enter.

E.D.Tenn.,2006.
Vincit Enterprises, Inc. v. Zimmerman
Slip Copy, 2006 WL 1319515 (E.D.Tenn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.