# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KNOWLEDGEPLEX, INC. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Civil Action No.** 1:07-CV-02315-RMU |
| | ) |
| | ) |
| | ) |
| METONYMY, INC. | ) |
| D/B/A PLACEBASE | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## PLACEBASE'S REPLY TO KNOWLEDGEPLEX'S OPPOSITION TO PLACEBASE'S MOTION TO DISMISS

Dated:  March 17, 2008

Kenneth W. Brothers (D.C. Bar No. 441113)
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C.  20006
(202) 420-2200

*Attorney for Metonymy, Inc. d/b/a Placebase*

DSMDB-24107733

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION AND SUMMARY .............................................................. 1

II.   THE COURT SHOULD DISREGARD KPI'S INCOMPLETE AND UNSUPPORTED
      ALLEGATIONS AND INCONSISTENCIES WITH THE CONTRACTS AT ISSUE.... 2

      A. This Court Should Disregard KPI's New Allegations ..................................4

      B. KPI's Incomplete And Unsupported Allegations Regarding the Contracts .................4

III.  GOVERNING LEGAL PRINCIPLES ............................................................... 9

      A. A Motion to Dismiss Tests The Allegations of the Complaint, Not Legal
         Memoranda ...................................................................................9

      B. Opposition Must Be Supported By Evidence ...............................................9

      C. Unopposed arguments are deemed admitted .............................................10

      D. The Vinq-Placebase Contract trumps the conflicting provisions of the FMF-
         Vinq Contract................................................................................10

IV.   ARGUMENT.................................................................................... 11

      A. This Court Does Not Have Personal Jurisdiction Over Placebase ...........................11

         1.    KPI concedes that no general jurisdiction exists ...........................................11

         2.    KPI has not shown that specific jurisdiction exists .......................................11

         3.    Placebase did not consent to jurisdiction in the District of Columbia........... 13

      B. KPI's Complaint Should Be Dismissed For Improper Venue Pursuant To
         Fed. R. Civ. P. 12(b)(3)........................................................................16

         1.    KPI concedes that there was no contract between KPI and Placebase .......... 16

         2.    KPI has made no showing that venue is proper under either 28 U.S.C. §
               1391(b) or 28 U.S.C. § 1400..........................................................17

      C. The Complaint Should Be Dismissed Under Rule 12(b)(7) For Failure To
         Join A Party Under Rule 19 ...................................................................17

      D. KPI's Copyright Claim Should Be Dismissed Pursuant To Fed. R. Civ. P
         12(b)(1) For Lack Of Subject Matter Jurisdiction .........................................19

         1.    KPI has dropped its allegations regarding PushPin ....................................... 19

2.      KPI's copyright claim must be dismissed because the deposit at the copyright office is not the code required to operate DataPlace....................................... 20

3.      KPI cannot maintain a federal cause of action based on the 42 pages that comprise Registration No. TXu 1-570-162 .................................................... 21

4.      KPI's claim to common law copyright does not salvage its copyright claim. 22

E.  KPI's Trade Secret Misappropriation Claims Should Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted ................................23

1.      KPI fails to allege a trade secret ................................................................... 23

2.      The Contracts refute KPI's assertion of a confidentiality obligation ............ 23

3.      KPI fails to state a claim for common law trade secret misappropriation for which relief may be granted........................................................................... 25

V.      CONCLUSION............................................................................................................. 25

## TABLE OF AUTHORITIES

Page(s)

Cases

*Bancoult v. McNamara,*
    227 F. Supp. 2d 144 (D.D.C. 2002) (Urbina, J.)................................................10, 11

*Corsi v. Eagle Publishing, Inc.,*
    No. 1:07-CV-02004-ESH, Slip Copy, 2008 WL 239581 (D.D.C. Jan. 30, 2008)...................19

*Diodes, Inc. v. Franzen,*
    67 Cal. Rptr. 19 (Cal. Ct. App. 1968) ...............................................................24

*DSMC, Inc. v. Convera Corp.,*
    479 F. Supp. 2d 68 (D.D.C. 2007) ..................................................................25

*Dugan & Meyers Const. Co. v. Worthington Pump Corp.,*
    746 F.2d 1166 (6th Cir. 1984) .......................................................................10

*Global Discount Travel Servs, LLC v. Trans World Airlines, Inc.,*
    960 F. Supp. 701 (S.D.N.Y. 1997) ..................................................................19

*Henthorn v. Dep't of Navy,*
    29 F.3d 682 (D.C. Cir. 1994)......................................................................3, 4, 9

*In re U.S. Office Products Co. Securities Litigation,*
    251 F. Supp. 2d 58 (D.D.C. 2003) ..................................................................3, 4

*John F. Harkins Co., Inc. v. Waldinger Corp.,*
    796 F.2d 657 (3rd Cir. 1986) ......................................................................14, 15

*John W. Johnson, Inc. v. Basic Const. Co.,*
    429 F.2d 764 (D.C. Cir. 1970) ................................................................10, 11, 15

*Johnson v. Gordon,*
    409 F.3d 12 (1st Cir. 2005)...........................................................................21

*Manganaro Corp. v. Jefferson at Penn Quarter,*
    No. Civ.A. 04-2133 GK, 2005 WL 3273979 (D.D.C. Aug. 9, 2005).......................14

*McManus v. District of Columbia,*
    530 F. Supp. 2d 46 (D.D.C. 2007) .............................................................2, 9, 10

*Munter v. Lankford,*
    127 F. Supp. 630 (D.D.C. 1955) ......................................................................3

*Paley v. Estate of Ogus,*
    20 F. Supp. 2d 83 (D.D.C. 1998).........................................................................9

*Ruckelshaus v. Monsanto,*
    467 U.S. 986 (1984)..........................................................................................24

*S. Leo Harmonay, Inc. v. Binks Mfg. Co.,*
    597 F. Supp. 1014 (S.D.N.Y. 1984)................................................................10

*Schwartz v. CDI Japan, Ltd.,*
    938 F. Supp. 1 (D.D.C. 1996) (Urbina, J.)................................................12, 13

*U.S. ex rel. Harris v. Bernad,*
    275 F. Supp. 2d 1 (D.D.C. 2003) (Urbina, J.)..................................................2

<u>Statutes</u>

17 U.S.C. § 409..............................................................................................22

17 U.S.C. § 411(a)...........................................................................................22

28 U.S.C. § 1391(b).........................................................................................17

28 U.S.C. § 1400.............................................................................................17

28 U.S.C. § 1404...............................................................................................1

17 U.S.C. § 506(e)...........................................................................................22

<u>Other Authorities</u>

Fed. R. Civ. P 12(b)(1).........................................................................3, 19, 22

Fed. R. Civ. P 12(b)(2).......................................................................................3

Fed. R. Civ. P. 12(b)(3)........................................................................3, 16, 17

Fed. R. Civ. P. 12(b)(6)..........................................................2, 9, 10, 22, 25

Fed. R. Civ. P. 12(b)(7)...........................................................2, 3, 17, 19

Fed. R. Civ. P. 12(d).........................................................................................3

Fed. R. Civ. P. 19............................................................................................17

Fed. R. Civ. P. 56..........................................................................................3, 9

I.        **INTRODUCTION AND SUMMARY**

KPI's Opposition invents a story that bears little resemblance, and contains few citations, to the allegations of the Complaint.  Comparisons of the Opposition, the Complaint, and the Contracts reveal multiple contradictions and fatal admissions.  Because a party cannot amend its Complaint in an opposition to a motion to dismiss, this Court should disregard KPI's efforts to recast its allegations.  Instead, the Court should examine the allegations along with the undisputed facts, the operative agreements, and the certified copyright registration attached to Placebase's motion.  Those legally operative facts, and the case law, show why KPI's complaint must be dismissed for five independent reasons.

First, KPI has failed to show how this Court has personal jurisdiction over Placebase. KPI concedes that it has not pled that this Court has either general or specific jurisdiction over Placebase.  KPI's Opposition concedes (by not addressing the arguments raised by Placebase) that this court lacks general jurisdiction.  The sole basis for KPI's jurisdictional assertion is a contract between Fannie Mae Foundation (FMF) and Vinq that Placebase never signed or even saw.  A review of the operative contracts and the alleged actions of the parties show that KPI's unsupported assertion that KPI contracted to provide services in the District is insufficient to satisfy the requirements of the District's Long-Arm Statute.  Further, KPI has failed to show that Placebase consented to jurisdiction in the District because the FMF-Vinq Contract's jurisdictional clause is trumped by a contrary jurisdictional clause in the Vinq-Placebase Contract, the only contract to which Placebase is a party.

Second, KPI likewise has failed to show that venue is appropriate in the District of Columbia.  As KPI has not moved for a transfer under 28 U.S.C. § 1404, the Complaint must be dismissed.

Third, KPI's Opposition confirms Placebase's argument that Vinq is an indispensable party. KPI's refusal to join Vinq is fatal under Fed. R. Civ. P. 12(b)(7).

Fourth, KPI's concessions are fatal to its copyright claim, and because the copyright claim is the sole basis for federal jurisdiction, the entire Complaint must be dismissed. KPI does not dispute that the official deposit for the only copyright registration it possesses is the deposit Placebase attached to its motion. KPI also admits that the 42 pages of code representing the official deposit for that registration is not the code required to operate Dataplace – the focus of the complaint. KPI's desperate argument that it has a common law copyright confirms that the Complaint should be dismissed, because this Court has no diversity jurisdiction over KPI's unasserted common law claim.

Finally, KPI does not dispute that it has failed to plead the necessary elements to make out a viable trade secret claim. KPI's reach for a common law cause of action is expressly precluded by D.C. law, and confirmed by KPI's own case law.

## II.    THE COURT SHOULD DISREGARD KPI'S INCOMPLETE AND UNSUPPORTED ALLEGATIONS AND INCONSISTENCIES WITH THE CONTRACTS AT ISSUE

The first seven pages of KPI's Opposition are devoid of a single reference to the Complaint, or to an affidavit or declaration, that supports KPI's bald assertions in its "factual background" and "governing contractual provisions." This Court should disregard KPI's unsupported arguments of counsel couched as "facts." *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 64 (D.D.C. 2007) (holding that "[f]actual allegations in briefs or memoranda of law may not be considered when deciding a Rule 12(b)(6) motion"); *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 5 (D.D.C. 2003) (Urbina, J.) (holding that the "court need not accept as true legal conclusions cast as factual allegations"). More tellingly, KPI's recitations repeatedly

contradict the allegations of the Complaint, as well as the actual contractual provisions of the two contracts that KPI concedes form the basis for its Complaint.

KPI's Opposition does not cure the deficiencies of its ambiguous and incomplete Complaint. Fed. R. Civ. P. 12(d) affords a party a "reasonable opportunity to present all the material that is pertinent to the motion," and KPI must be held to its Opposition.[1] But because KPI has presented bald assertions that are unsupported and inconsistent with the Complaint, they must be excluded by this Court. *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994) (holding that "factual allegations in briefs or memoranda of law … most certainly may not be considered when the facts they contain contradict those alleged in the complaint").

As shown below, KPI's Opposition repeatedly contradicts the allegations of its Complaint. KPI's Opposition (as well as its Complaint) are inconsistent with the two contracts KPI concedes form the basis for its Complaint. Factual allegations in an opposition "may not be considered when the facts they contain contradict those alleged in the complaint." *Id.* (affirming the grant of a motion to dismiss despite factual assertions in memoranda). Even more devastating to KPI's claims are the contradictions between the bare allegations in the Complaint and the Opposition and the FMF-Vinq and Vinq-Placebase Contracts submitted by KPI. "[I]f there is a discrepancy between the terms of an instrument annexed to a pleading and its interpretation in the pleading, the former must prevail." *In re U.S. Office Products Co. Securities Litigation*, 251 F. Supp. 2d 58, 71 (D.D.C. 2003) (citing *Munter v. Lankford*, 127 F. Supp. 630 (D.D.C. 1955) for this "elementary rule"). When "plaintiffs plead [themselves] out of court," as

---

[1]     KPI does not argue that Placebase's Rule 12(b)(6) motion should be treated as one for summary judgment under Rule 56. KPI also does not dispute that the court may consider the submitted evidence in Placebase's motion under Rule 12(b)(1), (2), (3), and (7).

is the case here, it is appropriate to dismiss the deficient claims. *In re U.S. Office Products Co. Securities Litigation*, 251 F. Supp. 2d at 71.

### A.    This Court Should Disregard KPI's New Allegations

KPI's Opposition provides no support for its factual allegations. A motion to dismiss tests the Complaint, and not the ability of counsel to invent additional allegations not in the Complaint. *Henthorn*, 29 F.3d at 687-88 (rejecting the argument that a "plaintiff may further develop his claim in his brief in opposition"). Because KPI's unsupported assertions have no effect on Placebase's motion, Placebase need not address all of the unsupported assertions of KPI's Opposition.[2]

### B.    KPI's Incomplete And Unsupported Allegations Regarding the Contracts

KPI opens its Opposition with the unsupported assertion that "Placebase admits that it was a subcontractor to KnowledgePlex." (Opp'n at 1.) Placebase has made no such admission and KPI did not, and cannot, point to any such admission. Indeed, KPI's own exhibit, the Vinq-Placebase Contract, identifies the End Client as FMF – not KPI. (Opp'n Ex. 1 at 1.) KPI did not even exist until 2007 – three years after the 2004 contracts were signed, and well after those contracts expired. (Opp'n at 3.)

KPI's Complaint makes only one reference to FMF, alleging that "KnowledgePlex, through its predecessor-in-interest the Fannie Mae Foundation (collectively referred to [by KPI] as "KnowledgePlex"), issued a Request for Proposals." (Compl. ¶ 7.) However, the Complaint never specifically defined "KnowledgePlex." KPI's attempts to clarify the definition of "KnowledgePlex" in its Opposition only lead to more questions. (Opp'n at 1, 3-4, 7.) KPI's Opposition identifies KnowledgePlex as "an innovative initiative" launched by FMF that FMF

---

[2]    Placebase disagrees with KPI's characterizations of the facts set out in its factual background and will address these assertions when they are properly before the Court.

4

later "spun off" into KnowledgePlex, Inc. (Opp'n at 3-4.) KPI alleges that at the same time

FMF "spun off KnowledgePlex into KnowledgePlex, Inc.," FMF "assigned its rights in the

DataPlace project to KnowledgePlex, Inc." (Opp'n at 4.) KPI further alleges that "[i]n April

2007, the Fannie Mae Foundation transferred and assigned its rights, title and interests in and to

each asset of the *KnowledgePlex unit* within Fannie Mae Foundation to KnowledgePlex, Inc."

(Opp'n at 7.) KPI intentionally blurs the differences between FMF's KnowledgePlex initiative

and the legal entity that is KPI. KPI never identifies whether "KnowledgePlex" is legally the

same as the Fannie Mae Foundation, or whether "KnowledgePlex" is a "unit within Fannie Mae

Foundation," or whether "KnowledgePlex" refers to the content within the FMF "innovative

initiative," or whether "KnowledgePlex" is KPI.

      Despite "KnowledgePlex" being ill-defined, KPI has now conceded (Opp'n at 9) that

the Vinq-Placebase Contract (Opp'n Ex 1) forms the "basis for this suit."[3] The Placebase-Vinq

Subcontract, and the Vinq-FMF prime Contract, are legally operative documents that are proper

to consider in connection with Placebase's motion to dismiss for lack of personal jurisdiction,

subject matter jurisdiction (the defective copyright), improper venue, and failure to join an

indispensable party. The table below summarizes the contractual relationships defined by the

Vinq-Placebase Subcontract, the FMF-Vinq Prime Contract, and the alleged relationship

between FMF and KPI.

---

[3]     The Complaint never identified the contractual basis for KPI's claims.

| | Subcontract | | Prime Contract | | Limited Assignment | |
|---|---|---|---|---|---|---|
| Placebase CA | ←→ *August 2004* | Vinq CA | ←→ *July 2004* | FMF DC | → *April 2007* | KPI CA |
| <ul><li>The only contract to which Placebase if a party</li><li>Prime Contract was not attached</li><li>Jurisdiction/Venue in CA</li><li>Forum clause survives termination</li><li>All deliverables in CA</li><li>Placebase retains ownership in its preexisting intellectual property</li><li>Contrary provisions in Prime Contract inapplicable (only "applicable" terms of Prime Contract incorporated)</li><li>Only limited confidentiality obligations</li><li>No trade secrets identified</li></ul> | | | <ul><li>Placebase is not a party</li><li>Placebase never received a copy</li><li>Not attached to Subcontract</li><li>Terminated in 2006 or earlier[4]</li><li>Inconsistent provisions do not apply to Placebase</li><li>Jurisdiction/Venue in DC</li><li>Forum selection clause does not survive termination</li><li>Limited confidentiality obligations</li><li>Acknowledges third-party intellectual property</li><li>No trade secrets identified</li></ul> | | <ul><li>Purported limited assignment</li><li>KPI refused to produce agreement</li><li>No allegation that any FMF trade secrets were assigned to KPI</li><li>No KPI contractual relationship with Placebase</li></ul> | |

---

[4]     The FMF/Vinq contract provided for a termination date of July 1, 2006 "unless terminated sooner." (Opp'n Ex. 1(A) § 12(a).) Placebase has documentary evidence that the FMF-Vinq and Vinq-Placebase Contracts terminated in early 2005 and that Vinq specifically requested Placebase to continue working on the DataPlace project without a contract. As KPI has not shown that the Contracts extended beyond their termination date of July 1, 2006, Placebase need not submit that evidence at this time, but is prepared to do so if requested by the court. While the Contract provides an option to extend the term of the contract, KPI has provided no evidence that the option was exercised in writing as required by § 12(b). (Opp'n Ex. 1(A) § 12(b).)

KPI alleges that FMF is KPI's predecessor-in-interest. (Compl. ¶ 7.) On February 1, 2008, Counsel for Placebase requested a copy of any agreement(s) between FMF and KPI that establish KPI as a successor-in-interest to FMF. (Ex. A (Brothers Dec. ¶ 2, Ex. 1).) KPI's counsel, however, ignored Placebase's request. (Ex. A (Brothers Dec. ¶ 3).) Despite its failure to provide a copy of any such agreement(s), KPI's Opposition includes ambiguous allegations that FMF made an assignment to KPI of "rights in the DataPlace project" and that FMF "transferred and assigned its rights, title and interests in and to each asset of the KnowledgePlex unit" to KPI. (Opp'n at 4, 7.) KPI's allegations are not supported by a single document or affidavit despite the requirement of both the FMF-Vinq and Vinq-Placebase Contracts that any assignment of the agreements be consented to in writing. (Opp'n Ex 1 § 21, Ex 1(A) § 15(d).) KPI has not, and cannot, allege that Placebase ever consented to any such assignment. KPI's failure to support its allegations that it is FMF's successor-in-interest and that FMF made limited transfers and assignments to KPI puts KPI's standing to bring this suit squarely at issue.

KPI now admits (Opp'n at 2) that FMF, not KPI, entered into a contract with Vinq. Vinq and Placebase subsequently executed a subcontract to the Prime Contract with FMF. (Opp'n at 2.) KPI alleged that "the prime contract was attached to the subcontract." (Opp'n at 1-2.) While the Vinq-Placebase Contract states that the Prime Contract is "attached hereto as Exhibit A," the Prime Contract was never so attached. (Mot. to Dismiss Ex. C). KPI's attachment of the two contracts as two separate agreements likewise suggests that the two contracts were never combined.[5]

---

[5]    Despite its criticism of Placebase for not attaching a contract that it did not have, KPI failed to attach several important documents that were incorporated by reference into the FMF-Vinq Prime Contract. "The Request for Proposal, dated March 30, 2004 ('Proposal'), Contractor's Response, dated April 13, 2004 ('Response'), and work plans shall be incorporated by reference into this Agreement." (Opp'n Ex 1(A) at A-5.)

KPI acknowledges that "Placebase agreed to be bound by and comply with the *applicable* provisions of the Prime contract."[6] (Opp'n at 6, emphasis added.) As discussed in greater detail below, not all terms of the Prime Contract were incorporated into the Vinq-Placebase Subcontract. Instead, the Prime Contract specifically stated that only those terms "*applicable to Subcontractor or the Services*" are incorporated into the Subcontract. (Opp'n Ex. 1 § 2.) Thus, to the extent that the Prime Contract had terms inconsistent with the terms of the subcontract, they were, by definition, not applicable to Placebase.

KPI's opposition alleges (Opp'n at 4) that "Placebase had not yet delivered to KnowledgePlex all of the information and tools necessary to operate and maintain DataPlace. KnowledgePlex could not add new data sets, correct bugs in the code, improve the usability of the site, or update the system to function with new browsers and operating systems." This allegation is not in the Complaint, and KPI does not, because it cannot, point to a single requirement in any of the contracts cited by KPI with any such deliverables.[7] Despite the lack of support for its assertions that Placebase failed to complete delivery of DataPlace under any contract, KPI baldly alleges that in 2007 "Placebase was unwilling to continue under the terms of the existing contract" and "Placebase ceased work under the existing contract." (Opp'n at 3-4.) However, the Vinq-Placebase Contract terminated at the latest with "the expiration or

-------

[6]    The Vinq-Placebase Contract states: "This Agreement is subject to those terms of the Prime Contract, attached hereto as Exhibit A, *applicable* to Subcontractor or the Services (as defined below), which terms are incorporated by reference as if fully set forth herein. All *applicable* provisions contained in the Prime Contract shall be binding upon the Subcontractor, and Subcontractor hereby agrees to comply with such provisions in the Prime Contract." (Opp'n Ex. 1 § 2, emphasis added.)

[7]    The Vinq-Placebase Contract requires that "[t]he scope of work for each project of work (a 'Project') shall be set forth in an addendum to this Agreement (a 'Statement of Work') that describes the Project and is executed by each party." (Opp'n Ex. 1 § 3.) The FMF-Vinq Contract states that "[a]ny proposed work not specified and priced in Addendum A must be separately approved in advance and in writing...." (Opp'n Ex. 1(A) § 4(c).)

termination of the Prime Contract."[8]  (Opp'n Ex. 1 § 16(a).)  On the face of the FMF-Vinq

Contract, the term of the contract expired on July 1, 2006, unless terminated sooner.  (Opp'n Ex.

1(A) § 12(a).)

KPI alleges that "[t]he Prime Contract was renewed and continued throughout the

development of DataPlace," (Opp'n at 5, n.1) but KPI has not provided any evidence that the

FMF-Vinq Contract was extended "by written notice" as required by the FMF-Vinq Contract.

(Opp'n Ex. 1(A) § 12(b).)  The Prime Contract terminated no later than July 1, 2006.  Thus,

KPI's concession that the Vinq-Placebase Contract is the basis for its claims must be viewed in

light of the fact that the Vinq-Placebase Contract expired no later than 2006.

## III.    GOVERNING LEGAL PRINCIPLES

### A.    A Motion to Dismiss Tests The Allegations of the Complaint, Not Legal Memoranda

"The purpose of a motion to dismiss is to assess the validity of the *pleadings*."

*Henthorn*, 29 F.3d at 688 (emphasis in original).  "To require that trial courts accept as true

factual allegations made in legal memoranda, which form no part of the official record, when

those allegations directly contradict the facts set forth in the complaint would be to stretch Rule

12(b)(6) far beyond even the generous pleading standards that we apply to pro se plaintiffs." *Id.*

### B.    Opposition Must Be Supported By Evidence

KPI's Opposition must be supported by admissible evidence.  *Paley v. Estate of*

*Ogus*, 20 F. Supp. 2d 83, 89-91 (D.D.C. 1998) (holding that statements in a supporting brief

must be acceptable under the standards of Fed. R. Civ. P. 56).  This Court should disregard KPI's

unsupported arguments of counsel couched as "facts."  *McManus*, 530 F. Supp. 2d at 64 (holding

---

[8]    The operative question is whether the Vinq-Placebase Contract terminated, an issue
which KPI wholly ignores.  The Vinq-Placebase Contract provides for numerous methods of
termination, including expiration of the Prime Contract.  (Opp'n Ex. 1 § 16(a).)

that "[f]actual allegations in briefs or memoranda of law may not be considered when deciding a Rule 12(b)(6) motion").

### C.    Unopposed arguments are deemed admitted

KPI's Opposition's failure to oppose Placebase's arguments deems those arguments admitted. *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002) (Urbina, J.) (holding that "if the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case"); *McManus*, 530 F. Supp. 2d at 66 (finding the plaintiff did not "substantively address" defendants' claims of improper service and thus conceded the issue).

### D.    The Vinq-Placebase Contract trumps the conflicting provisions of the FMF-Vinq Contract

Only the "terms of the Prime Contract … *applicable* to Subcontractor or the Services" are incorporated into the Subcontract.  (Opp'n Ex. 1 § 2, emphasis added.)  Where a subcontract contains a clause that conflicts with the incorporated prime contract, "[s]pecial provisions of a subcontract prevail over provisions of [the prime contract]."  *John W. Johnson, Inc. v. Basic Const. Co.*, 429 F.2d 764, 774-76 (D.C. Cir. 1970) (holding that a contract incorporated for a limited purpose only includes the portions related to that purpose); *accord Dugan & Meyers Const. Co. v. Worthington Pump Corp.*, 746 F.2d 1166, 1174-75 (6th Cir. 1984) (finding a warranty clause in a subcontract controls over a similar, but conflicting, clause in the prime contract); *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014, 1026 (S.D.N.Y. 1984) (refusing to bind subcontractor to terms of prime contract where subcontractor "is not a party to that contract, even though it is incorporated by reference into its subcontract, and it has no rights thereunder").  In *John W. Johnson*, a subcontract incorporated a prime contract by reference, however the Court of Appeals had "no difficulty" in limiting the

incorporation of the prime contract to the provisions detailing the type of work to be performed, not the dispute resolution clause. *John W. Johnson, Inc.*, 429 F.2d 764 at 773-75. The Court noted that even though the general contract required the contractor to include its terms in all subcontracts, "the subcontractor was not a party to the prime contract and he was not made privy to its provisions by having it incorporated by reference into its subcontract." *Id.*

IV.     **ARGUMENT**

    A.     **This Court Does Not Have Personal Jurisdiction Over Placebase**

        KPI does not dispute that it bears the burden of establishing that personal jurisdiction exists over Placebase, and that the exercise of jurisdiction must satisfy constitutional due process requirements. KPI does not dispute that its Complaint failed to allege a basis for general or specific jurisdiction over Placebase. The contracts at issue show that, as a matter of law, Placebase did not consent to jurisdiction in D.C., but instead all actions relating to the subject of the lawsuit must be brought in California.

        **1.     KPI concedes that no general jurisdiction exists**

        KPI does not dispute that there is no general jurisdiction over Placebase. Unopposed arguments are deemed admitted. *Bancoult*, 227 F. Supp. 2d at 149 ("if the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case"). Therefore, this Court lacks general jurisdiction over Placebase.

        **2.     KPI has not shown that specific jurisdiction exists**

        KPI admits that, for specific jurisdiction, it "*must show*: (1) that [Placebase] transacted business in the District; (2) that the claim arose from the business transacted in the District; and (3) that [Placebase] had minimum contacts with the District such that the Court's exercise of jurisdiction would not offend traditional notions of fair play and substantial justice."

11

(Opp'n at 8-9 (emphasis added) (*citing Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 4-5 (D.D.C.

1996) (Urbina, J.)).)  However, KPI makes no allegations, unsupported or otherwise, that

Placebase transacted *any* business in the District, that its claim arose from *any* business

transacted in the District, or that Placebase had minimum contacts with the District sufficient to

satisfy constitutional due process.

KPI's Opposition raises new, unsupported allegations that "Placebase contracted to

provide services in the District of Columbia when it entered into the Subcontract and agreed to

provide services to KnowledgePlex." (Opp'n at 9.)  There is no support for this assertion, and, in

fact, it is contradicted by the legally governing contracts.  The FMF-Vinq Prime Contract

required that Vinq "shall perform work at [Vinq's] offices in California." (Opp'n Ex. 1(A) at A-

4.)  The Vinq-Placebase Subcontract required that Placebase "shall perform work at

[Placebase's] offices in California." (Opp'n Ex. 1 at Statement of Work 4.)  Further, all

deliverables were to be delivered to Vinq in California.[9]  (Opp'n Ex. 1 at 1.)

The *Schwartz* case relied on by KPI states that "[w]hen a non-resident has solicited

the business relationship and the contract calls for the performance of work within the District,

the court may find that the transaction has such a substantial connection with the District such

that the exercise of personal jurisdiction is permissible." *Schwartz*, 938 F. Supp. at 5.  KPI has

not shown that Placebase "solicited the business relationship" or that "the contract calls for the

performance of work within the District."  There is no evidence of a "substantial connection with

the district" that permits the exercise of personal jurisdiction.  KPI's own case law indicates that

"[t]he focus is on the quality and nature of contacts, and these contacts must illustrate a

---

[9]     While the ultimate deliverables went to FMF (not KPI), the FMF-Vinq and Vinq-
Placebase Contracts are silent as to where that delivery was to take place.  (Opp. Ex. 1 at p. 1.)
And in any event, the deliverables to FMF were from Vinq, not Placebase.

deliberate and voluntary association with the forum on the part of the defendant." *Id.* KPI has

not shown "a deliberate and voluntary association with the forum on the part of [Placebase]."

KPI claims that "the basis for this suit" is "Placebase's breach of that agreement to

provide services in the District of Columbia, namely, assisting in the development of DataPlace."

(Opp'n at 9 (citing *Schwartz*, 938 F. Supp. at 5-6[10]).)  KPI's own case law indicates that it "must

allege specific facts connecting [Placebase] with the forum state and cannot rest on bare

allegations or conclusory statements." *Id.* at 4.  KPI's "bare allegations" and "conclusory

statements" are insufficient to connect Placebase with the forum.

### 3. Placebase did not consent to jurisdiction in the District of Columbia

KPI acknowledges that "Placebase agreed to be bound by and comply with the

*applicable* provisions of the Prime contract."  (Opp'n at 6, emphasis added.)  Yet KPI's

Opposition alleges that Placebase consented to jurisdiction in the District of Columbia citing to

the FMF-Vinq Contract (Opp'n at 7-8) despite a clearly conflicting jurisdictional provision in the

Vinq-Placebase Contract that requires all actions relating to Placebase's work to be in Santa

Clara County, California.[11]  (Opp'n Ex. 1 § 21.)

KPI brushes over these conflicting terms with a conclusory statement that "Vinq and

Placebase lacked the capacity to alter the choice of forum or to force KnowledgePlex to a

---

[10]     Further, *Schwartz* is factually distinguishable from the case at bar, there a Virginia
plaintiff was the agent of two Japanese defendants who had assumed a contract with a D.C.
institution, the Court found personal jurisdiction in D.C., because one of the defendants
negotiated the assignment of the contract and contemplated future dealings in the District of
Columbia. *Schwartz*, 938 F. Supp. at 3-6.

[11]     KPI states that the "basis for this suit" is the Vinq-Placebase Contract.  (Opp'n at 9.)  KPI
is not bringing this suit under the FMF-Vinq Contract.

different forum to resolve this dispute."[12] (Opp'n at 8 citing *Manganaro Corp. v. Jefferson at Penn Quarter*, No. Civ.A. 04-2133 GK, 2005 WL 3273979 (D.D.C. Aug. 9, 2005) and *John F. Harkins Co., Inc. v. Waldinger Corp.*, 796 F.2d 657 (3rd Cir. 1986).) As explained below, neither of the two cases cited by KPI support this proposition and the evidence shows that Placebase did not consent to jurisdiction in the District of Columbia.

In *Manganaro*, the subcontract bound the subcontractor to *all* the terms of the prime contract, *Manganaro*, 2005 WL 3273979 at *1, whereas only the *applicable* provisions contained in the FMF-Vinq Contract are incorporated. (Opp'n Ex. 1 § 2.) In addition, the *Manganaro* subcontract explicitly provided that the claim was to be "determined solely by applicable provisions of such [Prime] Contract, including any *dispute provisions* thereof," (*Id.* at *3, emphasis added); no similar provision exists in the Vinq-Placebase Contract. *Manganaro* is further distinguishable in that the subcontract provided for venue in multiple forums, including the forum identified in the prime contract, *Id.* at *3-4, whereas the FMF-Vinq and Vinq-Placebase Contracts identify conflicting exclusive fora. (*Compare* Opp'n Ex. 1(A) § 15(i) *with* Opp'n Ex. 1 § 21.) The *Manganaro* court stated "[w]hat matters is that [the subcontractor] intended, at the time the Subcontract was entered into, to be bound by all the terms of the Prime Contract, including its forum selection clause." *Id.* at *3. Likewise, the relevant inquiry here should be, what did Placebase intend at the time the Vinq-Placebase Contract was entered into; the answer to that inquiry is simple – Placebase intended to be bound to *applicable* provisions of the FMF-Vinq Contract, and not to conflicting provisions.[13] (Opp'n Ex. 1 § 2, 21.) This

---

[12]    It is unclear how this proposition relates to personal jurisdiction, neither of the two cited cases discuss personal jurisdiction, nor do the cited cases relate to capacity to alter a choice of forum provision.

[13]    The Vinq-Placebase Contract states "[t]his Agreement, the Prime Contract (*when available and only to the extent applicable*), the Statements of Work, Change Orders (if any),

14

interpretation is reasonable in light of well established canons of contract construction.[14] *John W. Johnson, Inc.*, 429 F.2d 774-75 (holding that a contract incorporated for a limited purpose only includes the portions related to that purpose).

Likewise, *Harkins* is not analogous to the case at bar as it relates to the enforceability of conflicting arbitration clauses in a dispute between a contractor and subcontractor where the arbitration clause in the prime contract was narrower than the arbitration clause in the subcontract. *Harkins*, 796 F.2d at 658-663 (upholding district court finding that dispute between subcontractor and contractor was not arbitrable). The case at bar is neither between the contractor, Vinq, and subcontractor, Placebase, nor do the clauses at issue implicate the scope of relief available pursuant to an arbitration clause.

Ironically, KPI is not even abiding by the forum selection clause in the FMF-Vinq Contract that it seeks to enforce against Placebase. That clause provides for venue in the "courts of the District of Columbia *sitting without jury*." (Opp'n Ex 1(A) § 15(i).) KPI, however, has

---

and the documents incorporated by reference in this writing constitute the *entire agreement and understanding between the parties* and supersede all prior agreements, whether oral or written, between the parties with respect to the subject matter of this Agreement." (Opp'n Ex. 1 § 21, emphasis added.)

[14]     This interpretation also applies to the choice-of-law provision. (Opp'n Ex. 1 § 21.) KPI ignored Placebase's showing that California law applies to this dispute. The express language of the Vinq-Placebase Contract that it "shall be governed by the internal laws of the State of California exclusive of its conflicts-of-law principles." (Opp'n Ex. 1 § 21.) KPI's only response is to point to the choice-of-law provision in the FMF-Vinq Contract. (Opp'n at 8 n.4.) That provision is simply not applicable to Placebase.

KPI does not dispute that the Vinq-Placebase Contract provides for California law to govern the contract, nor does it dispute that there is a reasonable relationship to California. In fact, KPI fails to challenge Placebase's assertion that California is the state with the "most significant relationship" to the dispute. KPI also fails to challenge Placebase's assertion that any alleged injury and any conduct causing any alleged injury occurred in California where KPI and Placebase are both located. Contrary to KPI's assertion, the application of DC law is not reasonable.

demanded a jury trial.  (Compl. at 10.)  Equity forbids KPI from arguing that this provision is

binding on Placebase while ignoring the very same provision.

**B.    KPI's Complaint Should Be Dismissed For Improper Venue Pursuant To Fed. R. Civ. P. 12(b)(3)**

**1.    KPI concedes that there was no contract between KPI and Placebase**

KPI's Complaint alleges "Venue is proper in this Court … pursuant to agreement by

the parties."  (Complaint ¶ 4.)  KPI's Opposition conveniently changes its allegations with

respect to venue, making no mention of an "agreement by the parties" and directly refuting its

earlier allegations of an "agreement by the parties."[15]  (Opp'n at 2.)  KPI's Opposition thus

concedes that there was no "agreement by the parties," as Placebase explained in its motion.

KPI's asserts (Opp'n at 9) that the FMF-Vinq Contract had a venue provision and the

Vinq-Placebase Contract incorporated that provision.  This argument fails for the same reason

KPI's personal jurisdiction argument fails – when provisions conflict, the Subcontract controls.

KPI purports to bring its suit as a third-party beneficiary to the Vinq-Placebase

Contract.  (Compl. ¶ 16.)  KPI does not contest that a third-party beneficiary "cannot accept the

benefits and avoid the burdens or limitations of a contract."  Yet KPI inexplicably ignores the

express terms of the Vinq-Placebase Contract that requires venue in Santa Clara County,

California.  KPI has not, and cannot, provide any evidence that the forum selection clause in the

Vinq-Placebase Contract is unreasonable, therefore, the forum selection clause must be enforced.

As every claim in the Complaint arises out of or relates to work performed under the contract,

---

[15]    The only allegation in the complaint that purported to identify any agreement by the parties alleged that "Vinq, LLC, together with its subcontractor Placebase, submitted a proposal."  (Complaint ¶ 12.)  Now, KPI has changed its story, alleging that "KnowledgePlex accepted the proposal submitted by Vinq, LLC.  Vinq's proposal identified Placebase as Vinq's subcontractor."  (Opp'n at 2.)  KPI's complaint does not allege any other direct contractual relationship between KPI and Placebase.

KPI is precluded from bringing this action in this Court and the Complaint should be dismissed under Rule 12(b)(3).

### 2. KPI has made no showing that venue is proper under either 28 U.S.C. § 1391(b) or 28 U.S.C. § 1400

KPI concludes (Opp'n at 9) that "28 U.S.C. § 1391(b) provides for venue in this district 'in which a substantial part of the events or omissions giving rise to the claim occurred'" without identifying a single event or omission that occurred in the District of Columbia despite Placebase's call for such identification. (Mot. to Dismiss at 10 n.3.) To the extent § 1391(b) is applicable, KPI has failed to establish venue is proper under that statute.

KPI concedes that 28 U.S.C. § 1400 is applicable to copyright actions, but tacitly concedes that venue in this Court cannot be obtained under § 1400. Even if KPI had asserted venue under § 1400, KPI has not alleged that Placebase "may be found" in the District of Columbia, and, as explained above, this Court does not have personal jurisdiction over Placebase. For the same reasons that KPI cannot establish personal jurisdiction over Placebase, it cannot hold venue in D.C. pursuant to § 1400.

### C. The Complaint Should Be Dismissed Under Rule 12(b)(7) For Failure To Join A Party Under Rule 19

Placebase's concerns about KPI's failure to join Vinq have been confirmed by KPI's Opposition. KPI already has placed multiple alleged obligations of Vinq squarely at issue, including the choice-of-law and venue provisions. KPI also has implied that other obligations and rights of Vinq are at issue.

For example, the Vinq-Placebase Contract has many terms that are inconsistent with the FMF-Vinq Contract. The Vinq-Placebase Contract only incorporated "applicable" terms of the Prime. (Opp'n Ex. 1 § 2.) Vinq executed the Vinq-Placebase Contract with a different forum and choice-of-law than provided for in the FMF-Vinq Contract. (Opp'n Ex. 1 § 21.) The

17

Vinq-Placebase Contract does not indicate that inconsistent terms should be construed in favor of the Prime contract.  KPI specifically alleges that "Vinq … lacked the capacity to alter the choice of forum or to force KnowledgePlex to a different forum to resolve this dispute." (Opp'n at 8.) This allegation places Vinq's rights and obligations squarely at issue.

The FMF-Vinq Contract requires that Vinq provide evidence of Placebase's compliance with certain provisions of the FMF-Vinq Contract prior to the "disclosure of Confidential information to, or the performance by, [Placebase] in connection with or pursuant to this Agreement." (Opp'n Ex. 1(A) § 3(b).)  In light of KPI's allegations, this provision alone seriously implicates Vinq's rights and obligations for at least four reasons.  First, despite the requirement of § 3(b),Vinq and Placebase began working on DataPlace after the execution of the FMF-Vinq Contract but prior to the execution of the Vinq-Placebase Contract.[16]  (Opp'n Ex. 1 at Statement of Work 2.)  Second, if Vinq provided evidence of Placebase's compliance with the provisions of the FMF-Vinq Contract, either KPI has been aware of the inconsistent provisions in the Vinq-Placebase Contract since the fall of 2004 without objection or Vinq provided evidence that somehow misled KPI into believing Placebase was in compliance with the provisions of the FMF-Vinq Contract.  Third, if Vinq did not provide evidence of Placebase's compliance with the provisions of the FMF-Vinq Contract, Vinq was in violation of its contract with FMF.  Fourth, the Vinq-Placebase Contract terminated on or before July 1, 2006, (Opp'n Ex. 1(A) § 12(a)) but Placebase's work on DataPlace continued through 2007 despite this termination.  (Compl. ¶ 27; Opp'n at 3-5.)  As Placebase was no longer under contract, Placebase was no longer bound by any confidentiality agreement or any agreement regarding intellectual property rights with regard to DataPlace.  To the extent Vinq was under a duty to FMF to

---

[16]    The Vinq-Placebase Contract was executed in August 2004 after the deadline for multiple deliverables identified in the Statement of Work.  (Opp'n Ex. 1 at Statement of Work 1, 2)

maintain confidentiality with its subcontractors or ensure intellectual property rights, it failed to do so.[17]

As stated in Placebase's Motion to Dismiss, should this Court find that Vinq, rather than Placebase, breached its duties, there is nothing to prevent KPI from later bringing suit against Vinq for that breach. This Court's finding of breach would not bind a court hearing KPI's suit against Vinq. Vinq, in turn, could bring a claim against Placebase, alleging that Placebase, not Vinq, failed in its duties under the contract. At the end of the day, Placebase would have another court re-decide its rights and obligations under the agreement(s) at issue in the case at bar. Vinq is a necessary party to this litigation. Because KPI refused to join Vinq, this case must be dismissed under Fed. R. Civ. P. 12(b)(7).

### D.    KPI's Copyright Claim Should Be Dismissed Pursuant To Fed. R. Civ. P 12(b)(1) For Lack Of Subject Matter Jurisdiction

#### 1.    KPI has dropped its allegations regarding PushPin

KPI alleged in its complaint that "Placebase began developing a *nearly identical* product for itself called PushPin, and another product *substantially similar* to DataPlace – PolicyMap – for the Reinvestment Fund ("TRF")." (Compl. ¶ 32.) In its Opposition, however, KPI drops all references to PushPin, because it understands that Pushpin was developed well before the 2004 FMF-Vinq and Vinq-Placebase Contracts.

Instead, KPI has substituted PolicyMap as allegedly "a nearly identical system" compared to DataPlace. (Opp'n at 4.) As a matter of law, however, KPI's allegations that

---

[17]    Contrary to KPI's argument, Placebase's reliance on *Corsi* is appropriate for the proposition for which it was cited, "each claim in this case implicates [Vinq's] conduct under the contracts, and any findings involving these contracts will necessarily affect [Vinq's] rights." *Corsi v. Eagle Publishing, Inc.,* No. 1:07-CV-02004-ESH, Slip Copy, 2008 WL 239581 at *3-4 (D.D.C. Jan. 30, 2008). KPI's failure to address Placebase's reliance on *Global Discount Travel Servs, LLC v. Trans World Airlines, Inc.,* 960 F. Supp. 701 (S.D.N.Y. 1997), should be deemed an acceptance of its applicability making Vinq a necessary party.

Placebase started developing PolicyMap before it stopped working on DataPlace (Compl. 32, Opp'n at 4-5) cannot form the basis of any cause of action, because KPI has no right of exclusivity.  The FMF-Vinq Contract expressly includes a non-exclusive agreement provision. (Opp'n Ex. 1(A) § 15(c)).  Thus, Placebase was free to work on similar projects for others.

### 2.    KPI's copyright claim must be dismissed because the deposit at the copyright office is not the code required to operate DataPlace

KPI admits that "[t]he only claim of copyright infringement alleged in the Complaint is for infringement of United States Copyright Registration No. TXu 1-570-162.  (Opp'n at 12.) KPI does not dispute that Exhibit B of Placebase's Motion to Dismiss is a certified copy of the official deposit for Registration No. TXu 1-570-162 from the Copyright Office.  KPI does not provide a different certified copy of the official deposit for Registration No. TXu 1-570-162. Nor does KPI provide an explanation as to why the certified copy of the deposit for Registration No. TXu 1-570-162 is only 42 pages.  KPI simply states that it "is a mystery."  (Opp'n at 13.)

KPI also admits that the code required to operate DataPlace consists of more than 50 pages of source code, and concedes that the certified copy of the deposit that Placebase attached to its motion is not "the code required to operate DataPlace."  (Opp'n at 13, Ex. 2.)  Thus, there is no dispute that, as a matter of law, Registration No. TXu 1-570-162 provides no basis for KPI's copyright claim as alleged in its complaint.  KPI's attempt to salvage its copyright claim by claiming that it is "investigating" why the "*true representation* of the work entitled DataPlace" provided by the Copyright Office is only 42 pages is futile.  Likewise, KPI's promise to "obtain a certified copy of the correct deposit and provide it to this Court immediately upon receipt" (Opp'n at 13) does not cure any defects of the official Copyright Office records.

Simply put, there is no dispute as a matter of fact or law that the "*true representation* of the work entitled DataPlace" under Registration No. TXu 1-570-162 is not "the code required

to operate DataPlace." (Compl. ¶ 26.)  As such, KPI's allegation of copyright infringement is missing the basic predicate – a copyright registration for the subject of the complaint.  KPI's complaint is as sustainable as a complaint for infringement of the copyright for "Fantasia," when the underlying registration is for "Gone With The Wind."  Because there is no dispute that Registration No. TXu 1-570-162 is not the registration for DataPlace, KPI's federal copyright claim must be dismissed as a matter of law for want of subject matter jurisdiction.

### 3. KPI cannot maintain a federal cause of action based on the 42 pages that comprise Registration No. TXu 1-570-162

KPI's argument that it has stated a valid claim for copyright infringement "[e]ven if KnowledgePlex's copyright registration were limited to the deposit attached to Placebase's motion" (Opp'n at 14) is misguided.[18]  KPI has not alleged or otherwise explained how an assertion of infringement of KPI's limited deposit is consistent with the allegations in the Complaint that its registration is "for the code required to operate DataPlace." (Compl. ¶ 26.) KPI fails to address Placebase's argument that an incomplete and inadequate deposit renders a copyright invalid, thereby conceding that its deposit is invalid.

To the extent that KPI is implying that the limited deposit is a derivative work of the "code required to operate DataPlace," this argument fails as a matter of law.  KPI did not register its deposit as a derivative work.  KPI cannot now change the nature of its registration at its convenience.  Troy Anderson certified on behalf of KPI that the statements it made in its

---

[18]     To the extent this argument has any merit, which it does not, KPI does not dispute Placebase's assertion that "[e]lements distinct to an unregistered work cannot draw protection from a registered work even though the latter may contain the seminal idea that inspired both works." *Johnson v. Gordon*, 409 F.3d 12, 20 (1st Cir. 2005) (holding that only those elements of an unregistered long version of a song that are derived directly from the registered short version of the song form the basis for a charge of infringement).  Accordingly, if KPI is allowed to proceed on this theory, KPI's claim must be limited only to the 42 registered pages.

copyright application are correct to the best of its knowledge.[19] (Opp'n Ex. 2(A) at 3 (Form TX).) KPI's copyright application did not identify any work from which its registration was derived. (Opp'n Ex. 2(A) at 3 (Form TX).) KPI cannot maintain a cause of action for the limited deposit consistent with its Complaint and the Form TX it submitted to the Copyright Office. Under either Rule 12(b)(1) or Rule 12(b)(6), KPI's copyright claim must be dismissed.[20]

### 4.    KPI's claim to common law copyright does not salvage its copyright claim

KPI admits that its only claim of copyright infringement in the Complaint is for Registration No. TXu 1-570-162 and admits it has made no claim "for infringement of any other copyright registration or any unregistered work." (Opp'n at 12-13.) KPI does not challenge Placebase's assertion pursuant to 17 U.S.C. § 411(a) that copyright registration is a prerequisite to filing suit for copyright infringement.

KPI makes a last-ditch attempt to salvage its copyright claim by asserting (Opp'n at 13) that it "owns a protectable copyright in the DataPlace code with or without a registration and those rights extend to the entire work." Thus, despite its earlier disclaimer that it does not claim "infringement of . . . any unregistered work," KPI apparently is claiming that its DataPlace code is an actionable copyright "without a registration." In other words, KPI is claiming a common law copyright. But there is no independent federal jurisdiction for a common law copyright action, and diversity jurisdiction is not available as all parties are in California. Since the federal

---

[19]    That certification clearly puts the certifying party on notice of 17 U.S.C. §506(e) whereby "[a]ny person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500."

[20]    The defects in KPI's copyright claim jeopardize the entire basis for federal jurisdiction. KPI's trade secret and contract claims are not based upon federal law, but are purely supplemental to the copyright claim. Both KPI and Placebase are corporations with their principal place of business in California, so there can be no diversity jurisdiction.

copyright registration is the sole basis for federal jurisdiction, with that removed the entire case must be dismissed.

### E.    KPI's Trade Secret Misappropriation Claims Should Be Dismissed For Failure To State A Claim Upon Which Relief Can Be Granted

KPI admits that a trade secret claim must allege the existence of a trade secret and improper use or disclosure of the trade secret by one under a duty not to disclose it. (Opp'n at 15.) As shown below, KPI has failed state a claim upon which relief can be granted.

#### 1.    KPI fails to allege a trade secret

KPI has not identified, let alone alleged the existence of, a trade secret. Placebase challenged KPI's claim, in part, on the basis that KPI did not allege a "trade secret" that satisfied the statutory definition of a trade secret, KPI's Opposition deliberately avoids addressing this statutory definition. Both KPI's Complaint and its Opposition are silent as to any "actual or potential independent economic value[] from [its trade secrets] not being generally known." The failure to identify or even allege a trade secret is fatal to KPI's claim.

#### 2.    The Contracts refute KPI's assertion of a confidentiality obligation

Contrary to KPI's allegations in its Opposition, its Complaint does not allege "that Knowledgeplex required contractors and subcontractors to comply with the obligations of confidentiality." (Opp'n at 16 (citing Compl. ¶¶ 11-15).) Rather KPI's complaint vaguely refers to an unidentified agreement that "required Vinq to treat the project as confidential" and that Vinq "acknowledged that the project was confidential." (Compl. ¶ 14.) KPI's Complaint does not allege any duty of confidentiality with regard to subcontractors, such as Placebase, but admits that it "freely shared ideas and information" with Placebase.[21] (Compl. ¶ 19.)

---

[21]    It is irrelevant to the trade secret inquiry how KPI acted with regard to the rest of the world. If KPI disclosed "trade secret" material to Placebase without imposing any duty of

Now, after Placebase identified the deficiencies of KPI's complaint, KPI's Opposition alleges that "it required strict confidentiality throughout the proposal and development process." (Opp'n at 2.) There simply is no basis for this assertion in the complaint. KPI has not, and cannot, allege that Vinq's proposal for DataPlace was confidential, because it was not.

KPI's reliance on the FMF-Vinq and Vinq-Placebase Contracts does not support its broad assertion of "strict confidentiality." (Opp'n Ex. 1 §§ 2, 13; Ex. 1(A) §§ 3(b), 7.) The FMF-Vinq Contract provides a limited definition of "Confidential Information" as "confidential or proprietary information of the [Disclosing] party" and explicitly exempts information that "was previously known to the Receiving Party without any obligation to keep it confidential" or "was independently developed by the Receiving Party." (Opp'n Ex. 1(A) § 7.) The Vinq-Placebase Contract provision provides a similar definition of "Confidential Information." (Opp'n Ex. 1 § 13.) The Complaint does not allege an obligation of "strict confidentiality" because no such obligation ever existed.

KPI broadly alleges its trade secrets comprise "the DataPlace software and the innovative solutions achieved during its development." (Opp'n at 15.) As KPI is only alleging Placebase had a duty of confidentiality with regard to "Confidential Information" as defined in the FMF-Vinq and Vinq-Placebase Contracts, KPI's trade secret must be limited, as a matter of law, to such "Confidential Information." But nowhere is that limited "confidential information" described, as required by California law. *Diodes, Inc. v. Franzen*, 67 Cal. Rptr. 19, 24 (Cal. Ct. App. 1968). Merely stating that KPI has confidential information is a "bare legal conclusion" that will not suffice to state a claim. *Id.*

---

confidentiality, KPI invalidated its own trade secret. *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1002 (1984) (holding disclosure of a trade secret to others who are under no obligation to protect the confidentiality of the information extinguishes the right); 1 R. Milgrim, Trade Secrets § 1.01[2] (1983).

### 3.    KPI fails to state a claim for common law trade secret misappropriation for which relief may be granted

KPI claims that its "claims of common law trade secret misappropriation do not conflict with the District of Columbia Uniform Trade Secret Act ["DCUTSA"] and are well-stated" (Opp'n at 17) contrary to citing to a case directly on point with the opposite holding. *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 83-84 (D.D.C. 2007). In *DSMC*, the Court granted summary judgment to defendant on plaintiff's common law claims "clearly predicated on misappropriation of trade secrets" because they were preempted by DCUTSA. *Id.* Here, where KPI's claims are, in fact, misappropriation of trade secret claims, the Court must find KPI's common law claims preempted by DCUTSA and dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

## V.    CONCLUSION

KPI's Complaint should be dismissed.

Dated:  March 17, 2008                    Respectfully submitted,


                                          /s/ Kenneth W. Brothers
                                          ─────────────────────────────
                                          Kenneth W. Brothers (D.C. Bar No. 441113)
                                          Dickstein Shapiro LLP
                                          1825 Eye Street, N.W.
                                          Washington, D.C.  20006
                                          (202) 420-2200

                                          *Attorney for Metonymy, Inc. d/b/a Placebase*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2008 a copy of Placebase's Reply to Knowledgeplex's Opposition to Placebase's Motion to Dismiss was served via electronic transmission on the following:

> Brian A. Coleman
> DRINKER BIDDLE & REATH LLP
> 1500 K Street, NW
> Suite 1100
> Washington, DC 20005-1209

Dated: March 17, 2008                          /s/ Kenneth W. Brothers
                                               Kenneth W. Brothers

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **KNOWLEDGEPLEX, INC.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** 1:07-CV-02315-RMU |
| | ) | |
| | ) | |
| | ) | |
| **METONYMY, INC.** | ) | |
| **D/B/A PLACEBASE** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>DECLARATION OF KENNETH W. BROTHERS IN SUPPORT OF
PLACEBASE'S REPLY TO KNOWLEDGEPLEX'S OPPOSITION TO
PLACEBASE'S MOTION TO DISMISS</u>**

Kenneth W. Brothers (D.C. Bar No. 441113)
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C.  20006
(202) 420-2200

*Attorney for Metonymy, Inc. d/b/a Placebase*

DSMDB-2410862

I, KENNETH W. BROTHERS, declare as follows:

1.     I am an attorney with Dickstein Shapiro LLP.  I am admitted to practice in the District of Columbia and practice in my firm's Washington, D.C. office.  I have personal knowledge of the facts stated herein, and, if called to testify, I would testify as stated herein.

2.     On February 1, 2008, I emailed Richard Young of Drinker Biddle & Reath LLP, counsel of record for Plaintiff KnowledgePlex, Inc., and requested a courtesy copy of any agreement(s) between Fannie Mae Foundation (FMF) and KnowledgePlex, Inc. (KPI) that establish KPI as a successor-in-interest to FMF.  Attached hereto as Exhibit 1 is a true and correct copy of my email to Richard Young.

3.     To date, I have not received a reply from Mr. Young to my email of February 1, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Signed at Washington, District of Columbia on March 17, 2008.


   /s/ Kenneth W. Brothers   
Kenneth W. Brothers

# Exhibit 1

**From:**   Brothers, Kenneth
**Sent:**   Friday, February 01, 2008 5:44 PM
**To:**    'Young, Richard'
**Subject:** FMF-KPI Agreement

Rick:

In our correspondence and in Paragraph 7 of the Complaint, you refer to Fannie Mae Foundation as a predecessor-in-interest KnowledgePlex. We have not seen a copy of the agreement(s) between Fannie Mae Foundation and KnowledgePlex that establish KnowledgePlex as a successor-in-interest to Fannie Mae Foundation. Would you kindly provide a courtesy copy of any such agreement(s)? This should assist us as we prepare our response to KPI's complaint.

Thanks, Ken


**Kenneth W. Brothers**
Partner, IP Litigation
Dickstein Shapiro LLP
1825 Eye Street NW | Washington, DC 20006
Tel (202) 420-4128 | Fax (202) 420-2201
brothersk@dicksteinshapiro.com